Keith Butler (CA Bar No. 215670)
kbutler@brsllp.com
Cindy Reichline (CA Bar No. 234947)
creichline@brsllp.com
Shira Liu (CA Bar No. 274158)
sliu@brsllp.com
Taylor Keating (CA Bar No. 342693)
tkeating@brsllp.com
Ryan Roth (CA Bar No. 341585)
rroth@brsllp.com
BRS LLP
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Tel: (310) 295-9524

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Allina Health System; | Case No.: |
| Atlantic Health System; | **COMPLAINT** |
| CentraCare Health System; | **DEMAND FOR JURY TRIAL** |
| Fairview Health Services; | |
| Mayo Clinic; | |
| RWJ Barnabas Health, Inc.; | |
| University of Florida Health Corporation; and | |
| The University of Chicago Medical Center | |
| *Plaintiffs*,<br>v. | |
| Blue Cross Blue Shield Association; | |
| Elevance Health, Inc. f/k/a Anthem, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company; | |

Blue Cross of California and Anthem Blue Cross Life and Health Insurance Company, collectively d/b/a Anthem Blue Cross;

Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield;

Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield;

Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. and AMGP Georgia Managed Care Company, Inc., collectively d/b/a Anthem Blue Cross and Blue Shield;

Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield;

Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield;

Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield and Associated Hospital Service;

HMO Missouri, Inc., RightCHOICE Managed Care, Inc., and Healthy Alliance Life Insurance Company, collectively d/b/a Anthem Blue Cross and Blue Shield;

Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield;

Anthem HealthChoice Assurance, Inc. f/k/a Empire HealthChoice Assurance, Inc. d/b/a Anthem Blue Cross and Anthem Blue Cross and Blue Shield;

Anthem HealthChoice HMO, Inc. f/k/a Empire HealthChoice HMO, Inc. d/b/a Anthem Blue Cross and Anthem Blue Cross and Blue Shield;

Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield;

Anthem Health Plans of Virginia, Inc. d/b/a
Anthem Blue Cross and Blue Shield;

Blue Cross Blue Shield of Wisconsin,
Wisconsin Collaborative Insurance Company,
and Compcare Health Services Corporation,
collectively d/b/a Anthem Blue Cross and
Blue Shield;

Health Care Service Corporation, a Mutual
Legal Reserve Company;

Blue Cross and Blue Shield of Illinois;

Blue Cross and Blue Shield of Montana;

Blue Cross and Blue Shield of New Mexico;

Blue Cross and Blue Shield of Oklahoma;

Blue Cross and Blue Shield of Texas;

Cambia Health Solutions, Inc. f/k/a The
Regence Group, Inc.;

Regence BlueShield of Idaho, Inc.;

Regence BlueCross BlueShield of Oregon;

Regence BlueCross BlueShield of Utah;

Regence BlueShield;

Highmark Health and Highmark Inc. d/b/a
Highmark Blue Cross Blue Shield and
Highmark Blue Shield and including
Highmark Inc. predecessor Hospital Service
Association of Northeastern Pennsylvania
f/d/b/a Blue Cross of Northeastern
Pennsylvania;

Highmark BCBSD, Inc. d/b/a Highmark Blue
Cross Blue Shield Delaware;

Highmark Western and Northeastern New
York Inc. f/k/a HealthNow New York, Inc.
d/b/a Highmark Blue Cross Blue Shield of

Western New York and Highmark Blue Shield of Northeastern New York;

Highmark West Virginia, Inc. f/k/a Mountain State Blue Cross Blue Shield d/b/a Highmark Blue Cross Blue Shield West Virginia;

CareFirst, Inc.; CareFirst BlueChoice, Inc.; CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield;

Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield;

Guidewell Mutual Holding Corporation;

Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue;

Triple-S Management Corporation and Triple-S Salud, Inc. d/b/a BlueCross BlueShield of Puerto Rico;

Wellmark, Inc.;

Wellmark Health Plan of Iowa, Inc. d/b/a Wellmark Blue Cross and Blue Shield;

Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield;

Blue Cross Blue Shield of Michigan Mutual Insurance Company;

Blue Cross and Blue Shield of Vermont;

Premera;

Premera Blue Cross d/b/a Premera Blue Cross of Washington and Premera Blue Cross Blue Shield of Alaska;

Blue Cross and Blue Shield of Alabama;

Prosano, Inc.;

Blue Cross Blue Shield of Arizona, Inc. d/b/a AZ Blue;

USAble Mutual Insurance Company d/b/a
Arkansas Blue Cross and Blue Shield;

California Physicians' Service d/b/a Blue
Shield of California;

Hawaii Medical Service Association d/b/a
Blue Cross and Blue Shield of Hawaii;

Gemstone Holdings, Inc.;

Blue Cross of Idaho Health Service, Inc. d/b/a
Blue Cross of Idaho;

Blue Cross and Blue Shield of Kansas, Inc.;

Blue Cross and Blue Shield of Kansas City;

Louisiana Health Service & Indemnity
Company d/b/a Blue Cross and Blue Shield of
Louisiana;

Blue Cross and Blue Shield of Massachusetts,
Inc.;

Blue Cross and Blue Shield of Massachusetts
HMO Blue, Inc.;

Aware Integrated, Inc.;

BCBSM, Inc. d/b/a Blue Cross and Blue
Shield of Minnesota and BlueCross
Minnesota;

Blue Cross & Blue Shield of Mississippi, A
Mutual Insurance Company;

Goodlife Partners, Inc.;

Blue Cross and Blue Shield of Nebraska;

Horizon Healthcare Services, Inc. d/b/a
Horizon Blue Cross and Blue Shield of New
Jersey;

Lifetime Healthcare, Inc.;

Excellus Health Plan, Inc. d/b/a Excellus
BlueCross BlueShield;

Blue Cross and Blue Shield of North Carolina;
HealthyDakota Mutual Holdings;

Blue Cross Blue Shield of North Dakota f/k/a
Noridian Mutual Insurance Company;

Capital Blue Cross;

Independence Health Group, Inc.;

Independence Hospital Indemnity Plan, Inc.
f/k/a/ Independence Blue Cross;

QCC Insurance Company;

Independence Assurance Company;

Blue Cross & Blue Shield of Rhode Island;

BlueCross BlueShield of South Carolina;

BlueCross BlueShield of Tennessee, Inc.; and

Blue Cross Blue Shield of Wyoming,

*Defendants*.

1
2

**<u>TABLE OF CONTENTS</u>**

I. INTRODUCTION .................................................................................. 1

II. OTHER LITIGATION AGAINST THE DEFENDANTS ....................... 6

 A. Multidistrict Litigation ...................................................................... 6

 B. California Litigation ............................................................................ 8

III. SUMMARY OF THE CASE ................................................................. 8

IV. THE PARTIES ...................................................................................... 18

 A. Plaintiffs ............................................................................................. 18

  1) Allina Health System ................................................................. 18

  2) Atlantic Health System ............................................................. 19

  3) CentraCare Health System ....................................................... 20

  4) Fairview Health Services .......................................................... 21

  5) Mayo Clinic ............................................................................... 22

  6) RWJ Barnabas Health, Inc. ...................................................... 23

  7) University of Florida Health Corporation ................................. 25

  8) The University of Chicago ........................................................ 25

 B. Defendants ......................................................................................... 26

  1) The Blues and Affiliated Blue Plans ......................................... 26

  2) The Association—BCBSA—is a Conspiracy by Design ........... 56

V. JURISDICTION AND VENUE .......................................................... 60

VI. HISTORY OF THE BLUES AND BCBSA ......................................... 62

 A. Development of the Blue Plans .......................................................... 62

 B. Creation of the Blue Cross and Blue Shield Association ................. 67

 C. Creation of Additional Entities by the Blues .................................... 70

VII. THE BLUES COLLECTIVELY USE BCBSA TO RESTRAIN HORIZONTAL COMPETITION FROM ONE ANOTHER ................................................... 72

 A. ESAs Were Implemented to Prevent Competition ........................... 72

  1) Defendants Jointly Implemented the ESAs ............................... 72

  2) Defendants Implemented the ESAs to Eliminate Competition ... 81

 B. The ESA Allocation Agreements Are Agreements Between the Blues Not to Compete for Provider Contracts ............................................................... 85

 C. The ESA Allocation Agreements Also Eliminate Competition Between the Blues for Subscribers ...................................................................................... 92

 D. The Blues Jointly Implemented Additional Constraints to Enforce Their Conspiracy ....................................................................................... 93

  1) The Blues Have Agreed to Impose Prohibitively High Termination Penalties as a Means to Further Enforce Adherence to the Conspiracy ....................... 94

**COMPLAINT**

2)   The Blues Jointly Control Entry into and Exit from BCBSA To Limit Membership Within the "Family" of Co-Conspirators ................................................................................ 95

3)   The Blues Have Agreed to Allow BCBSA to Monitor Compliance ............................. 98

**E.   The Blues Have Agreed, and Continue to Agree, to Per Se Illegal Best Efforts Rules Which Jointly Insulate Each Other from Non-Blue Competition .................................... 99**

1)   Defendants Have Agreed to Restrict Each Other's Non-Blue Revenue ..................... 100

2)   The Blues Have Agreed to Continue the National Best Efforts Rule ......................... 108

3)   In All Events, Competition is Still Limited as a Result of the National Best Efforts Rule ................................................................................................................................. 113

**VIII.   THE BLUES' HORIZONTAL AGREEMENTS, INCLUDING TO LIMIT NON-BLUE COMPETITION, ARE PER SE VIOLATIONS OF THE SHERMAN ACT ........ 114**

**IX.   EVEN UNDER A RULE OF REASON STANDARD, THE BLUES' CONDUCT VIOLATES FEDERAL AND STATE ANTITRUST LAW ............................................... 115**

**A.   Relevant Product Market ..................................................................................... 115**

**B.   Relevant Geographic Markets ............................................................................. 118**

**C.   The Blues Have Market Power in the Relevant Markets ................................... 120**

**D.   Defendants' Conduct is Anticompetitive ............................................................ 127**

**X.   DEFENDANTS HAVE INJURED COMPETITION THROUGHOUT THE UNITED STATES ................................................................................................................................. 130**

**A.   The Blues Would Compete if They Did Not Agree to Restrain Competition ........... 130**

1)   Blue-on-Blue Competition Has Occurred When Not Banned By Joint Agreement .... 132

2)   While Abiding by Their Horizontal Agreements, Blue Plans Have Demonstrated an Interest in Expanding Beyond Their ESAs ......................................................................... 138

3)   Barriers to Competition Between the Blues Would be Lower Than Novel Entry by a New Competitor If Not For the Anticompetitive Conduct .................................................. 143

4)   Defendants Entered into the Anticompetitive Agreements Due to the Strong Likelihood of Competition Without Such Agreements .......................................................................... 144

**B.   The Illegal Agreements Injure Providers, Including Plaintiffs ........................ 144**

**C.   The Illegal Agreements Enabled Substantial Financial Windfalls to Defendants and Their Executives ....................................................................................................... 148**

**D.   The Illegal Agreements Injure Consumers ......................................................... 151**

**XI.   INTERSTATE COMMERCE .............................................................................. 152**

**XII.   TOLLING OF THE STATUTE OF LIMITATIONS ........................................ 152**

**XIII.   CLAIMS FOR RELIEF ..................................................................................... 153**

**XIV.   RELIEF REQUESTED ....................................................................................... 162**

1

## <u>LIST OF FIGURES AND TABLES</u>

2

3

**Figure 1:** ESAs by Blue ................................................................................... 12

4

**Figure 2:** Blue ESAs in Kansas and Missouri ...................................................... 13

5

**Figure 3:** Blue ESAs, Virginia, Maryland, and Washington D.C. ........................ 40

6

**Figure 4:** Blue ESAs, New York State................................................................. 52

7

**Figure 5:** Blue ESAs, Pennsylvania ................................................................... 54

8

**Table 1:** Non-Blue Affiliates Offering Employer-Sponsored Commercial Health Benefit Products................................................................................................... 109

9

**Table 2:** Non-Blue Affiliates Offering Exchange Plans........................................ 109

10

**Table 3:** Non-Blue Affiliates Offering Medicare and/or Medicaid Plans ............ 140

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

The central evil addressed by Sherman Act § 1 is the elimination of competition that would otherwise exist.[1]

One CEO reported that 'Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans' and that without service areas, 'there would be open warfare.'[2]

Q.    Do you ever compete with another Blue plan?
A.    Very rarely. We've got rules against competing against one another. There'll be occasions where we're invited into an opportunity to share our capabilities, but there's a prohibition to ever compete and put our fees or rates in front of a customer and have another Blue plan do the same.[3]

1.    Plaintiffs Allina Health System, Atlantic Health System, CentraCare Health System, Fairview Health Services, Mayo Clinic, RWJ Barnabas Health, Inc., University of Florida Health Corporation, and The University of Chicago Medical Center (collectively, "Plaintiffs" or "Provider Plaintiffs"), by and through their attorneys, bring this Complaint against Defendant Blue Cross Blue Shield Association ("BCBSA" or "Association") and 32 Defendant "Blues" and affiliates[4] (collectively, "Defendants"), on personal knowledge as to each Plaintiff's own activities, on information and belief as to the activities of others, and on public information, including court orders and documents filed in *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406 (N.D. Ala., Case No. 2:13-cv-20000).

## I.    INTRODUCTION

2.    Plaintiffs bring this action under federal and state antitrust laws to address anticompetitive agreements between separate economic entities that should, but do not, act in the market independently of one another when contracting with and reimbursing healthcare

---

[1] *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (cleaned up).
[2] *In re Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d 1241, 1253 (N.D. Ala. 2018) (quoting record).
[3] *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, N.D. Ala., Case No. 2:13-cv-20000, Dkt. Nos. 1252-182 (Testimony of Jerry Kertesz, Vice-President of Sales at Elevance, Inc.).
[4] In this Complaint, "Blues" (sometimes "Primary Licensees" or "Member Plans") refers to entities that hold licenses from BCBSA. Hereinafter, "Blue Plans" refer to public-facing entities offering Blue-branded Commercial Health Benefit Products.

providers, selling certain health insurance services, and administering employee benefit plans. Defendants are parties to long-standing, explicit, and illegal agreements to eliminate competition in predesignated geographic areas.  Plaintiffs are healthcare providers who contracted with and were underpaid (under-reimbursed) by one or more Blues for the provision of healthcare services, equipment, supplies, facility use for medical or surgical procedures, and/or professional services. Many of Plaintiffs' patients are insured by a Blue Plan or are members of an employee health benefit plan administered by a Blue Plan.  Plaintiffs seek to recover damages and other relief arising from a continuing conspiracy between and among Defendants to allocate geographic markets and restrict output in healthcare markets across the United States in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 *et seq.*); Defendants also caused damages that are recoverable by Plaintiffs under Section 4 of the Clayton Act (15 U.S.C. § 15).[5]  Such damages include the difference between what Plaintiffs were paid for the provision of healthcare services and the higher amounts they would have been paid but for Defendants' illegal conduct described herein.

3.     The Blues provide health insurance coverage and related administrative services for employee benefit plans to roughly one-third of the people in the United States.  They have also developed and operate the most extensive provider networks in the United States.

4.     Despite being independent companies, Defendants entered into agreements with each other with the intention and effect of preventing them from acting independently of one another.  Defendants have acted in concert with one another to allocate state and regional markets between and among themselves, restrict their own output, and eliminate virtually all competition between and among themselves.

5.     The heart of Defendants' anticompetitive conspiracy is their illegal agreement to divide the United States into Exclusive Service Areas ("ESAs") in which, with few exceptions,

_____

[5] For purposes of this Complaint, Plaintiffs providing facilities and/or services pursuant to agreements containing arbitration agreements covering the claims or parties at issue in this litigation expressly only bring suit against those Defendants who are not parties to the arbitration provisions in the agreements covering such facilities or services.  *See* Paragraph 540, *infra*.

only one Blue Plan can sell health insurance, administer employee benefit plans, and contract with healthcare providers.

6.      To fortify this geographic restriction and further limit their competition with one another, Defendants have developed additional rules that place added restraints on their ability to compete, not only with each other, but with other companies offering health insurance and administrative services.  These related output-reducing agreements include agreements to adhere to a National Best Efforts Rule — a rule that precludes each Blue from obtaining more than 33% of its commercial health benefit revenue from the sale of services that do not carry a Blue Cross or Blue Shield brand or trademark.  Despite an April 2021 announcement that the National Best Efforts Rule had been eliminated, the National Best Efforts Rule continues in force and/or effect through the filing of this Complaint.

7.      Taken together, the intention and effect of the ESAs and the National Best Efforts Rule is to ban essentially all competition among the Blues for providers to join their networks and negotiate reimbursement rates, as well as to ban essentially all competition for subscribers. Defendants' horizontal market allocations, together with the additional output restrictions of the National Best Efforts Rule, are, and have been found in court to be, per se violations of the antitrust laws.  As such, Defendants' conduct is presumed to be illegal without further inquiry into the restraint's actual effects on the markets or the intentions of those individuals who engaged in the unlawful conduct.

8.      To be sure, Defendants' illegal conspiracy *has* had effects on markets, and market participants like Plaintiffs, who have been underpaid by the Blue Plans for the services they render to members of Blue Plans.  Each Blue Plan has exploited the illegal negotiating advantage it has obtained through the per se illegal market allocation and output-restriction conspiracy to obtain discounts from contracted providers for services rendered to members of Blue Plans.  That is, providers, including Plaintiffs, have been forced by the reduction in competition to accept contracts from the Blue Plans under which they are reimbursed for services rendered to members of Blue Plans at levels that are lower than they would be if they had not been prevented from negotiating and contracting with more than one Blue Plan.  This illegal behavior has also caused

Plaintiffs to have been underpaid by other payors for services rendered to members of other health plans. Because these discounts were achieved through illegal agreements that are per se violations of the antitrust laws, Defendants are not permitted to defend themselves by offering purported pro-competitive justifications for their conduct.

9.     Defendants, however, did even more to obtain and maintain their illegal discounts. They also caused harm to providers, including Plaintiffs, by entering into further Blue-wide agreements, which included, among others, the so-called "BlueCard" and "National Accounts" Programs.

10.     The BlueCard Program addresses situations in which a Member of one of the Blue Plans receives healthcare services within the ESA of another Blue Plan. Since 1995, all Defendants have agreed with each other to require all Blue Plans to participate in the BlueCard Program. Under the BlueCard Program, Blue Plans are required to make their (illegally obtained) local provider discounts available to all Blue Plans, even if their members live in another Blue Plan's ESA. Thus, all Blue Plans have agreed that when a contracted provider treats a Member covered by a Home Plan (*i.e.*, a Blue Plan outside the service area in which the provider is located, sometimes called a "Control Plan"), the Home Plan will reimburse the provider at a rate that equals the illegally discounted levels received for providers under the provider's contract with its Host Plan (*i.e.*, the Blue Plan local to the provider's service area, sometimes called a "Participating Plan"). The BlueCard Program, in other words, requires that each Blue Host Plan must pass on to any Blue Home Plan the illegally negotiated discounts received from providers, including Plaintiffs.

11.     Under the BlueCard Program, the Blue Plans pay billions of dollars each year to each other, much of it garnered at the expense of Plaintiffs and other providers. Many of the Blue Plans have large numbers of members outside of their ESAs. Rather than forming competing networks of providers in other ESAs, the Blue Plans pay each other kickbacks, called an "Access Fee," and thereby share the excess profits they achieve through the sub-competitive prices that the Blue Plans pay to providers.

12.     In numerous ways, the BlueCard Program is also highly inefficient.  It places significant administrative burdens and expenses on health care providers, like Plaintiffs, which impedes innovation and efficient arrangements for the delivery and administration of health care services.

13.     The National Accounts Program functions in a similar manner.  It generally applies to employee benefit plans with subscribers in multiple states.  The Defendant Blue Plan that administers the employee benefit plan is called within the Blue system "the Home Plan," and the other Blue Plans in whose Service Areas the subscribers receive healthcare goods and services are called "Host Plans."  Under the Blues' License Agreements and BCBSA rules, a Blue Plan may not bid on a national account headquartered outside its service area using the Blue Marks unless the Blue Plan in whose service area the national account is headquartered agrees to "cede" the right to bid.

14.     A consequence of the Blues' agreements to participate in the National Accounts program is that each Blue Plan (with few exceptions) will not negotiate directly with providers outside its service area.  As a result, a healthcare provider who renders services or supplies goods or facilities to a patient who is insured or administered by a Blue Plan in another service area receives significantly lower reimbursement than the healthcare provider would receive absent this illegal agreement.  In other words, the National Accounts Program (like the BlueCard Program) locks in the fixed, discounted reimbursement rates that each Defendant Blue achieves through market dominance in its service area and makes those sub-competitive rates available to all other Blues without the need for negotiation or contracting in the Home Plan's service area.  The excess profits from these programs are then divided among the Blues.

15.     Because competition among the Blues is illegally reduced, providers, like Plaintiffs, have fewer competitive options than they would otherwise have when negotiating contracts with the Blues and other insurers, which ultimately results in having to accept lower reimbursement rates.  As a result, they must accept illegally discounted rates when contracting with the Blues.

16. The BlueCard and National Accounts Programs have been established by horizontal agreement between and among the Blues. In addition, the Blues have jointly entered into additional agreements that ensure that the anticompetitive ESA allocation agreements are effective at stifling competition.

17. The Blues have agreed to discipline one another to maintain compliance with their anticompetitive ESA allocation agreements, which would not be profitable for any of them to pursue individually. This discipline includes astronomical termination penalties, with very high fees for any Blue exiting the conspiracy, and trademark uncoupling rules that prevent a Blue from offering a Blue Plan that uses a trade name with the Blue Marks and then uses the same trade name to sell another health care service product without the Blue Marks. The Blues have also agreed to strict entry requirements to keep the control of the Blue Marks to entities already within the conspiracy "family." These requirements have been very successful—no "stranger" to the conspiracy family has taken control of a Blue Plan since the entry requirements were adopted in 1996. The Blues also adopted a Local Best Efforts Rule, which requires that 80% of the commercial health benefit revenue received by each Blue from within an allocated territory come from services that carry a Blue Cross and/or Blue Shield mark. The Blues also agreed to allow each other to monitor each other's confidential business information to ensure that each member of the conspiracy complies with the anticompetitive agreements.

18. Defendants' anticompetitive conduct has resulted in Plaintiffs being wrongfully and significantly under-reimbursed by Blue Plans and/or their affiliates from at least January 2008 through the present.

## II.  OTHER LITIGATION AGAINST THE DEFENDANTS

19. Provider Plaintiffs are not the first to sue these Defendants over their anticompetitive conduct. The litigation that has preceded Provider Plaintiffs' case has established important facts and legal conclusions that further support this separate action.

### A.  Multidistrict Litigation

20. On February 7, 2012 and July 24, 2012, respectively, putative classes of Blue Cross and/or Blue Shield subscribers and providers filed suit (hereinafter the "Class Action

Complaints"). Both classes alleged, *inter alia*, that Defendants violated Section 1 of the Sherman Act by engaging in a horizontal conspiracy to allocate geographic markets. Both actions were consolidated into a multidistrict litigation ("MDL") in the Northern District of Alabama (the "MDL Court") on January 8, 2013.

21.    Both putative classes moved for partial summary judgment as to the applicable standard of review. In 2018, the MDL Court held that Defendants' horizontal market allocations, together with the additional output restrictions of the National Best Efforts Rule, constituted per se violations of the antitrust laws.[6] In 2022, the MDL Court evaluated Defendants' argument that the earlier 2018 per se ruling did not apply to claims brought by providers because the National Best Efforts Rule "was a Subscriber-facing rule that has nothing to do with Provider claims."[7] The MDL Court called this argument "wrong," explaining in part that "restricting the development of non-Blue insurance options for Subscribers could also have the effect of reducing the options available to providers to contract with non-Blue health insurers."[8] The MDL Court therefore held that a per se standard of review would likewise apply to providers' allegations "involving the aggregation of ESAs and the [National Best Efforts Rule]."[9]

22.    In late 2020, with pretrial (including summary judgment) proceedings nearly complete, the putative subscriber class and the Defendants entered into a settlement agreement. The settlement was approved on August 9, 2022, with amended approval on September 7, 2022.

23.    With a remand order from the MDL Court on the horizon, on October 14, 2024, the putative provider class and the Defendants announced a settlement agreement. The settlement was preliminarily approved on December 4, 2024. All Plaintiffs in this case timely opted out of the proposed class settlement.

---

[6] *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1273 (N.D. Ala. 2018) (hereinafter "MDL Standard of Review Order").
[7] *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2022 WL 3221887, at *6 (N.D. Ala. Aug. 9, 2022) (hereinafter "MDL Provider Standard of Review Order"), *aff'd sub nom. In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070 (11th Cir. 2023).
[8] *Id.*
[9] *Id.*

### B.    California Litigation

24.    On July 27, 2021, Plaintiffs VHS Liquidating Trust, Prime Healthcare Services, Inc., and Prime Healthcare Foundation, Inc. (collectively, the "VHS Plaintiffs"), owners of multiple hospital systems across the U.S., brought suit in California state court against BCBSA and various Blues, including Elevance, Inc. and California Physicians' Service d/b/a Blue Shield of California ("BS-CA").[10]  A Second Amended Complaint was later filed on December 13, 2022 which included 16 counts against BCBSA and the Blues, asserting, among other violations, per se horizontal market allocation, per se group boycott and per se horizontal price fixing under California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et seq.*) for conduct occurring since at least 2008.[11]

25.    Defendants did not file a demurrer to the per se horizontal market allocation claim. Defendants, including Elevance, Inc. and BS-CA, filed a demurrer to various other claims brought by VHS Plaintiffs, including their per se group boycott and per se horizontal price fixing claims.  The court overruled the demurrer.[12]  As to the per se group boycott claim, the court held that the VHS Plaintiffs' allegations of a per se illegal boycott were legally sufficient."[13]  As to the per se horizontal price fixing claim, the court held that concerted activity that tampers with a market factor can constitute per se price fixing under the Cartwright Act.[14]

## III.    <u>SUMMARY OF THE CASE</u>

26.    This is an action to enforce the antitrust laws against the Blues and their affiliates along with BCBSA, which the Blues jointly control.  Plaintiffs serve patients that are Members of

---

[10] *See VHS Liquidating Trust v. Blue Cross of California*, Case No. RG21106600 (Cal. Super. Ct. (Alameda Cnty), July 27, 2021).

[11] *See* Second Amended Complaint for Violations of the Cartwright Act, Unfair Competition, and Other State Antitrust Laws, *VHS Liquidating Trust v. Blue Cross of California*, No. RG21106600 (Cal. Super. Ct. (Alameda County), Dec. 13, 2022).

[12] Order 1) Overruling Demurrer to Second Amended Complaint and 2) Denying Motion to Strike, *VHS Liquidating Trust v. Blue Cross of California*, No. RG21106600 (Cal. Super. Ct. (Alameda County), June 1, 2023).

[13] *Id*. at 7.

[14] *Id*. at 9.

Commercial Health Benefit Products[15] offered by a Blue Plan. Each Plaintiff has contracted with its local Blue Plan (or multiple Blue Plans, for Plaintiffs that offer services in multiple ESAs).

27.     As of 2023, there were more than 115 million Members of Blue Plans—a substantial portion of the insured population in the United States. Five of the ten largest and eleven of the twenty-five largest health insurance companies in the country are Blues. In 2015, 15 of the Blues were within the top 25 health insurers in the United States as measured by total membership.[16]

28.     The Blues have developed and operate the most extensive provider networks in the United States. In 2018, 96% of hospitals and 92% of physicians were in-network with a Blue

---

[15] "Commercial Health Benefit Product(s)" means any product or plan providing for the payment or administration of healthcare services (including but not limited to medical and pharmacy products and services) or expenses through insurance, reimbursement, or other similar healthcare financing mechanism, for Members in the U.S. (however funded, including insured or self-funded) other than a product or plan purchased or offered by a government entity, including but not limited to those offered under the Children with Special Health Care Needs Program (CSHCN); Children's Health Insurance Program (CHIP); Civilian Health and Medical Program of the Department of Veteran's Affairs (CHAMPVA); Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); Indian Health Service, Tribal, and Urban Indian Health Plan; Medicaid; Medicare; Medicare Advantage; Medicare Stand-Alone Prescription Drug Plans; Refugee Medical Assistance Program; State Maternal and Child Health Program (MCH); or TriCare. Commercial health benefit products include employer-sponsored health plans and plans sold on ACA exchanges ("Exchange Plans").

"Commercial Health Insurance" means any Commercial Health Benefit Product which (1) an insurer, carrier, or health plan underwrites, issues, insures, or reinsures (*e.g.*, through a stop-loss policy) to cover healthcare costs and/or utilization risk, or (2) is filed with the applicable state regulator as, or is considered by the applicable state regulator to be, an insured product.

"Commercial Health Insurance Company" means any company that contracts with providers and offers for sale Commercial Health Benefit Products to subscribers.

"Self-Funded Health Benefit Plan" means any Commercial Health Benefit Product other than Commercial Health Insurance, including administrative services only ("ASO") contracts or accounts, administrative services contracts or accounts ("ASC"), and jointly administered administrative services contracts or accounts ("JAA").

"Member" means any individual enrolled in or covered by a Commercial Health Benefit Product regardless what term or title is used to refer to the individual in documents that pertain to the Commercial Health Benefit Product, including employees, their spouses and dependents, beneficiaries, and ERISA participants.
[16] MDL Standard of Review Order at 1256-57.

Plan.[17]  In 2016, Blue Plans had the largest provider networks in 32 states and D.C., and, in seven more states, Blue Plans had the second largest provider networks.

29.     Each of the Blues has a license from BCBSA to develop provider networks and administer health insurance carrying the Blue Cross and/or Blue Shield trademarks ("Blue Marks") by offering a Blue Plan carrying Blue Marks in one or more ESAs.  Under these licenses, the Blues may use Blue Marks to provide Commercial Health Insurance and/or Self-Funded Health Benefit plans for Commercial Health Benefit Products, and Medicare, Medicaid, and the Children's Health Insurance Program.

30.     Each Blue is a separate economic actor pursuing separate economic interests.  The MDL Court previously recognized that "the Blue Plans are 36 independent companies,"[18] each of which sells health insurance services; each Blue is "autonomous in its operations" and a "financially independent entit[y]" with its own profits and losses; and Defendants are not "partners or joint ventures."[19]

31.     Nine Blues offer Blue Plans in multiple ESAs.  Many of these Blues have affiliated entities, some of which offer Commercial Health Benefit Products and/or government program plans.  Some of the Commercial Health Benefit Products offered by affiliates do not use

---

[17] MDL Standard of Review Order at 1257.

[18] MDL Standard of Review Order at 1250.  Plaintiffs have sought to identify and include all Blues in this Complaint.  Since the MDL Court's 2018 Order, a number of Blues have consolidated, leaving 32 Blues by Plaintiffs' count.  This count is consistent with the number of Blues reflected in the October 2024 putative provider class settlement agreement (also 32 Blues).  However, BCBSA's most recent IRS Form 990 (filed Nov. 14, 2024) states there are now 34 Blues, and BCBSA's website currently lists 33 Blues.  Consolidations include at least the following:

- In March 2021, Highmark, Inc. acquired HealthNow New York Inc., which was operating as both Blue Cross Blue Shield of Western New York and Blue Shield of Northeastern New York.
- On January 31, 2022, GuideWell Mutual Holding Corporation, the parent company of Blue Cross and Blue Shield of Florida, Inc., acquired Triple-S Management Corporation d/b/a BlueCross BlueShield of Puerto Rico.
- On October 9, 2023, Blue Cross and Blue Shield of Vermont was acquired by Blue Cross Blue Shield of Michigan Mutual Insurance Company.

In 2023, Elevance announced its intention to acquire Louisiana Health Service & Indemnity Company ("BCBS-LA").  The merger was abandoned after inquiries by state regulators.  If that acquisition had not been blocked, there would be 31 Blues.

[19] MDL Standard of Review Order at 1250.

Blue Marks and are not Blue Plans.[20]  The remaining twenty-three Blues offer Blue Plans in only one ESA.  Many of these single-ESA Blues have few or no affiliates.[21]

32.  BCBSA openly provides on its website which state each Blue Plan operates in, although it has historically considered the detailed contours of ESAs that do not precisely align with state borders to be a trade secret.  Certain BCBSA "Map Books" delineating these ESAs have become public as part of the MDL Litigation.  The majority of the Blue Plans' ESAs are exclusive and do not overlap with other Blue Plans' ESAs.[22]  **Figure 1** illustrates the Blues that operate in each state, along with the areas in each state that have more than one Blue:[23]

---

[20] For example, Defendant Cambia Health Solutions, Inc. ("Cambia") is a Blue that operates licenses from BCBSA in four ESAs: 1) Oregon (and Clark County, Washington); 2) Utah; 3) most counties in Washington (none of which overlap with the Idaho and Oregon ESAs); and (4) Idaho (and the Washington counties of Asotin and Garfield).  Cambia wholly owns a subsidiary in each of three of these ESAs, and each of these subsidiaries offers that ESA's Blue Plan: 1) Regence BlueCross BlueShield of Oregon ("BCBS-OR"); 2) Regence BlueCross BlueShield of Utah ("BCBS-UT"); and 3) Regence BlueShield ("BS-WA").  Cambia also manages and controls Regence BlueShield of Idaho, Inc. ("BS-ID") through a management agreement.  In addition, affiliates of Cambia Health Solutions, Inc., including Asuris Northwest Health, BridgeSpan Health Company, and Healthcare Management Administrators, Inc., offer Commercial Health Benefit Products and/or government program plans without Blue Marks.

[21] For example, Defendant Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA") is licensed only in Massachusetts and its only affiliate is Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc.

[22] MDL Standard of Review Order at 1252.

[23] Appendix A to this Complaint also lists the Blues (and associated Blue Plans) offering Commercial Health Benefit Products by state.

**Figure 1: ESAs by Blue**



33.     For many states in which multiple Blue Plans operate, the ESAs of these Blue Plans do not overlap.  In other words, even if more than one Blue Plan is licensed to operate in a state, that does not mean that there is competition within that state.  One such example is reflected in **Figure 2:**

**Figure 2: Blue ESAs in Kansas and Missouri**



34.     Both Defendant Blue Cross and Blue Shield of Kansas City ("BCBS-KC") and Defendant Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS") are licensed to operate in Kansas.  In Missouri, BCBS-KC is licensed and Elevance is also licensed to operate as "BCBS-MO."[24]  However, in Kansas or Missouri no provider of health services, and no buyer of Commercial Health Benefit Products, benefits from competition among Blue Plans because there is no overlap between the ESAs of BCBS-KS, BCBS-KC and/or Elevance (BCBS-MO).[25]

---

[24] "BCBS-MO" is defined to include Defendants HMO Missouri, Inc., RightCHOICE Managed Care, Inc., and Healthy Alliance Life Insurance Company, collectively d/b/a Anthem Blue Cross and Blue Shield (of Missouri), all of which are wholly-owned subsidiaries of Elevance Health.
[25] As shown in **Figure 2**, BCBS-KC is licensed in an ESA which includes counties in and surrounding Kansas City, including 30 Missouri counties and two Kansas counties.  BCBS-KS is licensed in an ESA which includes all of Kansas other than the two Kansas counties licensed to BCBS-KC, and BCBS-MO is licensed in an ESA which includes all of Missouri other than the 30 Missouri counties licensed to BCBS-KC.

35.     As independent companies, each Blue is an actual or potential competitor of every other Blue.  The Blues are major Commercial Health Insurance Companies.  Defendant Elevance Health, Inc. is the second-largest health insurance company in the country and the largest licensee within BCBSA with approximately 47 million enrollees and Blue Cross and/or Blue Shield licenses in fourteen different states.  Defendant Health Care Service Corporation ("HCSC"), operates Blue Plans in five states, including Texas and Illinois, and is the sixth-largest health insurance company in the country with more than 23 million enrollees.  The top three national insurers—United, Aetna, and Cigna—which offer healthcare financing plans and/or health insurance and related services *in all fifty states*, had a *combined* share of 38%.   Given their size, the Blues are the major source of potential competition in health insurance, benefits administration, and provider contracting in the United States.

36.     While they do maintain independence and separate economic interests, the Blues have a basic rule throughout their agreements: ***We will not compete***.  The heart of Defendants' anticompetitive conspiracy is their illegal agreement—implemented by and through BCBSA, which is also jointly controlled by the Blues—to reduce competition among the Blues, by allocating the United States into ESAs in which, with few exceptions, only one Blue Plan can contract with healthcare providers and offer Commercial Health Benefit Products.

37.     The Blues use the anticompetitive ESA allocation to avoid competition when contracting with healthcare providers.  In 1995, the Defendants collectively agreed that each Blue Plan would contract only with providers within its specifically designated ESA, with a few limited exceptions.  Thus, although Provider Plaintiffs treat patients who are Members of many different Blue Plans, they are nonetheless forced to contract only with the Blue Plans based in the ESAs in which they provide services.  For example, Plaintiff Mayo Clinic treats patients at its Arizona facilities and, given the proximity to California, a not insignificant number of patients annually are Blue Cross of California Members.  However, due to the Defendants' unlawful restraints, Blue Cross of California is prohibited from contracting with providers, including Mayo Clinic, in the state of Arizona, even though Blue Cross of California has a significant number of enrollees that are treated in the state.

38.     Instead, when Provider Plaintiffs provide services to Members of Blue Plans based in other ESAs, they must seek reimbursement under the BlueCard Program.  Under the BlueCard Program, each Blue has agreed with all other Blues not to compete with a "Host Plan" (the Blue Plan that is allocated the provider's ESA).  The Host Plan has agreed to share with any Blue "Home Plan" (the Blue Plan that is allocated the Member's ESA) the illegally negotiated discounts received from providers, including Plaintiffs.  The BlueCard Program uses the ESAs to prevent the Blues from competing with one another to contract with providers.  Providers, including Plaintiffs, have been forced by the absence of competition to accept contracts from Blues under which they are reimbursed for services rendered to Blue Plan patients at levels that are lower than they would be had their contract negotiations with the Blue Plan been open to competition from other Blues, including the Home Plan.

39.     Under the BlueCard Program, the Blues pay billions of dollars each year to each other, much of it garnered at the expense of Plaintiffs and other providers.  Rather than forming competing networks of providers in other service areas, the Blues pay the Home Plan a kickback, called an Access Fee, and thereby share the excess profits they achieve through the sub-competitive prices that the Blues pay to providers.

40.     The BlueCard Program is also highly inefficient.  It places significant administrative burden and expense on health care providers, including Plaintiffs, by having dozens of different sets of coverage and payment rules that the providers must learn and comply with, often without access to the rules of the Blue Plans with which they are not contracted.  The Blues often make it impossible to offer innovative, efficient arrangements for the delivery and administration of health care services.

41.     The Blues likewise use the anticompetitive ESA allocation to avoid competition in the offering of Commercial Health Benefit Products.  No Blue Plan offers Commercial Health Insurance outside of its ESA.  Self-Funded Health Benefit Plans are typically national employee benefit plans, otherwise known as national accounts.[26]  One, and only one, Blue Plan may bid to

---

[26] BCBSA defines national accounts as "[c]lient companies with employees and/or retirees in more than one Plan's service area."

offer a Self-Funded Health Benefit Plan.  In other words, in this area and many others, the Blues agree that they will not compete.  In 2023, the Blues' share of the national accounts market was estimated at 42%.  The Defendants divide the proceeds derived from this anticompetitive scheme either through the BlueCard Program or through separate agreements.

42.     The Blues have agreed with one another that each Blue Plan will refrain from using the Blue Marks to bid on any account headquartered outside its ESA unless the Blue Plan in whose ESA the account is headquartered agrees to "cede" the right to bid.[27]  Blue Plans have requested cedes from each other; some of these requests have been granted and some have been denied.  On occasion, one Blue Plan will pay another to cede a bid.  The anticompetitive ESA allocation account program locks in the fixed, discounted reimbursement rates that each Blue Plan achieves through market dominance in its ESA and makes those sub-competitive rates available to all other Blue Plans without the need for negotiation or contracting in the Home Plan's ESA.  The excess profits from these programs are then divided among the Blues.

43.     The Blues also jointly agreed, in violation of Section 1 of the Sherman Act, directly or through BCBSA, to place additional restraints that operate to fortify these ESAs and ensure that they are binding on one another.  These agreements include acquisition rules that limit the circumstances under which an adverse party could acquire a Blue Plan, as well as severe termination penalties to prevent "cheating" on the anticompetitive scheme by competing.  These agreements also include "best efforts" rules, which limit a Blue Plan's ability to offer Commercial Health Benefit Products under a brand that does not use the licensed trademarks (hereinafter "Non-Blue Affiliate").

44.     Through BCBSA, the Blues jointly agreed to adhere to a "National Best Efforts Rule," which precludes each Blue from obtaining more than 33% of its revenue from the sale of services that do not carry a Blue Cross or Blue Shield brand or trademark.  The MDL Court held that the National Best Efforts Rule "operates as an output restriction on a Plan's non–Blue brand

---

[27] In the limited instances of overlapping ESAs, both Blue Plans may bid for the business of a national account.

business," and that the National Best Efforts Rule, when combined with Defendants' horizontal market allocations, constitutes a per se violation of the antitrust laws.[28]

45.    In April 2021, in connection with the subscriber class settlement, the Blues agreed to eliminate a subsection of BCBSA's jointly-agreed-upon "Guidelines to Administer Membership Standards Applicable to Regular Members," which delineates revenue amounts that would subject a Blue to mediation or arbitration under the National Best Efforts rule. Notwithstanding the formal removal of this portion from the Guidelines, the Blues continue to agree to and enforce restrictions on the Non-Blue Affiliate business outside of each Blues' ESA(s).  That is, Defendants persist in their per se illegal practices.[29]

46.    Significantly, in addition, the Blues also jointly agreed, through BCBSA, to a "Local Best Efforts Rule," which requires that 80% of the revenue received by a Blue from within its ESA must come from the sale of services using a Blue Cross and/or Blue Shield mark.  There is no indication in Defendants' 2021 class settlement with subscriber plaintiffs, or elsewhere, that there has been any change to this open and obvious output restriction, which similarly limits the ability of each Blue to generate revenue from non-Blue branded business, and which thereby limits the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

47.    Defendants' anticompetitive conduct has caused, and continues to cause, significant harm to Plaintiffs, other healthcare providers, consumers, and the healthcare industry as a whole.  But for the illegal agreements to allocate geographic markets and restrict output, the Blues could and would compete with each other to contract with providers and thereby provide services to Members.

48.    Because competition between Blues has been illegally reduced, providers, like Plaintiffs, have fewer competitive options than they would otherwise have when negotiating contracts with Blue Plans and other insurers, which ultimately results in significantly lower

---

[28] MDL Standard of Review Order at 1272-73.
[29] Notably, even if the National Best Efforts rule were truly eliminated in practice as well as in form (it was not), the rule's anticompetitive effects continue to limit output and prevent meaningful competition from the sale of services by Blue affiliates that do not carry a Blue Mark.

reimbursement rates.  Defendants' actions also create substantial inefficiencies in the provision of medical services and impede the Blue Plans from developing innovative and collaborative agreements with providers.

49.    Defendants' agreements have further harmed competition by increasing the prices and decreasing the options available to healthcare consumers.  The only beneficiaries of Defendants' antitrust violations are Defendants themselves.

50.    Plaintiffs seek to recover damages and other relief arising from a continuing conspiracy between and among Defendants to allocate geographic markets, restrict output, and boycott and price fix markets across the United States in violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 15) and California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).  Such damages include the difference between what Plaintiffs were paid by the Blues and their affiliates for the provision of healthcare services and the higher competitive amounts they would have been paid but for Defendants' illegal conduct described herein.  Plaintiffs also seek injunctive relief to prevent Defendants from continuing to harm competition through their antitrust violations.

## IV.    THE PARTIES

### A.    Plaintiffs[30]

#### 1)    Allina Health System

51.    Plaintiff Allina Health System ("Allina") is a Minnesota non-profit corporation with its principal place of business in Minneapolis, Minnesota.  For purposes of this Complaint, Allina includes Allina Health System, and the subsidiaries, affiliates, affiliated or employed providers, and entities over which Allina has ownership or control or which, through assignment, have provided Allina with the right to pursue claims in this litigation, all of which are included in Appendix B.  Allina operates multiple hospitals, rehabilitation institutes, physical therapy facilities, ambulatory surgery centers, urgent care clinics, emergency medical services, pharmacies, and other health care facilities across Minnesota and Western Wisconsin.  During the

---

[30] Certain Plaintiffs bring claims on behalf of entities they acquired who may have held preexisting contracts with Defendants during the relevant time period.

relevant time period: (i) Allina provided facilities and services, including professional services by professionals employed by and/or affiliated with Allina, to enrollees of Aware Integrated, Inc. and BCBSM, Inc. (collectively, "BCBS-MN"), pursuant to its in-network contract(s) with BCBS-MN, and billed BCBS-MN; and (ii) from its Wisconsin facilities, Allina provided facilities and services, including professional services by professionals employed by and/or affiliated with Allina, to enrollees of Blue Cross Blue Shield of Wisconsin, Wisconsin Collaborative Insurance Company, and Compcare Health Services Corporation (collectively, "BCBS-WI"), pursuant to its in-network contract(s) with BCBS-WI, and billed BCBS-WI.

52. Allina has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services. Through the BlueCard Program, Allina has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

53. Allina was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result. As set forth herein, Allina has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

### 2) Atlantic Health System

54. Plaintiff Atlantic Health System ("Atlantic") is a New Jersey non-profit corporation with its principal place of business in Morristown, New Jersey. For purposes of this Complaint, Atlantic includes Atlantic Health System, and the subsidiaries, affiliates, and entities over which Atlantic has ownership or control or which, through assignment, have provided Atlantic with the right to pursue claims in this litigation, all of which are included in Appendix C. Atlantic operates multiple hospitals and other health care facilities across New Jersey. During the relevant time period: (i) Atlantic provided facilities and services to enrollees of Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey ("BCBS-NJ"), pursuant to its in-network contract(s) with BCBS-NJ, and billed BCBS-NJ; (ii) Atlantic provided facilities and services to enrollees of Anthem HealthChoice Assurance, Inc. and Anthem HealthChoice HMO, Inc. (collectively, "BCBS-NYC-Albany"), pursuant to its in-network

contract(s) with BCBS-NYC-Albany, and billed BCBS-NYC-Albany; (iii) Atlantic provided facilities and services to enrollees of AmeriHealth, Inc., pursuant to its in-network contract(s) with AmeriHealth, and billed AmeriHealth; (iv) Atlantic provided facilities and services to enrollees of Highmark Inc. d/b/a Highmark Blue Cross Blue Shield ("Highmark"), pursuant to its in-network Medicare-only contract(s) with Highmark, and billed Highmark; and (v) Atlantic provided facilities and services to enrollees of Independence Health Group, Inc., Independence Hospital Indemnity Plan, Inc. f/k/a/ Independence Blue Cross (IBX), QCC Insurance Company, and Independence Assurance Company (collectively, "Independence"), pursuant to its in-network contract(s) with Independence, and billed Independence.

55. Atlantic has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services. Through the BlueCard Program, Atlantic has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

56. Atlantic was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result. As set forth herein, Atlantic has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

### 3) CentraCare Health System

57. Plaintiff CentraCare Health System ("CentraCare") is a Minnesota non-profit corporation with its principal place of business in St. Cloud, Minnesota. For purposes of this Complaint, CentraCare includes CentraCare Health System, and the subsidiaries, affiliates, affiliated or employed providers, and entities over which CentraCare has ownership or control or which, through assignment, have provided CentraCare with the right to pursue claims in this litigation, all of which are included in Appendix D. CentraCare operates multiple hospitals, rehabilitation centers, ambulatory surgery centers, and other clinics and healthcare centers across Minnesota. During the relevant time period, CentraCare provided facilities and services, including professional services by professionals employed by and/or affiliated with CentraCare,

to enrollees of BCBS-MN, pursuant to its in-network contract(s) with BCBS-MN, and billed BCBS-MN.

58.     CentraCare has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services.  Through the BlueCard Program, CentraCare has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

59.     CentraCare was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result.  As set forth herein, CentraCare has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

### 4)     Fairview Health Services

60.     Plaintiff Fairview Health Services ("Fairview") is a Minnesota non-profit corporation with its principal place of business in Minneapolis, Minnesota.  For purposes of this Complaint, Fairview includes Fairview Health Services, and the subsidiaries, affiliates, affiliated or employed providers, and entities over which Fairview has ownership or control or which, through assignment, have provided Fairview with the right to pursue claims in this litigation, all of which are included in Appendix E.  Fairview operates multiple hospitals, rehabilitation centers, physical therapy facilities, diagnostic laboratories, ambulatory surgery centers, urgent care clinics, emergency medical services, long-term acute care facilities, pharmacies, and other clinics and healthcare centers across Minnesota and Western Wisconsin.  During the relevant time period: (i) Fairview provided facilities and services, including professional services by professionals employed by and/or affiliated with Fairview, to enrollees of BCBS-MN, pursuant to its in-network contract(s) with BCBS-MN, and billed BCBS-MN; and (ii) from its Wisconsin facilities, Fairview provided facilities and services, including professional services by professionals employed by and/or affiliated with Fairview, to enrollees of BCBS-WI, pursuant to its in-network contract(s) with BCBS-WI, and billed BCBS-WI.

61.     Fairview has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services.  Through the BlueCard

Program, Fairview has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

62.     Fairview was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result. As set forth herein, Fairview has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

### 5)    Mayo Clinic

63.     Plaintiff Mayo Clinic ("Mayo Clinic") is a Minnesota non-profit corporation with its principal place of business in Rochester, Minnesota.  For purposes of this Complaint, Mayo Clinic includes Mayo Clinic, and the subsidiaries, affiliates, affiliated or employed providers, and entities over which Mayo Clinic has ownership or control or which, through assignment, have provided Mayo Clinic with the right to pursue claims in this litigation, all of which are included in Appendix F.  Mayo Clinic is a nationally recognized healthcare system with academic and research hospitals and healthcare centers in Minnesota, Florida, Arizona, Wisconsin, and Iowa. From these locations, Mayo Clinic and its affiliates operate multiple hospitals, rehab facilities, End-Stage Renal Disease (ESRD) treatment centers, hospice facilities, clinics, skilled nursing facilities, laboratory service facilities, ambulance transports, internal medicine facilities, pharmacies, and other healthcare facilities.

64.     During the relevant time period: (i) from its Minnesota facilities, Mayo Clinic provided facilities and services, including professional services by professionals employed by and/or affiliated with Mayo Clinic, to enrollees of BCBS-MN pursuant to its in-network contract(s) with BCBS-MN, and billed BCBS-MN; (ii) from its Florida facilities, Mayo Clinic provided facilities and services, including professional services by professionals employed by and/or affiliated with Mayo Clinic, to enrollees of Blue Cross Blue Shield of Florida, Inc. ("BCBS-FL"), pursuant to its in-network contract(s) with BCBS-FL, and billed BCBS-FL; (iii) from its Arizona facilities, Mayo Clinic provided facilities and services, including professional services by professionals employed by and/or affiliated with Mayo Clinic, to enrollees of Blue Cross Blue Shield of Arizona, Inc. ("BCBS-AZ"), pursuant to its in-network contract(s) with

BCBS-AZ, and billed BCBS-AZ; (iv) from its Wisconsin facilities, Mayo Clinic provided facilities and services, including professional services by professionals employed by and/or affiliated with Mayo Clinic, to enrollees of BCBS-WI, pursuant to its in-network contract(s) with BCBS-WI, and billed BCBS-WI; and (v) from its Iowa facilities, Mayo Clinic provided facilities and services, including professional services by professionals employed by and/or affiliated with Mayo Clinic, to enrollees of Wellmark Health Plan of Iowa, Inc. ("BCBS-IA"), pursuant to its in-network contract(s) with BCBS-IA, and billed BCBS-IA.

65.    Mayo Clinic has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services.  Through the BlueCard Program, Mayo Clinic has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

66.    Mayo Clinic was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result.  As set forth herein, Mayo Clinic has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

### 6)    RWJ Barnabas Health, Inc.

67.    Plaintiff RWJ Barnabas Health, Inc. ("RWJ Barnabas") is a New Jersey non-profit corporation with its principal place of business in West Orange, New Jersey.  For purposes of this Complaint, RWJ Barnabas includes RWJ Barnabas Health, Inc., and the subsidiaries, affiliates, affiliated or employed providers, and entities over which RWJ Barnabas has ownership or control or which, through assignment, have provided RWJ Barnabas with the right to pursue claims in this litigation, all of which are included in Appendix G.  RWJ Barnabas operates multiple hospitals, physical therapy facilities, ambulatory surgery centers, imaging centers, and other health care facilities across New Jersey.  RWJ Barnabas also operates multiple physical therapy facilities across Pennsylvania and New York, and an orthopedic center in New York.  During the relevant time period: (i) RWJ Barnabas provided facilities and services, including professional services by professionals employed by and/or affiliated with RWJ Barnabas, to enrollees of Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey

("BCBS-NJ"), pursuant to its in-network contract(s) with BCBS-NJ, and billed BCBS-NJ; (ii) RWJ Barnabas provided facilities and services, including professional services by professionals employed by and/or affiliated with RWJ Barnabas, to enrollees of Anthem HealthChoice Assurance, Inc. and Anthem HealthChoice HMO, Inc. (collectively, "BCBS-NYC-Albany"), pursuant to its in-network contract(s) with BCBS-NYC-Albany, and billed BCBS-NYC-Albany; (iii) RWJ Barnabas provided facilities and services, including professional services by professionals employed by and/or affiliated with RWJ Barnabas, to enrollees of Independence Health Group, Inc., Independence Hospital Indemnity Plan, Inc. f/k/a/ Independence Blue Cross (IBX), QCC Insurance Company, and Independence Assurance Company (collectively, "Independence"), pursuant to its in-network contract(s) with Independence, and billed Independence; (iv) RWJ Barnabas provided facilities and services, including professional services by professionals employed by and/or affiliated with RWJ Barnabas, to enrollees of AmeriHealth, Inc., pursuant to its in-network contract(s) with AmeriHealth, and billed AmeriHealth; and (v) RWJ Barnabas provided services, including professional services by professionals employed by and/or affiliated with RWJ Barnabas, to enrollees of Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. and AMGP Georgia Managed Care Company, Inc., collectively d/b/a Anthem Blue Cross and Blue Shield (of Georgia) (and collectively "BCBS-GA"), pursuant to its in-network contract(s) with BCBS-GA, and billed BCBS-GA.

68.    RWJ Barnabas has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services.  Through the BlueCard Program, RWJ Barnabas has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

69.    RWJ Barnabas was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result.  As set forth herein, RWJ Barnabas has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

1

       **7)**    **University of Florida Health Corporation**

2          70.    Plaintiff University of Florida Health Corporation ("UF Health") is a non-profit

3 organization with its principal place of business in Gainesville, Florida.  For purposes of this

4 Complaint, UF Health includes University of Florida Health Corporation, and the subsidiaries,

5 affiliates, affiliated or employed providers, and entities over which UF Health has ownership or

6 control or which, through assignment, have provided UF Health with the right to pursue claims in

7 this litigation, all of which are included in Appendix H.  It is a nationally recognized healthcare

8 system with academic and research hospitals throughout the state of Florida.  UF Health operates

9 multiple hospitals, rehab centers, surgical centers, emergency centers, urgent care centers,

10 oncology centers, imaging facilities, neuromedicine centers, radiology facilities, and other health

11 care facilities throughout Florida.  During the relevant time period, UF Health provided facilities

12 and services, including professional services by professionals employed by and/or affiliated with

13 UF Health, to enrollees of BCBS-FL, pursuant to its in-network contract(s) with BCBS-FL, and

14 billed BCBS-FL.

15          71.    UF Health has also provided facilities and services to Blue Plan Members through

16 national programs and has billed for those facilities and services.  Through the BlueCard

17 Program, UF Health has also provided facilities and covered services, to Members of other Blue

18 Plans throughout the United States and billed for those facilities and covered services.

19          72.    UF Health was paid less for these facilities and services than it would have been

20 but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a

21 result thereof.  As set forth herein, UF Health has been injured in its business or property as a

22 result of Defendants' violations of the antitrust laws.

23        **8)**    **The University of Chicago Medical Center**

24          73.    Plaintiff The University of Chicago Medical Center ("UCMC") is a non-profit

25 academic medical health system with its principal place of business in Chicago, Illinois.  For

26 purposes of this Complaint, UCMC includes The University of Chicago Medical Center, and the

27 subsidiaries (including Ingalls Memorial Hospital), affiliates (including The University of

28 Chicago), affiliated or employed providers, and entities over which UCMC has ownership or

control or which, through assignment, have provided UCMC with the right to pursue claims in this litigation, all of which are included in Appendix I. UCMC operates hospitals and other health care facilities throughout Illinois and in Indiana. During the relevant time period: (i) UCMC provided facilities and services, including professional services by professionals employed by and/or affiliated with UCMC, to enrollees of Blue Cross and Blue Shield of Illinois, a division of Health Care Service Corporation, a Mutual Legal Reserve Company ("BCBS-IL"), pursuant to its in-network contract(s) with BCBS-IL, and billed BCBS-IL; and (ii) from its Indiana facilities, UCMC provided facilities and services, including professional services by professionals employed by and/or affiliated with UCMC, to enrollees of Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield (of Indiana) ("BCBS-IN"), pursuant to its in-network contract(s) with BCBS-IN, and billed BCBS-IN.

74.     UCMC has also provided facilities and services to Blue Plan Members through national programs and has billed for those facilities and services. Through the BlueCard Program, UCMC has also provided facilities and covered services to Members of other Blue Plans throughout the United States and billed for those facilities and covered services.

75.     UCMC was paid less for these facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. As set forth herein, UCMC has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**B.     Defendants**

      **1)     The Blues and Affiliated Blue Plans**

76.     The Blues are independent entities. The Blues do not have common shareholders or ownership. Each has its own sales, revenue, and costs and makes its own profits and losses, which only benefits its individual shareholders or stakeholders. No Blue has or had any franchise agreement with any other Blue or the BCBSA.

77.     The Blues have taken steps to ensure they are not referred to as a single entity. Indeed, Defendants have admitted publicly that their own License Agreements, implemented and

administered through BCBSA, expressly provide that nothing "shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

78.    Internal communications and memoranda also confirm BCBSA's position that the Blues should not be considered a single entity for legal or operational purposes.  For example, in April 1993, Roger G. Wilson, Senior Vice President, General Counsel, and Corporate Secretary of BCBSA, sent a memorandum explaining that regulations adopted by BCBSA's Board of Directors prohibit any "public communications" that "refer to the Blue Cross and Blue Shield system as a single entity unless the materials also adequately disclose that it is composed of independent Plans" or "refer to the Blue Cross or Blue Shield organization or system without a specific indication that it is composed of independent plans."

79.    In addition, an untitled document dated January 14, 2008, produced by Arkansas Blue Cross and Blue Shield in the course of litigation, discusses: "Our Advantages" and "Our Disadvantages."  In connection with a "[d]isadvantage" in its effort to win business from Wal-Mart, the Defendant Blue stated: "We aren't really a single entity to contract with and [Wal-Mart] knows this."

80.    Similarly, in 2012, BCBSA prepared a presentation to a "CEO Workgroup" called "Consumer Market: Strategic Brand and Marketing Plan."  Among the slides in this presentation was one titled: "But the single entity model is not a good analogy for the Blue system."

81.    Likewise, in 2016, the U.S. Department of Justice brought claims against Elevance, Inc. (then called Anthem, Inc.) in federal court to block the merger of Elevance and Cigna, then the country's two largest health insurers.  In a pre-trial brief, Elevance, Inc. sought to defend its attempted merger by asserting:

> [T]he various Blues *are not a single firm*; notwithstanding their participation in the BCBSA, *they are separate firms* that at times *compete with one another* and that at all times separately *seek to maximize their own profits*.

82.    Not surprisingly, on summary judgment, the MDL Court held that a trier of fact "could determine that Defendants remain 'separately controlled, potential competitors with economic interests that are distinct from the Association's financial well-being.'"[31]

### a)    Multi-ESA Blues

83.    Nine Blues have licenses from BCBSA to operate Blue Plans in multiple Exclusive Service Areas ("ESAs").  The following subsections identify each of these multi-ESA Blues and their Blue Plans and affiliates in which they operate, as well as the location of the various ESAs.

### i.    The Elevance Defendants

84.    Defendant Elevance Health, Inc. f/k/a Anthem, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company is a publicly-traded corporation and the largest licensee within BCBSA.  Its corporate headquarters are located at 220 Virginia Avenue, Indianapolis, IN 46204.  Elevance Health and its subsidiaries and affiliates, including its health insurance companies, are collectively referred to as "Elevance" throughout the Complaint.  By and through its subsidiaries and affiliates, Elevance holds licenses from BCBSA to operate ESAs in *fourteen* states, including: California, Connecticut, Colorado, Nevada, Georgia, Indiana, Kentucky, Maine, Missouri, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

85.    <u>California</u>: Defendants Blue Cross of California and Anthem Blue Cross Life and Health Insurance Company, collectively d/b/a Anthem Blue Cross (and collectively "BC-CA") are California corporations with their headquarters located at 21215 Burbank Boulevard, Woodland Hills, CA 91367.  BC-CA contracts with providers and sells Commercial Health Insurance and administer Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in California and are wholly-owned subsidiaries of California Services, Inc., Anthem Holding Corp., and Elevance Health, Inc.[32]

86.    <u>Connecticut</u>: Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross of Connecticut ("BCBS-CT") is a Connecticut corporation with its headquarters located at 108

---

[31] MDL Standard of Review Order at 1265 (cleaned up).
[32] Defendant Blue Cross of California's license in California is not exclusive.  Defendant California Physicians' Service is licensed by BCBSA to use the Blue Shield marks throughout California.

Leigus Road, Wallingford, CT 06492.  It contracts with providers and sells Commercial Health

Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health

plans carrying the Blue Marks in Connecticut and is a wholly-owned subsidiary of Elevance

Health.

87.     <u>Colorado and Nevada</u>: Defendant Rocky Mountain Hospital and Medical Service,

Inc. d/b/a Anthem Blue Cross Blue Shield (of Colorado) ("BCBS-CO") and d/b/a Anthem Blue

Cross and Blue Shield (of Nevada) ("BCBS-NV"), is a Colorado corporation with its

headquarters located at 700 Broadway, Suite 600, Denver, CO 80203.  It contracts with providers

and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to

enrollees through various health plans carrying the Blue Marks in Colorado and Nevada and is a

wholly-owned subsidiary of ATH Holding Company, LLC and Elevance Health.

88.     <u>Georgia</u>: Defendant Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. and

AMGP Georgia Managed Care Company, Inc., collectively d/b/a Anthem Blue Cross and Blue

Shield (of Georgia) (and collectively "BCBS-GA") are Georgia corporations with their

headquarters located at 3350 Peachtree Street, Northeast, Atlanta, GA 30308.  They contract with

providers and sell Commercial Health Insurance and administer Self-Funded Health Benefit Plans

to enrollees through various health plans carrying the Blue Marks in Georgia and are wholly-

owned subsidiaries of Cerulean Companies, Inc., Anthem Holding Corp., and Elevance Health.[33]

89.     <u>Indiana</u>: Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross

and Blue Shield (of Indiana) ("BCBS-IN") is an Indiana corporation with its headquarters located

at 220 Virginia Avenue, Indianapolis, IN 46204.  It contracts with providers and sells Commercial

Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various

health plans carrying the Blue Marks in Indiana and is a wholly-owned subsidiary of Elevance

Health.

90.     <u>Kentucky:</u> Defendant Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue

Cross and Blue Shield (of Kentucky) ("BCBS-KY") is a Kentucky corporation with its

---

[33] BCBS-GA's license in Georgia is not exclusive as Defendant BlueCross BlueShield of
Tennessee, Inc. is also licensed to operate in the Georgia counties of Catoosa, Dade, and Walker.

headquarters located at 13550 Triton Park Boulevard, Louisville, KY 40223.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Kentucky and is a wholly-owned subsidiary of ATH Holding Company, LLC and Elevance Health.

91.     Maine: Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield (of Maine) and Associated Hospital Service ("BCBC-ME") is a Maine corporation with its headquarters located at 2 Gannett Drive, South Portland, ME 04016.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Maine and is a wholly-owned subsidiary of ATH Holding Company, LLC and Elevance Health.

92.     Missouri: Defendants HMO Missouri, Inc., RightCHOICE Managed Care, Inc., and Healthy Alliance Life Insurance Company, collectively d/b/a Anthem Blue Cross and Blue Shield (of Missouri) (and collectively "BCBS-MO") are Missouri corporations with headquarters located at 1831 Chestnut Street, St. Louis, MO 63103.  They contract with providers and sell Commercial Health Insurance and administer Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the State of Missouri (excluding 30 counties which are in Missouri but part of the Kansas City area).[34]  They are all wholly-owned subsidiaries of Anthem Holding Corp., and Elevance Health.

93.     New Hampshire: Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield (of New Hampshire) ("BCBS-NH") is a New Hampshire corporation with its headquarters located at 1155 Elm Street, Suite 200, Manchester, NH 03101. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in New Hampshire and is a wholly-owned subsidiary of ATH Holding Company, LLC and Elevance Health.

---

[34] Defendant Blue Cross Blue Shield of Kansas City exclusively operates in these 30 counties. See **Figure 2**, *supra*, Section III, and Section IV.B.1.b.viii, *infra*.

94.     New York: Defendant Anthem HealthChoice Assurance, Inc. f/k/a Empire HealthChoice Assurance, Inc. d/b/a Anthem Blue Cross and Anthem Blue Cross and Blue Shield (of New York) and d/b/a Empire BlueCross BlueShield is a New York corporation with its headquarters located at 9 Pine Street, 14th Floor, New York, NY 10005.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in New York, including the counties of Albany, Bronx, Clinton, Columbia, Delaware, Dutchess, Essex, Fulton, Greene, Kings (Brooklyn), Montgomery, Nassau, New York (Manhattan), Orange, Putnam, Queens, Rensselaer, Richmond (Staten Island), Rockland, Saratoga, Schenectady, Schoharie, Suffolk, Sullivan, Ulster, Warren, Washington, and Westchester.[35]  It is a wholly-owned subsidiary of WellPoint Holding, Corp. and Elevance Health.

95.     Defendant Anthem HealthChoice HMO, Inc. f/k/a Empire HealthChoice HMO, Inc. d/b/a Anthem Blue Cross and Anthem Blue Cross and Blue Shield (of New York) is a New York corporation with its headquarters located at 1 Penn, 35th Floor, New York, NY 10119.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the same New York counties as Anthem HealthChoice Assurance, Inc. and is a wholly-owned subsidiary of Elevance Health.  Defendant Anthem HealthChoice Assurance, Inc. and Defendant Anthem HealthChoice HMO, Inc. are collectively referred to as "BCBS-NYC-Albany" throughout the Complaint.

96.     Ohio: Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield (of Ohio) ("BCBS-OH") is an Ohio corporation with its headquarters located at 4400

---

[35] Defendants Highmark Western and Northeastern New York, Inc. (together "BCBS-WNE-NY") and Excellus Health Plan, Inc. ("Excellus") are also licensed by BCBSA to use the Blue Marks in limited counties within New York.  No other Blue Plans are licensed to compete in New York. Within the ESA of Anthem HealthChoice Assurance, Inc. and Defendant Anthem HealthChoice HMO, Inc. (collectively, "BCBS-NYC-Albany"), Highmark is licensed to use the Blue Marks in the counties of Albany, Clinton, Columbia, Essex, Fulton, Greene, Montgomery, Rensselaer, Saratoga, Schenectady, Schoharie, Warren, and Washington.  Within BCBS-NYC-Albany's ESA, Excellus is licensed to use the Blue Marks in the counties of Clinton, Delaware, Essex, Fulton, and Montgomery.  See **Figure 4**, Section IV.B.1.b.xv, *infra*.

Easton Commons Way, Suite 125, Columbus, OH 43219. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Ohio[36] and is a wholly-owned subsidiary of ATH Holding Company, LLC, and Elevance Health.

97. <u>Virginia:</u> Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield (of Virginia) ("BCBS-VA") is a Virginia corporation with its headquarters located at 2015 Staples Mill Road, Richmond, VA, 23230. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks throughout Virginia, except the cities of Alexandria and Fairfax, the town of Vienna, Arlington Country, and the areas of Fairfax and Prince William Counties east of Virginia State Route 123.[37] It is a wholly-owned subsidiary of Elevance Health.

98. <u>Wisconsin:</u> Defendants Blue Cross Blue Shield of Wisconsin, Wisconsin Collaborative Insurance Company, and Compcare Health Services Corporation, collectively d/b/a Anthem Blue Cross and Blue Shield (of Wisconsin) (and collectively "BCBS-WI") are Wisconsin corporations with their headquarters located at N17 W24340 Riverwood Drive, Waukesha, WI 53188. They contract with providers and sell Commercial Health Insurance and administer Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Wisconsin and are wholly-owned subsidiaries of Crossroads Acquisition Corp., Anthem Holding Corp., and Elevance Health.

99. In addition to the above, Elevance has dozens of subsidiaries and affiliates that offer a variety of services. However, Elevance's only non-Blue branded subsidiaries that contract with providers and sell employer-sponsored Commercial Health Benefit Products are (i) HealthLink, Inc. and its affiliates, and (ii) IEC Group, Inc. d/b/a Ameriben. HealthLink, Inc. and

---

[36] BCBS-OH shared its license to operate in Washington County with Highmark West Virginia, Inc. until Highmark West Virginia, Inc. relinquished its license in the county, effective October 22, 2024.

[37] Defendant CareFirst BlueCross BlueShield is assigned the Blue Marks in the remaining portion of Virginia as well as the District of Columbia and Maryland. *See* **Figure 3**, Section IV.B.1.a.v, *infra*, for a map of the Blue ESAs in Virginia, the District of Columbia, and Maryland.

its affiliates offer Self-Funded Health Benefit Plans in Missouri, most of Illinois, and Kansas counties in and near Kansas City (Allen, Atchison, Bourbon, Brown, Doniphan, Douglas, Franklin, Jackson, Jefferson, Johnson, Leavenworth, Linn, Miami, Nemaha, Pottawatomie, Shawnee, Wabaunsee, and Wyandotte). Ameriben offers Self-Funded Health Benefit Plans in Arizona, Utah, Colorado, and Oregon.

100.    Wellpoint, a Non-Blue Affiliate of Elevance, offers Exchange Plans in Florida, Texas, and Maryland. Five Non-Blue Affiliates of Elevance also offer Medicare and/or Medicaid plans: Wellpoint offers Medicare plans in Arizona, Medicaid plans in Maryland and West Virginia, and both Medicare and Medicaid plans in Iowa, New Jersey, Tennessee, Texas, and Washington; Amerigroup offers Medicare plans in New Mexico and Medicaid plans in the District of Columbia and Georgia; Colorado Community Health Alliance offers Medicaid plans in Colorado; Simply Healthcare Plans, Inc offers Medicare and Medicaid plans in Florida; and HealthSun Health Plans, Inc. offers Medicare plans in Florida.

101.    Elevance's board members are compensated bountifully. Its CEO Gail Boudreaux earned a base salary of $1.6 million dollars in 2023, just a small fraction of her total earnings. In total, after nearly $12 million in stock awards, $4 million in stock options, and $4.5 million in other compensation, Elevance's CEO earned nearly $22 million dollars in fiscal year 2023. Morningstar, a company that provides insights on publicly traded companies, reports that Elevance has paid its President and CEO Gail Boudreaux more than $95 million in total compensation (an average of more than $19 million annually) between 2019 and 2023. Every other Elevance executive earned at least $6.4 million in 2023. In 2017, when Elevance's then-CEO led the company through the ill-fated merger effort with Cigna that carried a breakup fee of at least $1.85 billion, Elevance's Board awarded him with a salary increase of $3 million.

### ii.    The HCSC Defendants

102.    Defendant Health Care Service Corporation, a Mutual Legal Reserve Company is an Illinois corporation with its headquarters located at 300 East Randolph Street, Chicago, IL 60601. Health Service Corporation and its subsidiaries and affiliates, including its health insurance companies, are collectively referred to as "HCSC" throughout the Complaint. HCSC

holds licenses from BCBSA to operate ESAs in five states, including: Illinois, Montana, New Mexico, Oklahoma, and Texas.

103. <u>Illinois</u>: Defendant Blue Cross and Blue Shield of Illinois ("BCBS-IL") is a division of HCSC with its headquarters located at 300 East Randolph Street, Chicago, IL 60601. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Illinois.

104. <u>Montana:</u> Defendant Blue Cross and Blue Shield of Montana ("BCBS-MT") is a division of HCSC with its headquarters located at 3645 Alice Street, Helena, MT 59601. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Montana. For the purposes of this Complaint, "BCBS-MT" includes both Blue Cross and Blue Shield of Montana and its predecessor Caring for Montanans, Inc.

105. <u>New Mexico:</u> Defendant Blue Cross and Blue Shield of New Mexico ("BCBS-NM") is a division of HCSC with its headquarters located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in New Mexico.

106. <u>Oklahoma:</u> Defendant Blue Cross and Blue Shield of Oklahoma ("BCBS-OK") is a division of HCSC with its headquarters located at 1400 South Boston Avenue, Tulsa, OK 74119. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Oklahoma.

107. <u>Texas:</u> Defendant Blue Cross and Blue Shield of Texas ("BCBS-TX") is a division of HCSC with its headquarters located at 1001 East Lookout Drive, Richardson, TX 75082. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Texas.

108. In March 2025, HCSC acquired Cigna's Medicare business. At the time of the purchase agreement, Cigna offered Medicare plans across more than thirty states, including in

Alabama, Arkansas, Arizona, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Illinois, Kansas, Kentucky, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington.

109.    HCSC posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011, and 2012.  This figure does not account for its Self-Funded Account business.  In 2011, CEO Patricia Hemingway Hall received total compensation of $12.9 million.  Each of HCSC's ten highest-paid executives got at least $1.2 million more in 2012 than they did in 2011.  Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million in 2012.  Further, in 2021, CEO Maurice Smith was compensated over $11.1 million.

### iii.    The Cambia Defendants

110.    Defendant Cambia Health Solutions, Inc. f/k/a The Regence Group, Inc. is an Oregon corporation with its headquarters located at 200 SW Market Street, Portland, OR 97201.  Cambia Health Solutions, Inc. and its subsidiaries and affiliates, including its health insurance companies, are collectively referred to as "Cambia" throughout the Complaint.  By and through its subsidiaries and affiliates, Cambia holds licenses from BCBSA to operate ESAs in four locations: Idaho, Oregon, Utah, and most counties in Washington.

111.    Idaho: Regence BlueShield of Idaho, Inc. ("BS-ID") is an Idaho corporation with its headquarters located at 1602 21st Avenue, Lewiston, ID 83501.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Idaho and in the Washington counties of Asotin and Garfield.  It is a managed by Cambia under a management and services agreement.

112.    Oregon: Regence BlueCross BlueShield of Oregon ("BCBS-OR") is an Oregon corporation with its headquarters located at 200 SW Market Street, Portland, OR 97207.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded

Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Oregon and in Clark County, Washington. It is a wholly-owned subsidiary of Cambia.

113.    Utah: Regence BlueCross BlueShield of Utah ("BCBS-UT") is a Utah corporation with its headquarters located at 2890 East Cottonwood Parkway, Cottonwood Heights, UT 84121. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Utah and is a wholly-owned subsidiary of Cambia.

114.    Washington: Regence BlueShield ("BS-WA") is a Washington corporation with its headquarters located at 1800 9th Avenue, Seattle, WA 98101. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the following counties in Washington: Clallam, Columbia, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Klickitat, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Walla Walla, Whatcom, and Yakima.[38] It is a wholly-owned subsidiary of Cambia.

115.    Non-Blue Affiliates of Cambia include the following companies that contract with providers and administer Self-Funded Health Benefit Plans to enrollees without Blue Marks: (i) Asuris Northwest Health, which offers coverage in Eastern Washington, and (ii) BridgeSpan Health Company, which offers coverage in Oregon, Utah, and Washington. It also owns (iii) Healthcare Management Administrators, Inc., a non-Blue company which contracts with providers and administers Self-Funded Health Benefit Plans to enrollees in Washington, Oregon, Idaho, and Utah. Asuris Northwest Health also offers Exchange Plans in Oregon, Utah, and Washington. BridgeSpan Health Company offers Medicare and Exchange Plans in Washington.

116.    In 2021, Cambia CEO Jared Short received total compensation of $4,154,549.

---

[38] Defendants Regence BlueShield of Idaho, Inc.'s and Regence Blue Shield's licenses are not exclusive as Defendant Premera Blue Cross is also licensed by BCBSA to operate in Washington State. Premera is licensed in every county in Washington state other than Clark County, which is exclusively licensed to BCBS-OR, a subsidiary of Cambia.

1                       **iv.**       **The Highmark Defendants**

2      117.    Defendants Highmark Health and Highmark Inc. d/b/a Highmark Blue Cross Blue

3 Shield and Highmark Blue Shield, including Highmark Inc.'s predecessor Hospital Service

4 Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania are

5 Pennsylvania corporations with their headquarters located at 120 Fifth Avenue, Pittsburgh, PA

6 15222. Defendant Highmark, Inc. is a wholly-owned subsidiary of Highmark Health. Highmark

7 Health and its subsidiaries and affiliates, including its health insurance companies, are

8 collectively referred to as "Highmark" throughout the Complaint. By and through its subsidiaries

9 and affiliates, Highmark holds licenses from BCBSA to operate ESAs in four states: Delaware,

10 New York, Pennsylvania, and West Virginia.

11      118.    <u>Pennsylvania:</u> Highmark, operating as Highmark Blue Cross Blue Shield, contracts

12 with providers and sells Commercial Health Insurance and administers Self-Funded Health

13 Benefit Plans to enrollees through various health plans carrying the Blue Marks in the Western

14 Pennsylvania counties of Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria,

15 Cameron, Centre (certain parts), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene,

16 Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren,

17 Washington, and Westmoreland, and in the Northeastern Pennsylvania counties of Bradford,

18 Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga,

19 Wayne, and Wyoming.

20      119.    Highmark, operating as Highmark Blue Shield, contracts with providers and sells

21 Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees

22 through various health plans in the Central Pennsylvania counties of Adams, Berks, Centre,

23 Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin,

24 Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York. In January

25 2024, Highmark began operating in the Southeastern Pennsylvania (Philadelphia area) counties of

26 Bucks, Chester, Delaware, Montgomery, and Philadelphia.[39]

---

27 [39] Highmark, operating as Highmark Blue Shield, has a license in the entire state of Pennsylvania.
28 It is not the exclusive licensee of the Blue Marks in the Central Pennsylvania Counties, where

120.   Delaware: Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("BCBS-DE") is a Delaware corporation with its headquarters located at 800 Delaware Avenue, Wilmington, DE 19801.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Delaware and is a controlled affiliate of Highmark, Inc.

121.   New York: Defendant Highmark Western and Northeastern New York Inc. f/k/a HealthNow New York, Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and Highmark Blue Shield of Northeastern New York (together "BCBS-WNE-NY") is a New York corporation with its headquarters located at 1 Seneca Street, Suite 3400, Buffalo, NY 14243.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks as (i) Blue Cross Blue Shield of Western New York in eight counties in western New York, including Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming and (ii) Highmark Blue Shield of Northeastern New York in thirteen counties in northeastern New York, including Albany, Clinton, Columbia, Essex, Fulton, Greene, Montgomery, Rensselaer, Saratoga, Schenectady, Schoharie, Warren, and Washington.[40]  It is a controlled affiliate of Highmark, Inc. In 2020, HealthNow New York, Inc. CEO David W. Anderson received total compensation of $2,820,820.

122.   West Virginia: Defendant Highmark West Virginia, Inc. f/k/a Mountain State Blue Cross Blue Shield d/b/a Highmark Blue Cross Blue Shield West Virginia ("BCBS-WV") is a West Virginia corporation with its headquarters located at 614 Market Street, Parkersburg, WV 26101. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in West Virginia and is a controlled affiliate of Highmark, Inc.

---

Defendant Capital Blue Cross also is licensed by BCBSA to use the Blue Marks.  It is also not the exclusive licensee in the Southeastern Pennsylvania counties, where Defendants Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc. are also licensed by BCBSA to use the Blue Marks.  See **Figure 5**, Section IV.B.1.b.xix, *infra*, for a map of the Blues' ESAs in Pennsylvania.

[40] See **Figure 4**, Section IV.B.1.b.xv, *infra*.

123.    Highmark does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

124.    In 2022, Highmark Health CEO David Holmberg received total compensation of $9,476,858.  In 2021, he received total compensation of $8,644,727.  In 2020, he received total compensation of $7,823,567.

### v.    The CareFirst Defendants

125.    Defendant CareFirst, Inc. is a Maryland corporation with its headquarters located at 1501 South Clinton Street, Baltimore, MD 21224.  CareFirst, Inc. and its subsidiaries and affiliates, including its health insurance companies are collectively referred to as "CareFirst" throughout the Complaint.  By and through its subsidiaries and affiliates, CareFirst holds licenses from BCBSA to operate ESAs in the District of Columbia, Maryland, and certain parts of Virginia.

126.    Defendant CareFirst BlueChoice, Inc. is a District of Columbia corporation with its headquarters located at 840 First Street Northeast, Washington, DC 20065.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the District of Columbia, Maryland, and Virginia.  CareFirst BlueChoice, Inc is a wholly-owned subsidiary of CareFirst, Inc, CareFirst of Maryland, Inc., Group Hospitalization and Medical Service, Inc., CareFirst Holdings, LLC, and CareFirst Consolidated, Inc.

127.    Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located at 1501 South Clinton Street, Baltimore, MD 21224.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Maryland and is a wholly-owned subsidiary of CareFirst, Inc.  Defendants CareFirst, Inc., CareFirst BlueChoice, Inc., and CareFirst of Maryland, Inc. are collectively referred to as "BCBS-MD" throughout the Complaint.

128.    Defendant Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield is a District of Columbia corporation with its headquarters located at 840

First Street Northeast, Washington, DC 20065.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the District of Columbia, Maryland, and certain areas in Virginia, including the cities of Alexandria and Fairfax, the town of Vienna, Arlington Country, and the areas of Fairfax and Prince William Counties east of Virginia State Route 123.  It is a wholly-owned subsidiary of CareFirst, Inc.  Defendants CareFirst, Inc., CareFirst BlueChoice, Inc., and Group Hospitalization and Medical Services, Inc. are collectively referred to as "BCBS-DC" throughout the Complaint.

129.    **Figure 3** provides an illustration of the Blue ESAs in the District of Columbia, Maryland, and Viginia.

**Figure 3: Blue ESAs, Virginia, Maryland, and Washington D.C.**



130.    CareFirst does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

131.    In 2021, CareFirst CEO Brian David Pieninck received total compensation of $3,942,670.

### vi.    The Guidewell Defendants

132.    Defendant Guidewell Mutual Holding Corporation is a Florida corporation with its headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.  Guidewell Mutual Holding Corporation and its subsidiaries and affiliates, including its health insurance companies, are collectively referred to as "Guidewell" throughout the Complaint.  By and through its subsidiaries and affiliates, Guidewell holds licenses from BCBSA to operate ESAs in Florida and Puerto Rico.

133.    <u>Florida</u>: Defendant Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue ("BCBS-FL") is a Florida corporation with its headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Florida and is a wholly-owned subsidiary of Guidewell.  In 2021, BCBS-FL CEO Patrick Geraghty was compensated over $24 million, the highest paid health insurer CEO in AIS Health's annual roundup of Commercial Health Insurance Company executive compensation data.

134.    <u>Puerto Rico</u>: Defendant Triple-S Management Corporation and its wholly-owned subsidiary, Defendant Triple-S Salud, Inc., collectively d/b/a BlueCross BlueShield of Puerto Rico (and collectively, "BCBS-PR"), are Puerto Rico corporations with their headquarters located at 1441 Franklin D. Roosevelt Avenue, San Juan, Puerto Rico 00936.  BCBS-PR contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Puerto Rico. Defendant Triple-S Management Corporation is a wholly-owned subsidiary of Guidewell.  In 2020, CEO Roberto Garcia-Rodriguez received total compensation of $3,730,163.

135.    Guidewell also owns the following insurance companies that contract with providers and sell employer-sponsored Commercial Health Benefit Products under Blue Marks: (i) Capital Health Plan, which offers coverage in the Tallahassee area, specifically the Florida counties of Calhoun, Franklin, Gadsden, Jefferson, Leon, Liberty, Madison, Taylor, and Wakulla; (ii) Florida Health Care Plan, which offers coverage in the Florida counties of Brevard, Seminole,

Flagler, Volusia, and Saint Johns; and (iii) BeHealthy Florida, Inc. d/b/a Truli for Health, which offers coverage in the Central Florida counties of Lake, Orange, Osceola, Seminole, and Sumter; the South Florida counties of Broward, Palm Beach, Martin, St. Lucie, and Indian River; the West Florida counties of Hernando, Hillsborough, Pinellas, and Pasco; the Northwest Florida counties of Escambia and Santa Rosa; and the Northeast Florida Counties of Duval and St. Johns.  These subsidiaries offer their Members access to the BCBS-FL provider network, including the rates BCBS-FL negotiates with providers, and access to the BlueCard Program.  In 2020, Capital Health Plan, Inc. CEO John M. Hogan received total compensation of $908,319.

136.    Guidewell does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

### vii.    The Wellmark Defendants

137.    Defendant Wellmark, Inc. is an Iowa corporation with its headquarters located at 1131 Grand Avenue, Des Moines, IA 50309.  Wellmark, Inc. and its subsidiaries and affiliates, including its health insurance companies, are collectively referred to as "Wellmark" throughout the Complaint.  By and through its subsidiaries and affiliates, Wellmark holds licenses from BCBSA to operate ESAs in Iowa and South Dakota.

138.    Iowa: Defendant Wellmark Health Plan of Iowa, Inc. d/b/a Wellmark Blue Cross and Blue Shield ("BCBS-IA") is an Iowa corporation with its headquarters located at 1131 Grand Avenue, Des Moines, IA 50309.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Iowa and is a wholly-owned subsidiary of Wellmark.

139.    South Dakota: Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield ("BCBS-SD") is a South Dakota corporation with its headquarters located at 1601 West Madison Street, Sioux Falls, SD 57104.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in South Dakota and is a wholly-owned subsidiary of Wellmark.

140. Wellmark does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

141. In 2020, then-Wellmark CEO John D. Forsyth received total compensation of $4,367,108.  In 2021, CEO Cory R. Harris received total compensation of $2,105,052.

### viii.    The BCBS-MI Defendants

142. Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBS-MI") is a Michigan corporation with its headquarters located at 600 East Lafayette Street, Detroit, MI 48226.  BCBS-MI holds licenses from BCBSA to operate ESAs in Michigan and Vermont.

143. <u>Michigan</u>: BCBS-MI contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Michigan.  In 2023, CEO Daniel J. Loepp received total compensation of $15.7 million.

144. <u>Vermont</u>: Defendant Blue Cross and Blue Shield of Vermont ("BCBS-VT") is a Vermont corporation with its headquarters located at 445 Industrial Lane, Berlin, VT 05602.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Vermont and is a wholly-owned subsidiary of BCBS-MI.[41]  In 2020, CEO Don George received total compensation of $736,639.

145. BCBS-MI does not have any wholly-owned subsidiaries that offer non-Blue branded employer-sponsored Commercial Health Benefit Products.  As alleged in more detail in Section IV.B.1.b.xix, *infra*, BCBS-MI partners with Independence Health Group to offer non-Blue branded Medicaid, Medicare, Children's Health Insurance Program and/or Exchange Plans in 10 states and the District of Columbia.

---

[41] On October 9, 2023, BCBS-VT affiliated with and became a wholly-owned subsidiary of BCBS-MI.

### ix.    The Premera Defendants

146.    Defendant Premera is a Washington holding company with its headquarters located at 7001 220th Street Southwest, Mountlake Terrace, WA 98043.  Premera holds licenses from BCBSA to operate ESAs in Washington and Alaska.

147.    <u>Washington</u>: Defendant Premera Blue Cross is a Washington corporation with its headquarters located at 7001 220th Street Southwest, Mountlake Terrace, WA 98043.  It does business in Washington as Premera Blue Cross of Washington ("BC-WA").  BC-WA contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks throughout Washington state, excluding Clark County, and is a wholly-owned subsidiary of Premera.

148.    <u>Alaska</u>: Defendant Premera Blue Cross does business in Alaska as Premera Blue Cross Blue Shield of Alaska ("BCBS-AK"), whose headquarters is located at 3800 Centerpoint Drive, Suite 940, Anchorage, AK 99503.  BCBS-AK contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Alaska.  Premera, BC-WA, and BCBS-AK are collectively referred to as "Premera" throughout the Complaint.

149.    Premera owns LifeWise Health Plan of Washington, a non-Blue branded company that contracts with providers and sells commercial health insurance and administers Self-Funded Health Benefit Plans to enrollees in Clark County, Washington.  LifeWise also sells Exchange Plans throughout Washington State.

150.    In 2021, Premera CEO Jeffrey Roe was compensated over $4.5 million.

### b)    Single-ESA Blues

151.    The remaining 23 Blues operate Blue Plans primarily in one single pre-designated ESA.

### i.  Alabama

152.    Defendant Blue Cross and Blue Shield of Alabama ("BCBS-AL") is an Alabama corporation with its headquarters located at 450 Riverchase Parkway East, Birmingham, AL 35244.  It contracts with providers and sells Commercial Health Insurance and administers Self-

Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Alabama.

153.    BCBS-AL does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

154.    Prior to 2015, the compensation of BCBS-AL executives was publicly available through the Alabama Department of Insurance.  In 2013, the last year for which information is available, the total compensation of top BCBS-AL executives was as follows: CEO and President Terry Kellogg, $4.84 million; Executive VP Timothy Kirkpatrick, $2.69 million; Chief Administrative Officer Timothy Vines, $1.9 million; Senior VP and Chief Marketing Officer Timothy Sexton, $1.7 million; Senior VP and CFO Cynthia Vice, $1.47 million; Senior VP and CIO Brian S. McGlaun, $1.45 million; Senior VP of Business Operations Dick Briggs III, $1.44 million; Senior VP of Health Care Networks Jeffrey Ingrum, $1.42 million; Senior VP of Enterprise Resources Vickie Saxon, $1.26 million; Senior VP and Chief Legal Officer Michael Patterson, $1.03 million.

155.    BCBS-AL lobbied in support of legislation aimed at keeping its executives' compensation out of the public record.  In 2015, the Alabama legislature amended Alabama Code 1975 § 27-2-24, designating the compensation of officers and employees of insurance companies confidential and privileged.  This law did not benefit national publicly-traded insurance companies, such as United Healthcare and Aetna, which must report executive compensation to the Securities and Exchange Commission.  The amendment was sponsored by Sen. Slade Blackwell.  In 2013 and 2014, Blackwell received $53,250 in contributions from political action committees that in turn received $336,000 in contributions from BCBS-AL.

### ii.    Arizona

156.    Defendant Prosano, Inc. is an Arizona corporation with its headquarters located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021.

157.    Defendant Blue Cross Blue Shield of Arizona, Inc. d/b/a AZ Blue is an Arizona corporation with its headquarters located at 8220 North 23rd Avenue, Phoenix, AZ 85021.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded

Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Arizona.  It is a wholly-owned subsidiary of Defendant Prosano, Inc.  Defendants Blue Cross Blue Shield of Arizona and Prosano, Inc. are collectively referred to as "BCBS-AZ" throughout the Complaint.

158.    BCBS-AZ does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

159.    In 2021, CEO Pamela Kehaly received total compensation of $4,174,325.

### iii.    Arkansas

160.    Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield ("BCBS-AR") is an Arkansas corporation with its headquarters located at 601 South Gaines Street, Little Rock, AR 72201.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Arkansas.

161.    BCBS-AR does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

### iv.    California

162.    Defendant California Physicians' Service d/b/a Blue Shield of California ("BS-CA") is a California corporation with its headquarters located at 60 12th Street, Oakland, CA 94607.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in California.  BS-CA is a wholly-owned subsidiary of Ascendiun, Inc. and Aries Health, LLC.

163.    BS-CA does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

164.    In 2023, CEO Paul Markovich received total compensation of $7,809,641.

### v.    Hawaii

165.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("BCBS-HI") is a Hawaii corporation with its headquarters located at 818 Ke'eaumoku Street, Honolulu, HI 96814.  It contracts with providers and sells Commercial Health Insurance

and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Hawaii.

166.    BCBS-HI does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

167.    In 2021, CEO Mark M. Mugiishi received total compensation of $2,553,063.

### vi.    Idaho

168.    Defendant Gemstone Holdings, Inc. is an Idaho holding company with its headquarters located at 1305 12th Avenue Road, Nampa, ID 83686.

169.    Defendant Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its headquarters located at 3000 East Pine Avenue, Meridian, ID 83642. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Idaho. It is a wholly-owned subsidiary of Gemstone Holdings, Inc. Defendants Gemstone Holdings, Inc. and Blue Cross of Idaho Health Service, Inc. are collectively referred to as "BC-ID" throughout the Complaint.

170.    BC-ID does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

### vii.    Kansas

171.    Defendant Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS") is a Kansas corporation with its headquarters located at 1133 SW Topeka Boulevard, Topeka, KS 66629. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks throughout Kansas, excluding the counties of Johnson and Wyandotte.[42]

172.    BCBS-KS does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

---

[42] *See* **Figure 2**, Section III, *supra*.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### viii.    Missouri and Kansas (Kansas City)

173.    Defendant Blue Cross and Blue Shield of Kansas City ("BCBS-KC") is a Missouri corporation with its headquarters located at 2301 Main Street, Kansas City, MO 64108.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the Missouri counties of Andrew, Atchison, Bates, Benton, Buchanan, Caldwell, Carroll, Cass, Clay, Clinton, Daviess, DeKalb, Gentry, Grundy, Harrison, Henry, Holt, Jackson, Johnson, Lafayette, Livingston, Mercer, Nodaway, Pettis, Platte, Ray, Saline, St. Clair, Vernon, and Worth and the Kansas counties of Johnson and Wyandotte.[43]

174.    BCBS-KC does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

175.    In 2021, CEO Erin Stucky received total compensation of $3,144,115.

#### ix.    Louisiana

176.    Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBS-LA") is a Louisiana corporation with its headquarters located at 5525 Reitz Avenue, Baton Rouge, LA 70809.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Louisiana.

177.    BCBS-LA does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

#### x.    Massachusetts

178.    Defendant Blue Cross and Blue Shield of Massachusetts, Inc., including its affiliate Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc., (collectively, "BCBS-MA") is a Massachusetts corporation with its headquarters located at 101 Huntington Avenue, Suite 1300, Boston, MA 02199.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Massachusetts.

---

[43] *See id.*

179.    BCBS-MA does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

180.    In 2021, CEO Andrew Dreyfus was compensated over $4.6 million.

### xi.    Minnesota

181.    Defendant Aware Integrated, Inc. is a Minnesota corporation with its headquarters located at 1010 Dale Street North, Saint Paul, MN 55117.

182.    Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota and BlueCross Minnesota is a Minnesota corporation with its headquarters located at 3535 Blue Cross Road, Saint Paul, MN 55122.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Minnesota.  It is a wholly-owned subsidary of Aware Integrated, Inc. Defendants Aware Integrated, Inc. and BCBSM, Inc. are collectively referred to as "BCBS-MN" throughout the Complaint.

183.    BCBS-MN does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

184.    In 2020, CEO Craig Samitt received total compensation of $3,365,452.

### xii.    Mississippi

185.    Defendant Blue Cross & Blue Shield of Mississippi, A Mutual Insurance Company ("BCBS-MS") is a Mississippi corporation with its headquarters located at 3545 Lakeland Drive, Flowood, MS 39232.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Mississippi.

186.    BCBS-MS does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

187.    In 2009, BCBS-MS sued the Mississippi Insurance Department to stop it from releasing executive compensation information to the public, even though it is required to file such information as part of its annual report to the Mississippi Insurance Department.  A local

newspaper reported in 2022 that a former employee of BCBS-MS reported that "top executives make seven figures."

### xiii.     Nebraska

188.     Defendant Goodlife Partners, Inc. is a Nebraska mutual insurance holding company with its headquarters located at 1919 Aksarben Drive, Omaha, NE 68180.

189.     Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its headquarters located at 1919 Aksarben Drive, Omaha, NE 68180.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Nebraska.  It is a wholly-owned subsidiary of Goodlife Solutions, Inc. and Goodlife Partners, Inc.  Defendants Goodlife Solutions, Inc. and Goodlife Partners, Inc. and Blue Cross and Blue Shield of Nebraska are collectively referred to as "BCBS-NE" throughout the Complaint.

190.     BCBS-NE does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

191.     In 2020, CEO Steve Grandfield received total compensation of $2,065,687.

### xiv.     New Jersey

192.     Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey ("BCBS-NJ") is a New Jersey corporation with its headquarters located at 3 Penn Plaza East, Newark, NJ 07105.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in New Jersey.  BCBS-NJ is a wholly-owned subsidiary of Horizon Operating Holdings, Inc., which is wholly-owned by Horizon Mutual Holdings, Inc., a not-for-profit mutual insurance holding company.

193.     BCBS-NJ does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

194.     In 2021, Gary D. St. Hilaire, President and CEO, was compensated over $6.3 million.  Seven other officers and five other employees were each compensated over $1.2 million, including Christopher M. Lepre, Executive Vice President, Commercial Business ($4,234,331),

and Linda A. Willett, Executive Vice President, General Counsel and Secretary ($3,203,699). Ten of its sixteen directors were paid more than $100,000 each.

<strong>xv.        Central New York</strong>

195.    Defendant Lifetime Healthcare, Inc. is a New York corporation with its headquarters located at 165 Court Street, Rochester, NY 14647.

196.    Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a New York corporation with its headquarters located at 165 Court Street, Rochester, NY 14647. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the Central New York Region counties of Cayuga, Cortland, Jefferson, Lewis, Onondaga, Oswego, St. Lawrence, and Tompkins; the Central New York Southern Tier Region counties of Broome, Chemung, Chenango, Schuyler, Steuben, and Tioga; the Rochester Region counties of Livingston, Monroe, Ontario, Seneca, Wayne, and Yates; and the Utica Region counties of Clinton, Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Madison, Montgomery, Oneida, and Otsego. It is a wholly-owned subsidiary of Lifetime Healthcare, Inc. Defendants Lifetime Healthcare, Inc. and Excellus Health Plan, Inc. are collectively referred to as "Excellus" throughout the Complaint.

197.    Excellus owns Univera Healthcare, a non-Blue company that contracts with providers and sells commercial health insurance and administers Self-Funded Health Benefit Plans in eight counties in western New York (Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming). Univera also offers Medicare, Medicaid, and Exchange Plans in these counties.

198.    In 2023, Jim Reed, Excellus President and CEO was compensated $3.58 million. Three other executives were each compensated more than $1.5 million.

199.    **Figure 4** provides an illustration of the Blues' ESAs in New York.

**Figure 4: Blue ESAs, New York State**

Elevance (BCBS-NYC-Albany)
Highmark (BCBS-WNE-NY)
Excellus

### xvi.    North Carolina

200.    Defendant Blue Cross and Blue Shield of North Carolina ("BCBS-NC") is a North Carolina corporation with its headquarters located at 4613 University Drive, Durham, NC 27707. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in North Carolina.  BCBS-NC is a wholly-owned subsidiary of CuraCor Solutions Corp.

201.    In June 2023, North Carolina enacted "The Reorganization and Economic Development Act," a law fast-tracked by BCBS-NC, which allowed it to create its parent holding company and transfer to it much of BCBS-NC's $4.6 billion surplus to be invested without regulatory oversight.  Then, in September 2024, BCBS-NC filed an Amended and Reinstated Articles of Incorporation to require ownership by a member, an amendment consistent with transfer of equity to a holding company under The Reorganization and Economic Development Act.

202.    BCBS-NC does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

203.    In 2023, CEO Babatunde Sotayo Sotunde received total compensation of $5.08 million.

### xvii.    North Dakota

204.    Defendant HealthyDakota Mutual Holdings is a North Dakota holding company with its headquarters located at 4510 13th Avenue South, Fargo, ND 58121.

205.    Defendant Blue Cross Blue Shield of North Dakota f/k/a Noridian Mutual Insurance Company is a North Dakota corporation with its headquarters located at 4510 13th Avenue South, Fargo, ND 58121.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in North Dakota.  It is a wholly-owned subsidiary of HealthyDakota Mutual Holdings.  Defendants HealthyDakota Mutual Holdings and Blue Cross Blue Shield of North Dakota are collectively referred to as "BCBS-ND" throughout the Complaint.

206.    BCBS-ND does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

207.    In 2020, CEO Daniel Conrad received total compensation of $640,026.

### xviii.    Central Pennsylvania

208.    Defendant Capital Blue Cross ("Capital") is a Pennsylvania corporation with its headquarters located at 2500 Elmerton Avenue, Harrisburg, PA 17177.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the counties of Adams, Berks, Centre, Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York.

209.    Capital owns Avalon Insurance Company, a Non-Blue Affiliate that offers supplemental Medicare health insurance in Pennsylvania.

210.    In 2021, CEO Todd Shamash received total compensation of $2,601,584.

xix.        **Southeastern Pennsylvania**

211.    Defendant Independence Health Group, Inc. is a Pennsylvania corporation with its headquarters located at 1901 Market Street, Philadelphia, PA 19103.

212.    Defendant Independence Hospital Indemnity Plan, Inc. f/k/a/ Independence Blue Cross (IBX) and its subsidiaries and affiliates, Defendant QCC Insurance Company and Defendant Independence Assurance Company, are Pennsylvania corporations with their headquarters located at 1901 Market Street, Philadelphia, PA 19103.  They contract with providers and sell Commercial Health Insurance and administer Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in the Southeastern Pennsylvania counties of Bucks, Chester, Delaware, Montgomery, and Philadelphia.  They are wholly-owned subsidiaries of Independence Health Group, Inc.  Defendants Independence Health Group, Inc., Independence Hospital Indemnity Plan, Inc., QCC Insurance Company, and Independence Assurance Company are collectively referred to as "Independence" throughout the Complaint.

213.    **Figure 5** provides an illustration of the Blues' ESAs in Pennsylvania.

**Figure 5: Blue ESAs, Pennsylvania**



214.    Independence Health Group, Inc. owns AmeriHealth, Inc., a Non-Blue Affiliate, that offers commercial health insurance as well as Medicare plans and Exchange Plans without Blue Marks in New Jersey.

215.    Independence Health Group, Inc., in partnership with BCBS-MI, owns AmeriHealth Caritas, a Non-Blue Affiliate.  AmeriHealth Caritas offers Medicaid, Medicare, Children's Health Insurance Program and/or Exchange Plans in the following locations: Delaware, the District of Columbia, Florida, Louisiana, Michigan, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, and South Carolina.

216.    In 2020, then-CEO Daniel J. Hilferty received total compensation of $9,926,721. In 2021, CEO Gregory E. Deavens received total compensation of $3,178,344.

### xx.    Rhode Island

217.    Defendant Blue Cross & Blue Shield of Rhode Island ("BCBS-RI") is a Rhode Island corporation with its headquarters located at 500 Exchange Street, Providence, RI 02903.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Rhode Island.

218.    BCBS-RI does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

219.    In 2021, CEO Kim A. Keck received total compensation of $3,939,088.

### xxi.    South Carolina

220.    Defendant BlueCross BlueShield of South Carolina ("BCBS-SC") is a South Carolina corporation with its headquarters located at 2501 Faraway Drive, Columbia, SC 29223. It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in South Carolina.

221.    BCBS-SC does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

222.   BCBS-SC paid executives in the millions of dollars in 2010.  Members of the Board of BCBS-SC earned between about $100,000 and $160,000 in 2010 for their board duties. They were required to do little but show up to the occasional meeting. In 2021, CEO David Stephen Pankau received total compensation of $2,427,059.

#### xxii.   Tennessee

223.   Defendant BlueCross BlueShield of Tennessee, Inc. ("BCBS-TN") is a Tennessee corporation with its headquarters located at 1 Cameron Hill Circle, Chattanooga, TN 37402.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Tennessee and in the Georgia counties of Catoosa, Dade, and Walker.  Despite being licensed to operate in three Georgia counties for at least fifteen years, BCBS-TN only started offering insurance plans in these counties on November 1, 2022.

224.   BCBS-TN does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

225.   In 2021, CEO Jason David Hickey received total compensation of $4,022,848.

#### xxiii.   Wyoming

226.   Defendant Blue Cross Blue Shield of Wyoming ("BCBS-WY") is a Wyoming corporation with its headquarters located at 4000 House Avenue, Cheyenne, WY 82001.  It contracts with providers and sells Commercial Health Insurance and administers Self-Funded Health Benefit Plans to enrollees through various health plans carrying the Blue Marks in Wyoming.

227.   BCBS-WY does not have any Non-Blue Affiliates that offer Commercial Health Benefit Products or Self-Funded Health Benefit Plans.

### 2)   The Association—BCBSA—is a Conspiracy by Design

228.   BCBSA is a not-for-profit corporation organized in the state of Illinois.  The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601. BCBSA has contacts with all 50 states, the District of Columbia, and Puerto Rico by virtue of its

agreements and contacts with the individual Blues.  BCBSA does not itself underwrite any insurance policies.

229.    BCBSA was formed as part of the conspiracy to ensure national cooperation among the independent Blues.  As members and owners of BCBSA, the Blues collectively control and govern every aspect of BCBSA and use their control of BCBSA to coordinate their activities.  Indeed, Defendants have openly acknowledged this illicit purpose:

- BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania: **"*BCBSA's 39 [now 32] independent licensed companies compete as a cooperative federation against non-Blue insurance companies*."**

- Another Defendant Blue admitted: **"*Each of the [32] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages*."**

- In March 2007, a "Blue Caucus" was held in San Francisco, California, acknowledging this emphasis on collaboration rather than competition, stated publicly: **"*We intend to continue to strive to keep the interest of all Blue plans . . . aligned so the System can remain in a mutually supportive state*."**

- It was further noted: **"*The historic success of the System has been driven by the cooperation . . . of member Plans.  The future success of the System is dependent on this continued cooperation.  The ability of the member Plans to focus on the collective good of the System is critical to our success*."**

230.    In 2017, BCBSA confirmed statements from its website, further explaining its intent and purpose: "When the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy."  BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 32] Blue companies."

231.    In 1994, the United States Government Accountability Office (often called the "congressional watchdog") issued a detailed report on the operations of BCBSA.  The report revealed: "For practical purposes, meetings of the Association's board of directors and its membership comprise largely the same individuals."  Even BCBSA training documents show that "the Board and Member Plan meetings . . . are generally held at the same time for convenience" of the parties.

232.    The Board of Directors of BCBSA meets at least quarterly.  It is comprised of the CEO of each of the Blues plus the CEO of BCBSA.  The Blue CEOs have fiduciary responsibilities to both their individual Blue Plans and BCBSA.  A director can only be removed by a three-quarters vote of the other licensees and a three-quarters weighted vote of the licensees based on dues paid.

233.    Similarly, amendments to BCBSA's bylaws require "double-three-quarters" approval by the Blue Plans: a three-quarters vote of the Blue Plans with each Plan having one vote, and a three-quarters vote of the Blue Plans weighted by dues paid.  BCBSA's training materials for directors state that "Member Plans have the authority to establish or change the constitutional framework or matters that affect fundamental aspects of the Blue System."

234.    The BCBSA Board of Directors has various "standing committees" that oversee BCBSA's activities and enable the Defendants to jointly implement their anticompetitive schemes.  This includes:

(i)    The Brand Enhancement and Protection Committee ("BEPC"), formerly known as the Plan Performance and Financial Standards Committee ("PPFSC"), composed of nine Blue CEOs and three independent members, which, as detailed below, has the power to enforce the requirements of the License Agreements.

(ii)   The Inter-Plan Programs Committee ("IPPC"), composed of nine members including BCBSA Board Members and Blue Presidents, which is tasked with making rules and regulations for administering the Inter-Plan Programs, including BlueCard.  The IPPC is also responsible for providing oversight of BCBSA and for evaluating the Blue Plans' compliance with the IPPC's requirements.  The IPPC meets quarterly to discuss Inter-Plan development priorities, operational enhancements, and program compliance.[44]

(iii)  The Licensure and Financial Services Division, which monitors Blues' "compliance with the Membership Standards and reports directly to BCBSA Board's Plan Performance and Financial Standards Committee, which makes recommendations to the Board on plan licensure decisions."

235.    Each of the Blues has and continues to coordinate and agree with each other and with BCBSA to adhere to the rules, regulations, and bylaws promulgated by the jointly owned and controlled BCBSA.

---

[44] The National Accounts Programs are also implemented through the IPPC.

236.     The Blues centralized ownership of trademarks and trade names through BCBSA. As a result, under the administration of BCBSA, individual Blues needed to comply with certain requirements as a condition of being granted a license to use the marks and names.  The MDL Court previously acknowledged this questionable dynamic, noting that BCBSA's "own bylaws demonstrate that the [BCBSA] is funded and controlled by the Blue Plans, who receive licenses to use the Blue Marks."[45]  The MDL Court further acknowledged that not only does BCBSA "describe[] itself as an organization controlled by the Blue Plans," but also found "the Association is comparable to the licensee-controlled entities in *Sealy* and *Topco*."[46]

237.     The MDL Court has also already found that "the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement."[47]  That is, the rules and regulations imposed purportedly *by BCBSA* on the individual Blues are in truth anticompetitive restraints and regulations negotiated and agreed to, by and among the Blues— each of which are or would be horizontal competitors but for the anticompetitive agreements alleged herein.  The restraints and regulations of BCBSA, including, but not limited to, the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"),[48] the BCBSA Rules, the BCBSA Bylaws, and the November 18, 2016 Guidelines to Administer Membership Standards Applicable to Regular Members (the "Guidelines"), constitute horizontal agreements between competitors—the Blues—to limit output and divide the United

---

[45] MDL Standard of Review Order at 1267.
[46] *Id.* (discussing *U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967), and *U.S. v. Topco Assoc., Inc.,* 405 U.S. 596 (1972)).
[47] MDL Standard of Review Order at 1267.
[48] Through the Membership Standards, which are attached as an exhibit to each of the License Agreements, the Blue Plans have agreed and continue to agree to abide by certain BCBSA policies, including the required participation in national programs.  The standards instruct that "[a] Plan shall effectively and efficiently participate in each national program as from time to time may be adopted by the Member Plans for the purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area."

States into ESAs and then to allocate those ESAs among the Blue Plans, free of competition with few exceptions. As such, they are per se violations of Section 1 of the Sherman Act.[49]

**V.    JURISDICTION AND VENUE**

238.    Plaintiffs bring federal antitrust claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction over the federal antitrust claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.

239.    Plaintiffs also assert claims for damages, to seek restitution, and to secure other relief under California's Cartwright Act, California Business & Professions Code §§ 16720, *et seq.* This Court has subject matter jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal law claims that they form part of the same case or controversy. The exercise of supplemental jurisdiction over these claims will avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

240.    This Court has personal jurisdiction conferred by statute for Plaintiffs' federal antitrust claims over each Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22. Each Defendant in this action is a corporation organized and operating in the United States and is subject to the service of process provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22.

241.    This Court has general personal jurisdiction over Defendants Blue Shield of California and Elevance Health. Defendant BS-CA is a licensee of BCBSA in California and is headquartered in Oakland, California. Defendant BC-CA is also a licensee of BCBSA in California and is headquartered in Woodland Hills, California. It is a wholly-owned subsidiary of Elevance. California is one of the states in which Elevance operates with the largest concentrations of revenue. Each of the Plaintiffs provides treatment to and therefore bills for

---

[49] The License Agreements were amended in 2013, and at various other times. As detailed herein, the history of BCBSA demonstrates that the territorial and customer allocations in its purported trademark licenses facilitated and maintained a common scheme to eliminate competition between the various Blue Plans.

services provided to Members of both Elevance and Blue Shield of California, which includes residents of California.

242.    There is also extensive support for this Court's specific personal jurisdiction over the remaining Blues (the "out-of-California Blues") and BCBSA.  Each of the out-of-California Blues has significant business in and contacts with California through the national programs including the BlueCard Program and the National Accounts Programs.  In an order denying motions to dismiss brought by nine Blues that contested personal jurisdiction, the MDL Court recognized that all nine movants "have subscribers throughout the United States" and "they all have entered into the BlueCard Program in order to access a nationwide provider network."[50] That is, the out-of-California Blues have each received premiums, including via "access fees," each year on behalf of Members who are California residents, have submitted a substantial number of BlueCard claims to Elevance and BS-CA, and have paid a substantial amount per year on account of those claims.  Defendant BCBSA also enters into License Agreements, including the anticompetitive ESA allocation agreements, with Defendants BS-CA and Elevance.  In addition, BCBSA administers the BlueCard Program, which enables out-of-California Blues to maintain a commercial connection with Elevance and BS-CA.  Indeed, as part of the alleged anticompetitive scheme, BCBSA and each of the out-of-California Blues have conspired with both Elevance and BS-CA.  Elevance and BS-CA have undertaken overt acts in furtherance of the conspiracy within California.  BCBSA and each of the out-of-California Blues were aware that the effects of the conspiracy would be felt in California.  And through their violation of California Business & Professions Code §§ 16720, *et seq.*, BCBSA and each of the out-of-California Blues purposefully directed their anticompetitive conduct at California, and caused injuries in California, including to Plaintiffs.

243.    If this Court determines that it does not have personal jurisdiction for Plaintiffs' state law claims over any Defendant(s), this Court may exercise pendent personal jurisdiction over those Defendant(s) for Plaintiffs' state law claims, which are so related to the federal law

---

[50] *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406*, 225 F.Supp.3d 1269, 1296 (N.D. Ala 2016).

claims that they form a common nucleus of operative facts. The exercise of pendent personal jurisdiction over these state law claims will avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

244.    Defendants' agreement to allocate geographic markets has resulted in the following harms to consumers, including residents of California: (1) a reduction of health insurance companies competing with Elevance and BS-CA for business; (2) unreasonable limitations on entering the California health insurance market; (3) supra-competitive premiums; and (4) the deprivation of "benefits of free and open competition," including the deprivation of access to a market whose prices have been established in the absence of non-price restraints on competition.

245.    Venue is proper in this District under 15 U.S.C. §§ 15 and 22 because each Defendant engages in substantial business operations in this District. Venue is also proper under 28 U.S.C. § 1391. Defendants, as corporations organized and operating in the United States, reside in this District, in which they are subject to this Court's personal jurisdiction with respect to this action.

## VI.    HISTORY OF THE BLUES AND BCBSA

246.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently. Later, the plans jointly conceived of using the Blue Cross and Blue Shield marks in a coordinated effort with each plan operating within its local area.

247.    BCBSA was created by the Blues to support this endeavor and is entirely controlled by the Blues. The history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue Plans, and to ensure that each Blue Plan would be unimpeded by other Blue Plans within its ESA.

### A.    Development of the Blue Plans

248.    During the Great Depression, the majority of the population was medically underserved because most people could not afford hospital and medical care. In response, local hospitals and medical societies developed prepaid plans to serve Americans' healthcare needs in local areas. In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid

hospital plan in Saint Paul, Minnesota.  In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan.  Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.  The original Blue Cross plan in St. Paul took no action to stop others from using the symbol or name.

249.    In 1933, the New York State insurance commissioner determined that the early plans using the Blue Cross mark should be viewed as insurance because the plans collected premiums in advance and promised to provide care at some future date, not unlike life or casualty insurance.  In 1937, Blue Cross plan executives met in Chicago.  At that meeting, the American Hospital Association ("AHA") announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  One of these principles stated in part that "Plans should be established only where needs of a state or province are not adequately served by existing Blue Cross Plans."  In 1938, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.  By 1939, the AHA issued "Standards for Non–Profit Hospital Service Plans."  Under these standards, approval by the AHA's Commission on Hospital Service gave a Plan "permission to identify the plan by using the seal of the [AHA] superimposed upon a blue cross."  In 1947 and 1948, the AHA applied for and received a federal trademark registration for the "Blue Cross" marks.  At the time of its application and the subsequent trademark registration, AHA had not obtained an assignment or other ownership rights of the "Blue Cross" marks from the original pre-paid plan located in St. Paul, Minnesota.

250.    On occasion, a Member prepaid at one hospital but desired services from a different hospital at the time of illness.  To remedy this problem, multihospital plans developed. The taxation of excess profits and the freezing of wage rates during World War II incentivized employer participation in health care costs, as employers were able to give a wage increase to their employees by paying part or all of the cost of group health insurance costs.  After World War

II, the expansion of labor unions and favorable federal tax treatment further drove the growth of employer-sponsored health plans.

251.    Since the 1940s, the service areas of each Blue Plan have been recorded, initially in three-ring binders called service manuals.  In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced new approval standards, including that "Plans should be established only where needs of a state or province are not adequately served by existing non-profit hospital service plans" and "[a] hospital service plan located in or near an area already adequately served by an approved plan will not necessarily be approved by the Board of Trustees, even though such plan may enjoy sound financial position and reputable local sponsorship."  The MDL Court has recognized that the Blue Cross Commission promoted one Blue Plan per service area in part to reduce health care costs by obtaining participation of hospitals on more favorable terms, citing an affidavit by C. Rufus Rorem, who was the Director of the Blue Cross Commission.[51]

252.    Despite this, the independently formed prepaid hospital plans, operating under the Blue Cross name, engaged in fierce competition with each other and often entered each other's territories.  In a 1947 report, Louis S. Reed, health economist for the U.S. Public Health Service, observed a number of instances of Blue Plans serving the same areas and discussed the Blue Cross Commission's reluctance to enforce exclusive area requirements.  The Blue Cross Commission hesitated to enforce these requirements "upon the offending plans lest the net result be that the plans go on as before outside of rather than within the movement."  The Commission further conceded that to "give full title to a territory to a plan which was not successfully enrolling its population might satisfy the standards but impair service to the public."

253.    In 1997, a book entitled, "*The Blues: A History of the Blue Cross and Blue Shield System,*" was published (hereinafter, "*The Blues History*").[52]  *The Blues History* was "sponsored

---

[51] MDL Standard of Review Order at 1248.

[52] Robert Cunningham III and Robert M. Cunningham, Jr., *The Blues: A History of the Blue Cross Blue Shield System* (1997); *see also* Defendants' Motion for Summary Judgement on Plaintiffs' Section 1, Per Se, and Quicklook Claims, Exhibit 2 (Parts 1 and 2), *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406* (2:13-cv-20000) ECF Nos. 1353-7 and 1353-8.

by" BCBSA and was written by a consultant to BCBSA and his son, who acknowledged that "[s]everal [BCBSA] officers have read the manuscript at various stages and made useful suggestions."

254.    *The Blues History* describes the heated competition among health plans in the 1940s:

> The most bitter fights were between intrastate rivals . . . .

> Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . .

> John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans."

> At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . .

> By then there were also eight Plans in New York and four in West Virginia. . . .

> Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

255.    The MDL Court has likewise acknowledged:

> In 1947, in an effort to better compete with commercial insurance companies for employer-sponsored plans, Plans started experimenting with syndicates. Under these arrangements, a Plan in a state where a company's home office was located negotiated benefits at a certain price. Plans in other regions or states where the company had operations were given the details of the arrangement, and those Plans could choose to participate in the arrangement. The "Home" Plan guaranteed full delivery to the company and accepted all or part of the underwriting risk, depending on the cooperating Plans' agreed participation. Within five years, some 250 syndicates were providing coverage to about 1.2 million people. By working together, Plans were able to service national accounts, including the Federal Employees Health Benefit Program.[53]

---

[53] MDL Standard of Review Order at 1248 (internal citations omitted).

256.    *The Blues History* explains the substantial appeal of the syndicates for the cooperating Plans: "[T]hey were getting a bundle of new business—signed, sealed, and delivered by the originating Plan—without lifting a finger."

257.    The development of what became the Blue Shield plans followed, and largely imitated, the development of the Blue Cross plans.  While the Blue Cross hospital plans were developed in conjunction with the AHA, which represents hospitals, the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA"), which represents physicians.  Blue Shield plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  On information and belief, the "Blue Shield" name and symbol was first employed by the Western New York Plan in Buffalo, New York in 1939.  The Western New York Plan did not take action to stop other plans from using the name or symbol.  From 1939 to 1947, the use of the "Blue Shield" name expanded to many other pre-paid physician plans in the United States without intervention from the Western New York Plan.

258.    The AMA approved the concept of prepayment plans and promulgated approval standards for such plans.  The AMA set up the Associated Medical Care Plans ("AMCP") to administer the approval program for the various then-existing independent Blue Shield plans, and medical care plans that met the AMA/AMCP's standards likewise could use a blue shield emblazoned with a caduceus.  The AMCP's membership was comprised of Blue Shield plans and those members controlled the AMCP.  In 1947, the AMCP was succeeded by an entity known as the Blue Shield Medical Care Plans ("BSMCP").  The BSMCP adopted the Blue Shield name and mark as its own and, in 1950, it applied for federal registration of the Blue Shield mark.

259.    At the time of their initial formation, the Blue Plans were all non-profit entities.  Originally, most employers that offered health insurance to their employees purchased comprehensive health insurance from healthcare insurance companies like the Blue Plans, but that changed after the passage of the Employee Retirement Income Security Act ("ERISA") in 1974.  Under ERISA, self-insured plans were not subject to state insurance regulations dealing with reserves or coverage requirements or to state premium taxes.  ERISA had a profound impact on

health insurance plans purchased by large employers such that by 2011, 57% of insured workers were in a Self-Funded Health Benefit Plan.  The Blues facilitate self-insurance coverage by selling Self-Funded Health Benefit Plans pursuant to which they manage the day-to-day administration of subscribers' health plans and grant the Members access to their medical provider network(s), while allowing their subscribers to self-insure, meaning that they assume the risk and cost of covered medical services used by their Members.

**B.    Creation of the Blue Cross and Blue Shield Association**

260.    From 1947 to 1948, the Blue Cross Commission and the Associated Medical Care Plans attempted to develop a national agency for all plans using a Blue Cross or Blue Shield mark to be called Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that an unlawful restraint of trade action might result from such coordination.

261.    By the late 1940s, health insurance companies using Blue Cross or Blue Shield marks faced growing competition not just from each other, but also from other insurance companies that had entered the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million.  While insurance companies using a Blue Cross or Blue Shield mark remained dominant in most markets, this growth of competition was considered a threat.

262.    During the 1950s, while competing with commercial insurers for the opportunity to provide insurance to federal government employees, the Blue Plans were at war with one another.  As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate.  Two boards; two sets of managements.  Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

263.    To counter the increasing competition, the insurance companies using Blue Cross or Blue Shield marks agreed to centralize the purported ownership of the marks that they had all used and which had become generic by that time.  In 1952, the insurance companies using Blue Shield marks agreed, via written license agreement, to transfer any rights that they purported to have in the trade names and trademarks that they had all used and that had become generic by that

time to the National Association of Blue Shield Plans.  In 1954, the insurance companies using Blue Cross marks agreed, via written license agreement, to transfer any purported rights that they might have in each of the respective trade names and trademarks to the AHA.  With both the Blue Cross and Blue Shield marks in many areas in the country, no Blue ever owned exclusive common law rights that could be transferred to anyone.

264.    In prior litigation, BCBSA has explained: "Despite their local focus, the Plans recognized the necessity of national cooperation and formed the precursors of the Blue Cross and Blue Shield Association.  For their common benefit, the [Blue] Plans transferred all of their interests in the Blue Marks to predecessor organizations in the 1950s."

265.    Federal trademark registrations were later issued to the national organizations in 1952, and after the federal trademarks were issued, the local Blue Plans entered into written license agreements with the national organizations.

266.    The 1952 Blue Shield and 1954 Blue Cross license agreements restated and confirmed this sordid history, namely, that the Blue Plans had centralized local rights to the Blue Cross or Blue Shield marks in the national organizations and that the national organizations, in turn, licensed the federal Blue Marks back to each Blue Plan.  As acknowledged by the MDL Court, in areas where a single Blue Cross Plan had historically operated, under the license agreements, use of the Blue Mark "was deemed 'exclusive'; but, in areas where multiple Plans had historically operated, the license agreements reflected that reality with respect to those particular Plans."[54]

267.    Then, in 1972, AHA transferred ownership of the Blue Cross marks to the Blue Cross Association and the Blue Cross Association issued new license agreements to the Blue Plans.  The Blue Cross Plans then signed license agreements with the Blue Cross Association.

268.    These 1972 license agreements provided, in pertinent part:

> The rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement . . . except to the extent that said area may overlap

---

[54] MDL Provider Standard of Review Order at *2; *see also* MDL Standard of Review Order at 1268.

the area or areas served by one or more other licensed Blue Cross Plans on the effective date of this License Agreement, as to which overlapping areas the rights hereby granted are non-exclusive as to such other Plan or Plans only.

269. During the 1970s, the Blue Cross Association and National Association of Blue Shield Plans concluded that they needed cohesive national unity, which they believed could be achieved by working together. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (which had changed its name to the Blue Shield Association in 1976) began consolidating their separate staffs into a joint staff, although they retained separate boards of directors.

270. In his annual report to the associations in 1979, President Walter J. McNerney outlined his plan for illegal collusion. McNerney said that his focus would be on the "need for the Plans, within the framework of the Associations, to work together in today's challenging environment and to do so with a renewed sense of common mission." He noted that "problems" existed, "particularly where cooperative action among 2 or more Plans is required." He called for "mutual respect" among Blue Plans, decrying the "hazards" of "Blue sharking" (*i.e.* the submission of "highly competitive" prices by an out-of-area Blue Plan). With respect to one Blue Plan encroaching on the territory of another Blue Plan, he said "[t]he home Plan may resent the intrusion openly or covertly and add more fuel to antagonism within the system with the potentially perverted result of weakening mutual support and heightening the type of anxiety that leads to destructive competition." He concluded with a call for "coordinated action," explaining that "national accounts can only be served by coordinated action, and because national accounts are growing in importance, so is coordinated action."

271. As it should have, the call for "coordinated action" raised antitrust concerns. In 1980, when the two associations were considering a joint National Government Market Strategy, it was observed that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."

272.    Notwithstanding these antitrust concerns, the associations moved forward with their collusive plan.  The Blue Cross Association formally merged with the Blue Shield Association in 1982 to create Defendant BCBSA.  As a result of the merger, BCBSA now owns the Blue Cross and Blue Shield names and marks and, in turn, grants licenses to the Blue Plans to use the Blue Marks.  Each Blue has signed a License Agreement with BCBSA.

**C.    Creation of Additional Entities by the Blues**

273.    In addition to Defendant BCBSA, Blues have created several other corporations or entities that aid the Blues in advancing their conspiracy.  One of these entities is Consortium Health Plans, Inc. ("CHP").  CHP was founded in 1994 as an independent corporation to help the Blue Plans coordinate efforts to market to national accounts.  CHP describes itself as striving to "position Blue Cross Blue Shield Plans as the preferred carrier of National Accounts."  CHP's services are only available to Blue Plans and are intended to benefit all Blue Plans—CHP expressly observed that all Blue Plans benefit "from any BCBS national account sale" and advertised that "[e]very [CHP] program, service, consultant outreach effort, etc., promotes the national value of BCBS to employers," including tools that identify account expectations for administrative fees and provider discounts.

274.    CHP is owned by 20 Blues, including Defendants Elevance, BCBS-AR, BCBS-AL, BCBS-MA, BCBS-MI, BCBS-MN, BCBS-NC, BCBS-RI, BC-ID, BS-CA, Cambia, Capital, CareFirst, Guidewell, HCSC, Highmark, BCBS-NJ, Independence, Premera, and Wellmark.  CHP's CEO is the former President of National Accounts at Highmark and CHP's Chairman of the Board is the President of National Accounts at HCSC.  The remainder of CHP's Board of Directors is comprised of one representative, generally the Chief Marketing Officer or Head of National Account Sales, from each of the Blues that own CHP.  From its inception, CHP anticipated that Blue Plans that were not owners of CHP would participate in CHP's board meetings, and CHP currently has two advisory board members from non-owner plans BCBS-TN and BCBS-SC.  A BCBSA representative also attends CHP's board meetings.

275.    While BCBSA does not directly own CHP, the ownership of the two organizations substantially overlaps.  CHP and its member plans collaborate with BCBSA to develop programs

and capabilities to support national accounts, and a CHP representative described the company's relationship with BCBSA as "a very collaborative relationship" where the parties "try to delineate responsibilities so that we can effectively use [their] plan resources."  A 2002 National Account Support Agreement between CHP and BCBSA delineates roles between the two organizations and documents the agreement by CHP to provide services that benefit all Blue Plans, not just CHP's owners.  A 2007 CHP document summarizing CHP's assets and capabilities reports that national accounts appreciate the complementary roles of BCBSA and CHP, noting that Blue Plans "recognize that the success enjoyed by BCBS over the past decade is due, in large measure, to the complementary projects, programs, services and research efforts undertaken by both organizations."

276.    Another entity that advances the Blues' conspiracy is Health Intelligence Company LLC d/b/a Blue Health Intelligence ("BHI").  Founded by BCBSA and 17 Blues, BHI is an independent corporation and a licensee of BCBSA and is managed by a Board of Managers entirely comprised of executives from six Blues: BCBS-AL, BCBS-MA, BCBS-NC, HCSC, Highmark, and BCBS-MN.  BHI functions as a data and analytics company.  In 2013, BHI acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by Blue Plans.  Designed to lower health care reimbursement rates to providers, Intelimedix explicitly states that "we all share information."

277.    BHI receives its claims data from, among other sources, BCBSA, which in turn receives data from Blue Plans.  BHI uses BCBSA claims data, called the BCBSA National Data Warehouse Core, to perform analytic reports for the benefit of Blue Plans.  Prior to the time period in which Blue Plans submitted claims data directly to BCBSA, Blue Plans submitted data to BHI.  In turn, BHI transmitted the Blue Plans' claims data to a number of entities, including CHP.

278.    Per BHI's CEO, Bob Darin, BHI has the largest commercial claims database in the country, which allows it to provide unique insights to Blue Plans and its partners.  Darin explained that BHI has a vantage point with respect to price transparency that no other payor has.

## VII.    THE BLUES COLLECTIVELY USE BCBSA TO RESTRAIN HORIZONTAL COMPETITION FROM ONE ANOTHER

### A.    ESAs Were Implemented to Prevent Competition

#### 1)    Defendants Jointly Implemented the ESAs

279.    Competition in the same geographic areas under the Blue Cross name and Blue Shield name was constant in the 1930s and for decades thereafter.  Cross-on-Cross competition, Shield-on-Shield competition, or both, existed in at least California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, West Virginia, and Wisconsin.  In 1947, for example, there were twenty-two Blue Shield plans in Washington State, five in Oregon, and four in West Virginia.  As late as 1980, there were over *one hundred* Blue Plans in operation.

280.    During these initial decades, each Blue Plan was an autonomous company with a local presence, but often with strategic plans to compete in other service areas—whether within a state or across state lines.  Some Blue Plans saw the importance of national accounts and wished to compete for all of these accounts (notwithstanding their territorial basis).  Some Blue Plans saw themselves as competing with other health insurers who had a national presence and national provider networks.

281.    By the early 1980s, however, BCBSA and the Blue Plans were suffering from declining reserves, increasing financial instability, decreasing customer satisfaction, and declining business volume.  Collectively, the Blue Plans lost nearly half a billion dollars in 1980 and 1981.  The 1987 BCBSA White Paper, described in more detail later in this subsection, noted that "[c]ompetition is believed to be the salient factor in the changing circumstances of Plans" over "the last seven to ten years," and that the "trends of the recent past will continue."  The White Paper also noted that "only a few [Blue Plans] have been satisfied fully with their responses to competitive forces."

282.    Three years after President McNerney's 1979 annual report in which he called for "coordinated action," Defendants (via a Workgroup appointed by the Joint Executive Committee) presented a "Long-Term Business Strategy" at the 1982 annual meeting.  Edwin R. Werner, the

President of Blue Cross and Blue Shield of Greater New York[55] and Chairman of the Joint

Executive Committee, was appointed to work on an integrated business strategy and led the

effort.  In his November 11, 1982 presentation, Werner described the Long-Term Business

Strategy as a "fundamental change" that would result in "a concentration of power."  At that

meeting, over heated debate, the Blue Plans ultimately agreed to and promulgated multiple

propositions laid out in the 1982 Long-Term Business Strategy.

283.    *The Blues History* explained: "The key provisions of the business plan, backed by

the influence of the leadership group that had put it together, turned out to have a profound impact

on the future of the Blue Plans."  *The Blues History* further detailed that at least one motivation

for the change in strategy was the recognition that "one of the Blues' biggest marketplace

advantages—the 'differential,' or discounted reimbursements that hospitals accepted from the

Plans in exchange for volume of business and prompt payment—was under attack from

competitors, regulators, and politicians."

284.    The MDL Court properly observed that, according to the 1982 Long-Term

Business Strategy, the Blue Plans viewed "collective strength" as their "only real defense" against

business declines.[56]  Mr. Werner reported at BCBSA's 1982 annual meeting that "he would try to

persuade members that they could not sustain the status quo and that fundamental change is the

only realistic option."[57]  Mr. Werner further stated in his presentation that the "market share" of

the Blue Cross and Blue Shield organizations was eroding and "a course of correction is needed."

285.    The 1982 Long-Term Business Strategy indicated that the Blue Plans were losing

local and national market share and while the Blue Plans were "individually vulnerable," they

would be "collectively unbeatable—provided [they] 'put [their] act together.'"  To this end, the

1982 Long-Term Business Strategy laid out a number of proposals—which *The Blues History*

described as "a plan of action"—that sought to strengthen BCBSA and improve its decision-

---

[55] Blue Cross and Blue Shield of Greater New York is now Defendant BCBS-NYC-Albany, a wholly-owned subsidiary of Defendant Elevance.
[56] MDL Standard of Review Order at 1249.
[57] *Id.* at 1254.

making process, short-term market performance, and long-term competitive capability in public and private markets.

286. Proposition 3.4 of the Long-Term Business Strategy provided: "Launch an intensified program to retain, acquire and expand provider and professional payment differentials." Among the steps for implementing Proposition 3.4 was a call for the Association "to survey all Plans by March 1, 1983, to determine status [of] their efforts to protect/secure payment differentials." Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. In commenting on the Long-Term Business Strategy, William Flaherty (President of BCBS-FL) wrote to Mr. Werner, and explained: "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty further explained: "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Such statements confirm the Blues' understanding and awareness at this time, that by using their market power to secure large differentials, they could "close out" other insurers.

287. In August 1983, the Defendants had established two projects aimed at increasing the differentials, *i.e.*, reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of BCBSA to the CEOs of the Blue Plans:

> Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact in each Plan.

The second project was "Project State Watch," which included states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the aggregate Blue Plan differential would be reduced by a reduction in the differential in those states. In other words, all the Blues benefited by acting together to decrease provider reimbursement rates in each state.

288.    Proposition 1.1 was another proposition included in the 1982 Long-Term Business Strategy, which was later jointly approved by the Blues in November 1984.  Proposition 1.1 provided that "[a]ll Plans [] be joint Blue Cross and Blue Shield Plans, except when needs dictate[d] otherwise, by the end of 1985."[58]

289.    Proposition 1.2, also included as a recommendation in the 1982 Long-Term Business Strategy and later adopted by the Blues, required consolidation to one Blue Plan per state.[59]  Proposition 1.2 unequivocally provided that there should be ***"[o]nly one Plan per State . . . by the end of 1985."***[60]  The only included exception was when the Association Board of Directors agreed that business needs dictated otherwise.[61]  Remarkably, this proposition was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively," including "decision-making" and "policy determination."

290.    When presenting these propositions, Mr. Werner described a "significant reduction in the number of corporations which make up our collective effort" as "wise," and rhetorically questioned why "it makes good business sense for four corporations in one state to chase a total market potential of 677,000 employed people.  He asked: "Can we really justify 12 member corporations in one state—even though it is a large one?"

291.    As a result of these propositions, the number of Blues using the Blue Marks declined sharply from 114 in 1980, to 97 in 1984, to 75 in 1989, to 62 in 1996, and now stands at just 32 Blues.

292.    As an example of how this BCBSA-led consolidation decreased competition, consider Ohio as an example.[62]  BCBSA admits that in 1985 there were four Blues that operated in Ohio: (i) Community Mutual Insurance Company ("CMIC," a Blue Cross and Blue Shield licensee based in Cincinnati), (ii) Blue Cross of Central Ohio (based in Columbus), (iii) Blue

---

[58] *Id.*
[59] *Id.*
[60] *Id.* (emphasis added).
[61] *Id.*
[62] Section X.A.1.a, *infra*, details the sordid history of Blue-on-Blue competition in Ohio.

Cross and Blue Shield Mutual of Northern Ohio (based in Cleveland), and (iv) Blue Cross of

Northwest Ohio (based in Toledo). The MDL Court recounted BCBSA's initial efforts in 1985,

albeit thwarted, to eliminate competition in Ohio; specifically:

> In September 1985, [CMIC] began marketing and selling health
> insurance under the Blue Cross and Blue Shield Marks in Ohio.
> [BCBSA] filed a Complaint against CMIC seeking to enjoin CMIC's
> marketing and sales outside of its [ESA]. . . . [BCBSA]'s request for
> a preliminary injunction against CMIC was denied. The Ohio
> Attorney General intervened in the lawsuit and asserted a
> counterclaim alleging that [BCBSA]'s system of allocating ESAs
> violated antitrust laws. [BCBSA] agreed to dismiss its claims against
> CMIC if the counterclaim against it was dismissed. As a condition
> of that settlement, [BCBSA] agreed, for a period of time, not to
> pursue litigation seeking to enforce the ESAs against any of the Ohio
> Plans.[63]

293.    However, subsequent consolidation among these Blues permitted BCBSA to later

achieve its desired outcome. In 1986, Blue Cross and Blue Shield Mutual of Northern Ohio

merged with Blue Cross of Northwest Ohio to become Blue Cross Blue Shield of Northern Ohio,

and changed its name to Blue Cross and Blue Shield of Ohio. In 1993, Blue Cross of Central

Ohio decided to stop using the Blue Marks (resigning from BCBSA), and thereafter leaving only

two Blue Plans left in Ohio: CMIC and the newly formed Blue Cross and Blue Shield of Ohio. In

1995, CMIC merged with The Associated Group, an Indianapolis-based insurance and health care

company, forming Anthem Blue Cross and Blue Shield, which is now Elevance. The next year,

Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue Marks

to Columbia/HCA, a company that operated a number of hospitals. But BCBSA rejected the

proposed deal, revoked Blue Cross and Blue Shield of Ohio's license to use the Blue Marks, and

thereafter transferred the license to Anthem Blue Cross and Blue Shield. Anthem Blue Cross and

Blue Shield, formerly known as CMIC and now also known as BCBS-OH, became and is still to

this day the only Blue Plan that operates in Ohio.[64]

---

[63] MDL Standard of Review Order at 1252-53 (internal citations omitted).

[64] *See also* Sections VII.D.2 and X.A.1.a, *infra*. Highmark was licensed to operate in Washington
County, Ohio, until it relinquished its license in October 2024.

294.     In 1986, the Blues continued to coordinate via BCBSA to reduce competition when the Board of Directors of BCBSA approved a proposal for a series of meetings among the Blue Plans, known as the "Assembly of Plans."  This series of meetings was held for the explicit purpose of determining how the Blues would and would not compete against each other.  On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues, including actions that Blue Plans should do collectively.  In June 1986, John Larkin Thompson, the CEO of BCBS-MA, agreed to chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine Blue CEOs.  The Ad Hoc Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the Blue CEOs.  This became known as the "White Paper."

295.     The focus of the White Paper was to address "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements."  The White Paper identified points of agreement among the Blues, including "that the Blue Cross and Blue Shield service marks were vitally important and needed to be protected at almost any cost" and that "the exclusive service area concept of the license agreements needs to be examined."  The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue Marks within the Blues' ESAs.

296.     In April 1987, the Blues held the first Assembly of Plans meeting.  During the meeting, Blues agreed to recognize and maintain the ESAs when using the Blue Marks, thereby almost completely eliminating "Blue on Blue" competition.  The Blues assigned ESAs to distinct Blue Plans such that, in almost every part of the country, only one Blue Plan can contract with providers, contract with local employers, and bid on any particular national account.[65]  The intended result of the reduced competition from the ESAs was lower payments to providers—according to an internal report about the Assembly of Plans, "[b]y enjoying exclusive territories, Plans can bargain aggressively."

---

[65] *See* **Figure 1**, *supra*, Section III; *see also* Appendix A, *infra*.

297.    There was internal recognition that such a market allocation strategy posed significant legal risks.  The White Paper acknowledged that the ESAs were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing *Sealy* and *Topco*]. . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future. . . . Thus, an issue for the Assembly is whether to consider—at this time—alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

298.    A strong majority of the Blue CEOs agreed that the ESA concept was necessary, "although some CEOs reflected doubt as to whether this would be lawful."  The White Paper noted that if the Blues wanted to maintain their ESAs, they could "seek[] legislative relief from Congress, perhaps along the lines of the Soft Drink Interbrand Competition Act of 1980" which, it explained "legislatively approves the inclusion and enforcement of exclusive trademark territorial licenses as long as there is substantial and effective interbrand competition."

299.    Another option presented was to amend the License Agreements to provide for "Primary Services Areas" which would allow Blues to compete in each other's territories and would be "accepted in antitrust case law."  The author of a paper summarizing a meeting discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas in the future—shouldn't we be looking instead for other alternatives."

300.    A 1987 report on interviews of Blue CEOs that was sent to Mr. Thompson observed:

> Most regard the maintenance of exclusive service areas as a must in order to avoid chaos within the system.  There was concern that this issue be handled cautiously in view of antitrust implications and various court cases pending in Ohio and elsewhere.  There was a view that the right to control name and market may not extend to the ability/right to enforce exclusivity.

301.    Similarly, one internal memorandum from the CEO of BCBS-MD explicitly recognized the illegal and horizontal nature of any Blue Plan's market allocation agreement,

expressing the "feeling that the current licensing arrangements are 'illegal.'"  The memorandum explained that "we are in the position of approving our own licenses as members of the association.  Therefore, we are in the position of determining whether or not our licenses to the individual plans continue."  As this memorandum reveals, the Blues' use of BCBSA as the licensor was and is illusory; the arrangements are, in truth, horizontal, and accordingly, constitute per se violations of Section 1 of the Sherman Act.  The ESAs were agreed upon and have been maintained by all Defendants despite these antitrust concerns.

302.    As further evidence of Defendants' knowledge that their conduct was anticompetitive, in the mid-1980s the Ohio and Maryland Attorneys General each alleged that the Blues' ESA allocation was anticompetitive.[66]  BCBSA settled both sets of allegations by agreeing to local competition for a limited period of time in order to avoid having the antitrust allegations evaluated and ruled on by a court.

303.    Ultimately, following nine meetings of the Assembly of Plans from 1987 through 1989, and with open acknowledgement that a number of Blues were successfully competing with each other outside their service areas, the Assembly of Plans issued a Final Report on February 8, 1990.  The Assembly of Plans made recommendations to the Blues regarding the Blue Marks and ESAs, including a proposal to supplement the Blue Cross License Agreement and essentially replace the Blue Shield Agreement with the Blue Cross Agreement so that the agreements would be virtually identical.[67]  In addition, the proposed new agreement sought, among other things, to clarify and cure a "major deficiency" within the existing Blue Shield Agreement—the absence of specific written rules enforcing the ESAs.

304.    In 1991, BCBSA reissued License Agreements to the Blue Plans.[68]  These are "License Agreements" in name only, as they are intended to restrict, and have restricted, competition among the Blues.  These reissued agreements allowed BCBSA to enforce ESAs by restricting membership in BCBSA, restricting use of the Blue Marks, and providing for the

---

[66] *See* Sections X.A.1.a and X.A.1.b, *infra*.
[67] MDL Standard of Review Order at 1254.
[68] MDL Provider Standard of Review Order at *3.

issuance of monetary sanctions.  The revised 1991 Blue Cross License Agreements resulting from the Assembly of Plans contain the following provision regarding ESAs:

> The rights hereby granted are exclusive to Plan within the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been so granted a subsequent license, which is hereby defined as the "Service Area," except that BCBSA reserves the right to use the Licensed Marks and Licensed Name in said Service Area, and except to the extent that said Service Area may overlap the area or areas served by one or more other licensed Blue Cross Plans as of said date or subsequent license, as to which overlapping areas the rights hereby granted are nonexclusive as to such other Plan or Plans only.[69]

The Blue Shield License Agreement resulting from the Assembly of Plans contains a virtually identical provision.  This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where Blue Plans wish to compete with each other across assigned territories.

305.    These License Agreements can be modified or terminated by a vote of the Blues. Therefore, their contents are a collective agreement among Defendants.  In other federal court filings, BCBSA described the provisions of the License Agreements as something the Blues "deliberately chose," "agreed to," and "revised."

306.    The MDL Court also previously acknowledged that today, each of BCBSA's License Agreements references an ESA within which the Blue may use the Blue Marks.[70]  The above-excerpted provision of the License Agreements imposing ESAs has remained the same. Under the License Agreements, subject to certain exceptions related to national accounts and Government Programs as well as contiguous counties, the Blues agreed that a "Plan may not use the Licensed Marks and Name outside the Service Area."[71]

307.    BCBSA has a "Map Book," which it long kept highly confidential even within BCBSA, that memorializes each Blue Plan's ESA.[72]  The determination of where an individual

---

[69] MDL Standard of Review Order at 1254.
[70] *Id.* at 1251.
[71] *Id.*
[72] *Id.*; *see also* **Figure 1**, *supra*, Section III; Appendix A, *infra*.

Blue Plan competes using a Blue Mark and in what areas it will refrain from competing is not left to the "independent decision-making" of each Blue or to the independent decision-making of a holder of common-law trademark rights. To the contrary, it is BCBSA, composed of 32 separate economic entities, each with its own interest in preventing other BCBSA members from directly competing with it, that formulated the rules that govern where and with whom each Blue Plan can compete using Blue Marks.

308. The Blues have also publicly acknowledged the mandatory aspect of the ESAs. BCBS-AL told the Alabama Department of Insurance in 2010 that "[c]urrently the BCBS Association would not allow us to market out of state absent some agreement by the affected plans and approval from the Association." Independence separately stated that it "had been approached by brokers in the tri-state area . . . about quoting Blue business and we have been very clear that we can only do so within the [Independence] service area."

309. The mandatory aspect of the ESAs is further reflected by the conduct of corporations created by the Blues to aid them in furthering their conspiracy. CHP "agreed to comply with all [BCBSA] rules and regulations," including ESAs. CHP only assists a Blue Plan with responding to a request for information if (i) the prospective purchaser is headquartered in the Blue Plan's ESA, or (ii) if the account has been ceded by the Blue Plan who operates in the ESA where the purchaser is located.

**2)    Defendants Implemented the ESAs to Eliminate Competition**

310. Through BCBSA, the Blues extract a promise from each other that each "will not venture beyond its borders and compete against other Defendants outside of its territory." Indeed, Defendants implemented the ESAs to eliminate competition between the Blue Plans. On summary judgment, the MDL Court held that the "Rule 56 evidence in the record supports the proposition that the allocation of areas was the result of the Association's plan to (i) consolidate Blue Cross and Blue Shield Plans, and (ii) issue new licensing agreements reflecting the competitive restraints agreed to by a majority of the Blue Plans."[73]

311. In support of its ruling, the MDL Court observed the following:

[73] MDL Standard of Review Order at 1268.

- "[A] summary of conversations with four Blue CEOs in 1986 recognized that '[t]he major advantage of an exclusive franchise area was seen in the lessening of competition as well as the opportunity to discuss plans and proposals with companies in the same industry knowing that those ideas would not be used against you.'"

- "[I]n interviews conducted by the Association in which questions about ESAs were asked, Plan CEOs stated that ESAs create '[l]arger market share because other Blues stay out and do not fragment the market', and allow for aggressive bargaining."

- "In turn, national accounts enjoy local discounts."

- "One CEO reported that 'Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans' and that without service areas, 'there would be open warfare.'"[74]

312.    A BCBSA handbook also provides that, "[t]he ESAs encourage Plans to work together" in dealing with other health insurers.  According to the internal Assembly of Plans report, ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . .  Stronger provider agreements for the same reason."

313.    Simply put, the Blues agreed that each ESA would not only be an exclusive territory, but also a cage beyond which the Blues agreed with each other, through BCBSA, that their Blue Plans would not venture.  There are no comparable common law trademark rights that allow a horizontal group of competitors to agree that none of them will go beyond their territory to compete against each other.

314.    Although the Blue CEOs believed that the Blue Marks should be preserved at almost any cost, on summary judgment, the MDL Court found that there was "sufficient evidence to create a genuine issue of material fact as to the validity and/or enforceability of the [Blue] Marks," in part because "Defendants' own documents show that certain Blue Plan CEOs believed that they could have protected the Marks without the ESAs."[75]

---

[74] *Id.* at 1253 (citations omitted).

[75] *Id.* at 1265.  The White Paper prepared for the Assembly of Plans, for example, reveals the understanding that "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned."

315.    The MDL Court also already rejected arguments at summary judgement that ESAs "arose from either common law trademark rights or plan requirements imposed vertically by the AHA and AMA," in part because "Defendants' focus on the alleged vertical restraints imposed in the 1940s and 1950s disregards the effects wrought by the Long-Term Business Strategy and the Assembly of Plans in the 1980s."[76]  The MDL Court instead held that there was sufficient evidence to create a genuine issue of material fact as to the validity and/or enforceability of the Blue Marks in part because not all common law marks were exclusive, finding that the License Agreements recognize that a "Service Area may overlap areas served by one or more other licensed Blue [ ] Plans . . . as to which overlapping areas the rights hereby granted are nonexclusive as to such other Plan or Plans only."[77]

316.    The ESAs were not established to avoid confusion, nor are they needed for such purpose.  A 1987 BCBSA internal memorandum reported:

> Blue Cross of Washington and Alaska is actively competing against every other plan in the state.  Not only has Blue Cross written a strategic plan which targets the Blue Shield Plans, but it has developed a full range of products to sell statewide.  Yet, despite open competition, consumer confusion has remained minimal.

317.    On a page entitled "Exclusive Service Areas: Battle for the Brands," a September 2013 "Handbook for the BCBSA Board of Directors," explains:

> [I]n 1985, one Ohio Plan announced to BCBSA its intention to use the Brands in other Ohio Plans' ESAs.  BCBSA unsuccessfully sought a preliminary injunction to stop it.  At the same time, BCBSA had no written rules regarding ESA enforcement. . . . Prompted in part by the Ohio case, BCBSA started a comprehensive Brand protection program, including codifying Brand use rules via the *Service Mark Use Manual* in 1988.  This manual clarified ESA requirements . . . .

The handbook page also explains that "ESAs have helped The Blues stay competitive in the marketplace" and "encourage Plans to work together to compete with other health insurers," but does not mention avoiding confusion as a reason for the ESAs.

---

[76] *Id.* at 1268.
[77] *Id.* at 1265.

318.    Indeed, in the MDL Litigation, Defendants admitted that "[u]nique issues arising in overlapping service areas can be addressed by reasonable interpretation of the BCBSA's rules and regulations, which preserve the integrity of the Brands yet allow Plans to co-exist in overlapping service areas."

319.    The possibility of confusion among the Blue Plans is non-existent for providers, who already deal with multiple Blue Plans on a regular basis.  Like all Members of Commercial Health Benefit Products, the Blue Plans' Members carry membership cards that clearly identify the Blue Plan that underwrites or administers that Member's plan.  If anything, allowing Blue Plans to contract with providers outside their ESAs would reduce confusion.  As detailed in Section X.B, *infra*, providers must comply with the claim processing rules of Blue Plans located outside their ESAs, often without easy access to those rules.  If a provider could contract with these Blue Plans, they would be given those rules from the beginning of the contract and would likely have fewer claims denied for failure to follow the rules.

320.    The MDL Court has also already determined that the "market allocations at issue are not necessary to market, sell, or produce health insurance."[78]  It explained that "insurers offered health insurance benefits on a nationwide scale in the 1940s and 1950s," that the Blue Plans' market share declined in the 1980s "because other insurers were able to provide health insurance services to those accounts," and that "[t]he plan to go to ESAs constituted a new marketing/sales strategy, not a new product.  The products remain exactly the same—health insurance and insurance services."[79]

321.    Defendants use their joint agreements establishing and enforcing the ESAs as a means to implement their conspiracy to allocate geographic markets.  As explained below, each Blue has agreed with all other Blues to boycott providers outside of each Blue Plan's ESA.  Each Blue has also agreed with all other Blues to divide up national accounts based upon the ESA in which the subscriber is headquartered.  The effect of this program is to limit drastically the ability of Blues to compete in contracting with providers and selling Commercial Health Benefit

---

[78] *Id.* at 1270.
[79] *Id.*

Products.  Whatever theoretical encouragement the ESAs provide individual Blues to promote the Blue Marks within their ESAs, they have no relationship to the scheme whereby a single Blue is allocated the exclusive right to contract with a provider or bid on a national account with employees outside of that Blue Plan's ESA.  And when a Blue Plan services a national account, it is already operating outside of its ESA.

322.    The Antitrust Division of the Department of Justice defines a per se illegal allocation scheme as follows:

> [A]llocation schemes are agreements in which competitors divide markets among themselves.  In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.  For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers.  In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors.  In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies.

323.    Through the License Agreements, Guidelines, and Membership Standards, which the Blues created, control, and enforce, each Blue has agreed that neither it nor its subsidiaries will compete under Blue Marks outside of a designated ESA.  As detailed further in Sections VII.B and VII.C, *infra*, Defendants use the ESAs as a means to jointly implement their provider and customer allocation.  In this respect, Plaintiffs' allegations of unlawful market allocation are not just about the continuation of the ESAs.  Rather, they are about an agreement among the Blues to limit which one of them can contract with providers and customers.  As explained in Sections VII.D and VII.E, *infra*, Defendants have jointly agreed to additional horizontal restraints which fortify the ESAs.

**B.    The ESA Allocation Agreements Are Agreements Between the Blues Not to Compete for Provider Contracts**

324.    The Defendants' anticompetitive ESA allocation agreements require that each provider negotiate only with one Blue Plan per ESA to provide services to subscribers of Commercial Health Benefit Products offered by any Blue.  For example, Plaintiff Mayo Clinic

contracts with BCBS-MN for its Minnesota facilities, with BCBS-WI for its Wisconsin facilities, with BCBS-AZ for its Arizona facilities, and with BCBS-FL for its Florida facilities.  This is because the Blue Plans have agreed that each will *not* negotiate with providers outside of its ESA for Commercial Health Benefit Products (except in very limited circumstances).[80]  Specifically, an exhibit to the License Agreements provides:

> Other than in contracting with health care providers or soliciting such contracts in areas contiguous to a Plan's [ESA] in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its [ESA], a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its [ESA].

In other words, through the anticompetitive ESA allocation agreements, each Blue has agreed in writing with every other Blue to boycott providers outside of each Blue Plan's ESA (other than in contiguous counties under limited circumstances), which eliminates the possibility of price competition among the Blue Plans for providers' services.

325.    Many providers, including Plaintiffs, have large numbers of "local" patients that are Members of Blue Plans based in other ESAs.  This includes Members that work for a company that is headquartered in another ESA and Members that divide their time seasonally between two or more regions, *e.g.*, potential patients that relocate to warmer climates in the winter.  For Plaintiff Mayo Clinic, for example, a notable share of charges to Blue Plans for treatment at its Arizona locations are for Members of Blues outside of Arizona (most noticeably, BCBS-IL, which is part of HCSC).  And still for other reasons, certain provider locations may treat more patients who are Members of other Blue Plans than Members of the local Blue Plan (Host Plan).  This is true for Mayo Clinic's Rochester, Minnesota location, which continues to treat and seek reimbursement for *more* patients through the BlueCard Program than it does through its local Blue (BCBS-MN).  Ordinarily, in a truly competitive environment, providers, like Mayo Clinic, would be able to observe these patterns and contract directly with the Blues most often associated with the patients they treat.  The anticompetitive ESA allocation agreements, however, prevent Plaintiffs from negotiating to provide coverage to these patient

[80] *Id.* at 1251.

populations that they already serve—Plaintiffs are instead forced to accept terms on a take it or leave it basis; choose between covering all Members of all Blue Plans, at the same price, or none of them.

326.    The excerpt of the License Agreement quoted above shows that the License Agreements allow each Blue Plan to contract one county into a contiguous or adjacent Defendant's territory.  Even though the license agreements allow limited competition in contiguous counties, many of the Blue Plans have entered into what they call "gentlemen's agreements" to further restrict competition by not competing in these counties to their ESAs.[81]

327.    The ESA allocation agreements have created additional hurdles for providers with patients in contiguous counties.  For example, St. Louis is located in Missouri across the Mississippi River from Illinois.  HCSC, which holds the license for BCBS-IL, refused to enter into contracts with facilities in St. Louis, Missouri because HCSC and Elevance (which owns BCBS-MO) agreed not to compete in each other's ESAs, an additional restraint on top of the contiguous counties exception in the License Agreements.

328.    In yet another example, when Highmark was attempting to force University of Pittsburgh Medical Center ("UPMC") to accept lower reimbursement rates, UPMC asked BCBS-OH to contract with Harmot Hospital, which is in a county adjacent to Ohio.  But BCBS-OH refused to engage in any contract discussions with Harmot Hospital.  UPMC also wrote to Blue Plans across the country, requesting that they separately contract with UPMC.  Some Blue Plans responded to UPMC directly, refusing to negotiate.  BCBSA, on behalf of a number of other Blue Plans, coordinated and sent a response to UPMPC similarly communicating a refusal to negotiate.

329.    Highmark was licensed in Washington County, Ohio but refused to enter into contracts with providers there, leaving BCBS-OH with the entire Blue-branded market in Ohio. Highmark went so far as to relinquish its license to operate in Washington County in October 2024.

---

[81] This anticompetitive conduct has continued to the present.  One Plaintiff had a direct contract with a Blue in an adjacent ESA to serve that Blue's Members by the Plaintiff's facilities in the county contiguous to that Blue's ESA until 2020, when the adjacent Blue informed the Plaintiff that it would not renew the contract.

330.    The ESA allocation agreements harm providers because they prevent providers from contracting with more than one Blue Plan.  The BlueCard Program helps to facilitate and advance this anticompetitive scheme by providing the structure that enables Blue Plans to serve Members nationally while refusing to contract outside of their ESA.  Each Blue and BCBSA jointly adopted a license standard in 1995 requiring all Blue Plans to participate in the BlueCard Program.[82]  The MDL Court explained:

> Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan, *i.e.*, a Plan outside the service area in which the provider is located, the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan, *i.e.*, the local Plan. That is, in all cases, the Host Plan must pass the full amount of the discount/differential received from the provider to the Home Plan.[83]

331.    The Blues share the discounts they are able to impose through the BlueCard Program and National Accounts Programs.  In addition to the inclusion of an administrative fee that purports to cover the cost of processing claims through BlueCard, there is an "access fee," which is a percentage of the Host Plan's discount that the Home Plan kicks back to the Host Plan.  Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for agreeing not to compete and fixing their prices.

332.    All providers, including Plaintiffs, are required to participate in the BlueCard Program as a condition of their participation with their Host Plan.  As a result, a provider that treats patients who are enrolled in a Blue Plan not allocated to the provider's ESA is not permitted to negotiate a separate agreement with that Blue Plan.  Instead, the Home Plan pays the healthcare provider the discounted rate the Host Plan has imposed on the provider.

333.    When a provider treats a patient who is a Member of a Blue Plan outside of the provider's ESA (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays.  The provider is paid based on

---

[82] MDL Standard of Review Order at 1254-55.
[83] *Id.* at 1255 (cleaned up).

the reimbursement rates or prices in his or her contract with the Host Plan, but in order to be paid, they must comply with the medical policy and other requirements of the Home Plan, to which they often do not have access.

334.    As a result of the BlueCard Program, providers, including Plaintiffs, must comply with variations of medical policies for dozens of Blue Plans, creating inefficiencies, adding to administrative costs for providers and the health care system, and resulting in unwarranted and inappropriate claim denials and inefficient claim appeals, based, in whole or in part, upon the lack of information available to providers.  Sections X.B and X.D, *infra*, further explain how the BlueCard Program injures providers and consumers, respectively.

335.    The BlueCard Program means that when Plaintiffs negotiate with the Blue Plan in each facility's ESA, the local Blue Plan wields not only the volume of Members it insures or administers, but all Members of all Blue Plans.  In 2021, the Blue Plans controlled more than 129 million Members, accounting for *one in three* Americans.  Moreover, many Blues have a practice of requiring providers to participate in the networks of their Non-Blue Affiliates as a condition of participating in their Blue networks.  That is, if a provider does not offer terms attractive to its local Blue Plan, it will not be in-network for a Member of that Blue Plan, any Blue Plan, or for a Member of any Non-Blue Affiliates of that Blue Plan.

336.    The reimbursements to Plaintiffs for services provided to a Member of any Blue Plan are based on Plaintiffs' contracts with their local Blue Plan(s).  The BlueCard Program enables the Blues to maintain their anticompetitive ESAs.  An internal BCBSA presentation confirms that "*Pre*-Blue Card," there were "[c]ase-by-case provider negotiations by Member's Plans in other Plan service areas," and "*Post*-Blue Card" there are "[c]entralized member service at the Member's Plans and provider service at the local Plan."  That is, the BlueCard Program enables the Blues' anticompetitive ESA allocation agreements by preventing each Blue Plan from negotiating with providers to provide services to Members outside of its ESA.  The BlueCard Program reinforces the agreements that the Blues have made with each other not to compete and it provides the quid pro quo in terms of billions of dollars in payments.  The excess profits from the BlueCard Program are then divided among the Blues.  The BlueCard Program locks in the

fixed, discounted reimbursement rates that each Blue Plan achieves in its ESA through market dominance and makes those sub-competitive rates available to all other Blue Plans without the need for negotiation or contracting.  The BlueCard Program was intended to and has successfully artificially lowered reimbursement rates to Plaintiffs and other health care providers.

337.    Each Blue Plan's refusal to compete outside of its ESA also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts.  Instead, the Blue Plans have jointly agreed to use the BlueCard Program.

338.    The BlueCard Program is not a joint purchasing agreement—the Defendants have already denied that they are engaged in joint purchasing.

339.    But for the illegal acts alleged herein, each of the Blues could and would enter each other's ESAs and compete against each other for contracts with providers, including Plaintiffs, for their Commercial Health Benefit Products.  The anticompetitive ESA allocation agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition.  Thus, while there are numerous Blues that could and would compete effectively in each other's ESAs to contract with providers to provide services to Members of Commercial Health Benefit Products but for the territorial restrictions, almost none do.

340.    One component of the Blues' ability to market their systemwide differentials has been the use of non-public data from individual Blue Plans, which CHP has collected and converted into marketing tools and materials.  A 1996 fact book compiled by CHP declares that its accomplishments to date include "[f]inancial arrangements that provide robust discounts and consistent pricing across multiple locations."  In 2005, then-CEO of CHP Anthony Masso explained that CHP collects claims data, based on past charges and discounts for a variety of insurance products, through its claims-based informational clearinghouse, ClaimsQuest, in order to help Blues compete on the national front.  Masso boasted:

> We have the best market intelligence in the industry.  The big players don't have this.  They have to buy a lot of their information . . . .

We have a better network and better discounts than any group in the country.

341.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs.

342.    One of the marketing tools that CHP produces from the Blue Plans' claims data is ValueQuest, which provides an estimate of Blue Plans' total cost of care for a population of consumers.  CHP provides "[d]iscount benchmarking analysis" for Blue Plans, through which Blue Plans receive analysis of their "network discounts relative to competitors' networks," and CHP produces the discount benchmarks with data that Blue Plans submit for ValueQuest.  The intended primary users of benchmarking analysis are sales executives, actuaries, and provider contracting and network executives for Blue Plans, and in order to access ValueQuest, Blue Plans must provide CHP with "claims and membership data."  CHP's representative explained that they refer to this requirement, which applies to several of their product offerings, as "give and get"—a Blue Plan must provide its own data in order to get access to the data.

343.    A marketing brochure from January 2015 for CHP's ValueQuest advertises that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally.  The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."  The CHP brochure further boasts that "[c]onsultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care."  As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM [(per member, per month)] historical results to a PMPM benchmark of national competitors.  Results of the most recent study show an 12.8% cost of care advantage for BCBS at the national level.  This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

344.    Thus, according to CHP, the Blue Plans pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors.  Indeed, as CHP itself states, "[n]o other carrier even comes close."  And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blue Plans' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor.  According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

345.    The Blues are able to leverage their shared data through CHP's marketing tools in negotiations with customers.  A CHP representative has stated that certain Blue Plans have used CHP's tools as benchmarks for performance guarantees with national accounts.

**C.    The ESA Allocation Agreements Also Eliminate Competition Between the Blues for Subscribers**

346.    The Blues have agreed with one another that each will not sell Blue-branded Commercial Health Benefit Products outside of its own Blue Plan(s)' ESA(s).  The MDL Court observed:

> Under the License Agreements, the [BCBSA]'s rules, or both, a Plan may not bid on a National Account headquartered outside its [ESA] using the Blue Marks unless the Plan in whose [ESA] the National Account is headquartered agrees to "cede" the right to bid.  In the limited instances of overlapping service areas, more than one Plan may bid for the business of a National Account. Plans . . . have requested cedes from each other.  Some of these requests have been granted and some have been denied.  On occasion, a Blue Plan will pay another Plan to cede the right to bid for a national account.[84]

Blue Plans have requested cedes from each other, some of which were granted, and some of which were accompanied by payment for a cede.   A Blue Plan can sell a cede to one and only one other Blue Plan, providing the exclusive right to bid on an account, thereby ensuring that any potential customer within any particular Blue Plan's ESA has no more than one Blue Plan bid for its business (other than in the small number of overlapping ESAs, *see* **Figure 1**, *supra*, Section III; *see also* Appendix A, *infra*).  Just as they will not compete in the sale of Self-Funded Health

---

[84] MDL Standard of Review Order at 1256.

Benefit Plans, Blue Plans have agreed that each will not sell Commercial Health Insurance outside of its assigned ESA.

347.   When an employer sponsoring a health plan has employees in multiple ESAs, the employer must pay BlueCard access and administration fees in addition to the payments to providers and administrative service fees.  When Plaintiffs provide health care services in an ESA to Members of Blue Plans based outside of that ESA, they must use the inefficient BlueCard Program to serve them, even when those employees live in an ESA in which the Plaintiff offers services.

348.   These anticompetitive ESA allocation agreements are customer or territorial allocations among actual or potential horizontal competitors that are intended to prevent, and do in fact prevent, the Blues from competing against each other by bidding for Commercial Health Benefit Product customers.

349.   The anticompetitive ESA allocation agreements also prevent competition in the sale of Exchange Plans.  The Blue Plans do not offer Exchange Plans outside of each Plan's ESA.

350.   The Blues, among themselves and with BCBSA, which they jointly control, have agreed to allocate customers, restrict output, and eliminate the ability of the Blues to compete against each other for the sale of Commercial Health Benefit Products.

351.   Under the MDL Litigation's subscriber class settlement, approved on August 9, 2022, certain employers with over 5,000 employees are now allowed to solicit a bid from a second Blue Plan.  This change, unfortunately, has not undermined or diminished the harmful effects of these agreements on Plaintiffs and other health care providers.  The ESA allocation agreements continue to limit artificially the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiffs and other health care providers, thereby eliminating competition in the manner described above.

   **D.    The Blues Jointly Implemented Additional Constraints to Enforce Their Conspiracy**

352.    In addition to the anticompetitive ESA allocation agreements themselves, the Blues have jointly entered into additional agreements that ensure that the anticompetitive ESA allocation agreements are effective at stifling competition.

**1)    The Blues Have Agreed to Impose Prohibitively High Termination Penalties as a Means to Further Enforce Adherence to the Conspiracy**

353.    The Blues have agreed to discipline one another to maintain compliance with their anticompetitive ESA allocation agreements, which would not be profitable for any of them to pursue individually.  That the Blues jointly agreed to impose these severe penalties on one another and themselves demonstrates the extraordinary value of the conspiracy to the Blues.

354.    BCBSA may discipline a Blue that controls a Blue Plan that uses the Blue Marks outside its ESA, including with excessive monetary fines and/or termination.  The BEPC (Brand Enhancement and Protection Committee) makes the initial determination about a Blue's compliance with the License Agreements and Membership Standards, and makes a recommendation to the BCBSA Board of Directors.  Thereafter, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

355.    The Blues have also agreed that they can vote to terminate a Blue's license for "such other reason as is determined in good faith immediately and irreparably to threaten the integrity and reputation of BCBSA, the Plans and/or the Licensed Marks."

356.    The Blues have jointly committed to a sufficiently disastrous termination sanction to assure one another that none of them would risk termination, such as by attempting to compete using the Blue Marks in another Blue's ESA.  Upon termination, the Blue would lose the use of the Blue Marks.  As Elevance explained in a recent securities filing, if a BCBSA license is terminated, "the BCBSA would be free to issue a license to use the BCBS names and marks in [the Blue's ESA] to another entity."  In that event, the Blue Plan's "existing BCBS members would be provided with instructions for obtaining alternative products and services licensed by the BCBSA."  Elevance also noted in a 2015 presentation to the U.S. Department of Justice Antitrust Division that if it were terminated, it would "also be required to comply with multiple

requirements to assist the plan that receives the licenses (*e.g.*, notification, transfer of Member and account data, transitional service to Blue accounts, compliance with BCBSA National Programs, assisting BCBSA and replacement plan with potential new Blue accounts headquarters in the former service area)."

357.   In addition, in the event of termination, the terminated Blue must pay an astronomical "re-establishment fee" to other Blues through BCBSA.  The re-establishment fee is deliberately large to dissuade the Blues from violating their collectively set restraints on competition and facing possible loss of their licenses.  Defendant Elevance explained in a recent securities filing that the re-establishment fee "would be used in part to fund the establishment of a replacement Blue Cross and/or Blue Shield licensee in the vacated [ESA]."  Elevance elaborated: "The fee is set at $98.33 per licensed enrollee.  If the Reestablishment Fee was applied to our total Blue Cross and/or Blue Shield enrollees of approximately 35 million as of December 31, 2023, we would be assessed approximately $3 billion by the BCBSA."

358.   Defendants agreed to raise the termination penalty even more by jointly adopting Uncoupling Regulations in 1999.[85]  The MDL Court explained:

> Under these Regulations, a Plan may choose to use a name in connection with the Blue Marks; however, if it does so, it may not thereafter "uncouple" that name from the Blue Marks.  For example, a Plan may call itself Acme Blue Cross and Blue Shield, but it may not later use the trade name Acme Health Insurance – it must keep the "Blue" in the trade name. [86]

That is, if a Blue's license is terminated, it would not only be unable to use "Blue Cross," "Blue Shield," or other marks licensed from BCBSA, but it would also lose the goodwill it had invested in the part of its Blue Plan name *not* licensed from BCBSA.  The terminated Blue would then need to build a new Non-Blue Affiliate with no name recognition.

**2)   The Blues Jointly Control Entry into and Exit from BCBSA To Limit Membership Within the "Family" of Co-Conspirators**

---

[85] MDL Standard of Review Order at 1255.
[86] *Id.* at 1256.

359.     Another way that Defendants fortify their anticompetitive ESA allocation agreements is by reducing the risk of cheating on the agreements.  As detailed in Section VI.B, *supra*, by the 1990s, the Blues had already worked together and collaborated through BCBSA for years.  Indeed, the members of BCBSA conspiracy see one another as part of a "family."  BCBSA has admitted in federal court that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."[87]

360.     Defendants reduce the risk of cheating by preventing entry into their cartel by entities that would be more likely to cheat—an entity that might prioritize its own individual interest over that of the collective interest.  *The Blues History* explains: "Ceding any measure of control of any kind to investors with no allegiance to the Blue Cross and Blue Shield organization—or to traditional operating practices or the general well-being of the Plans—was an extremely sensitive matter to the members of BCBSA, which owned the marks."  As illustrated in Section VII.A.1, *supra*, in 1996, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue Marks to Columbia/HCA, a company that operated a number of hospitals.  Although the current acquisition restrictions were not yet in place, BCBSA refused to allow the sale to go forward, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem, leaving only one Blue Plan operating in the state of Ohio.

361.     Also in 1996, BCBSA and the Blues adopted acquisition rules that "prevent a Plan from transferring its license to a non–Blue entity without meeting certain standards."[88]  That is, to maintain their cartelized "family," the Blues voted to control jointly the entry of new members into BCBSA.  According to a section entitled, "A Nationwide Network: Keeping Plans Blue," in the 2013 "Handbook for the BCBSA Board of Directors":

> To ensure that Blue interests come first, the License requires Plans to stay independent and not be controlled by any one person or group. . . . A 1996 Special Committee examined additional Plan control issues.  These included the possibility that a non-profit as well as a for-profit could be taken over by an unlicensed entity.  The results of

---

[87] *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, Brief of Appellee, 1997 WL 34609472, at *7, 21 (filed Jan. 9, 1997).
[88] MDL Standard of Review Order at 1255.

the examination prompted additional License requirements to prevent such takeovers.

362.    More specifically, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired).  The essence of these detailed restrictions is to prevent the sale or transfer of control of any Blue Plan to any entity not already a part of the cartel "family."  Should a "stranger" attempt to join BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a Blue, the other Blues can block it.

363.    The restrictions include four situations in which a Blue Plan's license will terminate automatically: (i) if any institutional investor becomes beneficially entitled to 10% or more of the voting power of the Blue; (ii) if any non-institutional investor becomes beneficially entitled to 5% or more of the voting power of the member plan; (iii) if any person becomes beneficially entitled to 20% or more of the Blue's then-outstanding common stock or equity securities; or (iv) if the Blue conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the Blue is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10% or more of the voting power, no non-institutional investor is beneficially entitled to 5% or more of the voting power, and no person is beneficially entitled to 20% or more of the then-outstanding common stock or equity securities.  These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Blue and also of a majority weighted vote of the disinterested Blue. In addition, "key conditions for keeping a license," include that no single person, entity, or special interest group may control 50% or more of a nonprofit's membership" or "may hold 50% or more of Board seats of either a for-profit or non-profit Plan."  Moreover, no "Department of Insurance, government official or other regulatory agency" may assume control of a Blue Plan.

364.    These restrictions have worked as intended.  Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other Blues.  ***That is, no "stranger" has entered the conspiracy since 1996.***

365.     In 2003, the State of Maryland attempted to take control of the Blue Plan operating in the Maryland ESA (CareFirst BlueCross BlueShield) by replacing most of its board members. Invoking the provision in the License Agreements that prohibits such takeovers, BCBSA terminated CareFirst's licenses, reinstating them only after the state agreed not to proceed with its takeover plan.

366.     In addition to keeping the ownership of Blue Plans in "family hands," these acquisition restraints reduce competition—in violation of antitrust law—because they substantially reduce the ability of insurance companies who are not "family members" to expand their business and compete against the Blues.  To expand into a new geographic area, a "stranger" insurance company faces the choice of whether to build its own network in that area or to acquire a network by buying some or all of an existing plan doing business in that area.  Through the acquisition restrictions, the Blues have conspired to force competitors to build their own networks and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue Plan's business.  By preventing "strangers" to the Blue "family" from acquiring Blue Plans, the acquisition restrictions in the BCBSA License Agreements effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition and reducing total output.  Moreover, limiting the participants in the conspiracy to "family" members facilitates Defendants' collusion.

### 3)     The Blues Have Agreed to Allow BCBSA to Monitor Compliance

367.     Another way that Defendants reduce the risk of cheating on their agreements, thereby fortifying their anticompetitive ESA allocation agreements, is by monitoring each others' compliance with the agreements.

368.     BCBSA facilitates the cooperation and communications between the Blue Plans. The Board of Directors of BCBSA meets at least quarterly and has various "standing committees" that oversee BCBSA's activities in various areas and enable Defendants to jointly implement their anticompetitive activities.

369.    In each License Agreement with BCBSA, each Blue agrees to "maintain in good standing its membership in BCBSA," "comply with the Membership Standards Applicable to Regular Members of BCBSA," and "to permit BCBSA . . . to inspect the Plan's books and records necessary to ascertain compliance herewith."  The Guidelines require each Blue to submit a "Quarterly Financial Report" each quarter, as well as a "Plan, Subsidiary and Affiliate Report" annually.

370.    The Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and BEPC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the BEPC that the triennial membership compliance letter has been distributed to all Plan Board Members."

E.    **The Blues Have Agreed, and Continue to Agree, to Per Se Illegal Best Efforts Rules Which Jointly Insulate Each Other from Non-Blue Competition**

371.    Another way that Defendants fortify their anticompetitive ESA allocation agreement is to prevent each other from shifting the economic pressure towards competition to Non-Blue Affiliates and thereby keeping each Blue (and any of its Non-Blue Affiliates) cooperating with every other Blue (and any of those Non-Blue Affiliates) by jointly limiting their competition with one another.  As set forth in Section VII.E.1, *infra*, Defendants' ESA allocation agreements were threatened when the Blues began to compete with one another via Non-Blue Affiliates.  To prevent this competition, Defendants implemented, and still enforce, "best efforts" rules to effectuate their anticompetitive ESA allocation agreements.

372.    Each Blue has agreed with all other Blues not only that each of them will exercise the exclusive right to use the Blue Marks within its ESA and derive none of its revenue from services offered under the Blue Marks outside of that ESA, but also that each of them will limit its revenue from Non-Blue Affiliates.  These agreements include a limitation on revenue earned

within each Blue Plan's licensed ESA (the "Local Best Efforts Rule"), and a limitation on revenue earned nationally (the "National Best Efforts Rule"). The "best efforts" names are an attempt to hide the obvious anticompetitive effects of these agreements.

### 1)    Defendants Have Agreed to Restrict Each Other's Non-Blue Revenue

373.    Discussions about limiting competition from Non-Blue Affiliates began in the late 1980s after Non-Blue Affiliates began to proliferate. At that time, the BCBSA, by joint agreement, still required Blue Plans to be not-for-profit entities, but did not have any such requirement for Non-Blue Affiliates. In 1986, a tax reform law stripped the Blue Plans' tax-exempt status. BCBSA's *The Blues History* quotes a 1991 statement by former BCBSA Counsel Marv Reiter: "There's no doubt that changed the behavior of Plans . . . Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles . . . We went from 50 or 60 nationally to where there's now 400 and some." Reiter further noted that once the IRS stopped viewing the Blue Plans as social welfare organizations, many of them stopped viewing themselves that way as well.

374.    In 1992, BCBSA Vice President Donald Cohodes explained that a new breed of executive had emerged "from finance" and "retail and insurance. . . . Their instincts and their training . . . are to work toward diversification, work for new ventures, entrepreneurial ventures."

375.    *The Blues History* describes this period of heightened competition between the Blues as follows:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed.

376.    The proliferation of Non-Blue Affiliates became an increasing problem that caused complaints from many Blues. In 1989, for example, William Flaherty, President of BCBS-FL, asked that an agenda item be added to the next Assembly of Plans on inter-Plan "unbranded

competition." While acknowledging potential antitrust constraints, he said that "[s]uch endeavors threaten Plans in their own markets and create mistrust which subsequently damages our ability to work together on other issues using the name and mark."

377.    In 1990, Anthem, which at the time operated an Indiana-based Blue Plan, bought the giant Dallas-based American General Insurance Company—"a Sputnik event" for the rest of the Blues, according to a former BCBSA Vice President who became CEO of BCBS-SC in 1987. Soon the merged entity's Non-Blue Affiliates were competing in many other Blue Plans' ESAs. Non-Blue Affiliates of Anthem and Blue Cross of California went public in 1992 and 1993, respectively. [89] *The Blues History* explains that these public non-Blue subsidiaries "meant sharing control of that subsidiary outside the family," and that "[i]f such subsidiaries were competing with other Plans, the tension created within the [BCBSA] could be all but unbearable."[90]

378.    *The Blues History* reports that in 1991, a committee of the BCBSA Board of Directors surveyed the Non-Blue Affiliates and "recommended that the [BSBSA] not attempt to increase its regulation of the unbranded companies, unless they were undermining the financial health of their parent Blue Plans." In 1992, Bernard Tresnowski, then BCBSA's CEO since 1981, explained that the agreement reached during the Assembly of Plans meetings by the Blues to abide by ESAs,[91] "does not restrict the corporation from doing anything it wanted to do in [unbranded] subsidiaries. Everybody sort of nodded their heads and said 'Well, that makes sense.' Little did they realize what kind of problem they were opening up for themselves."

379.    A June 1993 "Analysis of Current Culture and Business Issues" sent to the BCBSA Board of Directors by Tresnowksi reported that at the Assembly of Plans, "the Plans felt

---

[89] Since then, Anthem has undergone a number of corporate restructurings and name changes. In 2004, Anthem, merged with Wellpoint Health Networks, assumed the name Wellpoint, Inc., and became the country's largest health insurance company. Now known as Elevance, Inc., the company remains the largest Blue and the second largest health insurance company in the United States. *See* Sections IV.B.1.a.i, *supra*, and X.A.2, *infra*.

[90] The fact that when entities "outside the family" exerted control over entities affiliated with the Blues, those affiliates competed against other Blues more aggressively also contributed to the implementation of the 1996 rules which have successfully blocked acquisitions of Blue Plans by "strangers" for almost 30 years. *See* Section VII.D.2, *supra*.

[91] *See* Section VII.A.1, *supra*.

that the issue of unbranded competition needed to be addressed further," and therefore a subcommittee of the Executive Committee was established to further study the issue. This "Plan Organization and Structure Subcommittee" was tasked to "identify the consideration in favor of and against the use by Plans" of non-Blue marks in the provision of health care plans and "identify various optional courses of action." After a year of deliberation, in January 1992, the Subcommittee agreed that "[n]o substantial evidence of harm to a licensed Member Plan or to the Service Marks arising from Plans' unbranded activities was presented to the Subcommittee."

380.   In 1992, the BCBSA Board of Directors passed a resolution that: "BCBSA should not attempt to regulate activities by Plans under other names and marks, unless such activities in the opinion of the Board . . . significantly compromise protection of the names and marks." The Board also resolved to further monitor the Blues' Non-Blue Affiliates. First, the Board resolved that "Where there may be a significant reason to believe that unbranded activities are impairing the names and marks, the BCBSA staff should be authorized . . . to collect more information . . . beyond current general practices," and reiterated BCBSA's "authority to collect information about all Plans' subsidiaries."

381.   BCBS-MA leader (and former chair of the Ad Hoc Committee on the Assembly of Plans) John Larkin Thompson appealed to his fellow Blue CEOs to "pull together." And in his 1992 Annual Report to the Plans, Tresnowski wrote:

> If you wish to be a Blue Cross and Blue Shield Plan and give your best effort to strengthen the goodwill associated with those service marks then let's not be timid about that commitment. For those who would choose an alternative course or hedge their bets against future development, let's wish them well and on their way.

382.   In 1994, Tresnowski circulated to Blue Plan CEOs a "Report on CEO Interviews," which tabulated and reported the results of interviews of Blue Plan CEOs on 19 business issues facing the Blue Plans. The CEOs were asked to choose between the following two positions:

> Position A: Competition between Plans destroys teamwork and the ability to make the Blue Cross and Blue Shield system an effective, cohesive network. There is a need to regulate unbranded competition and/or define and clarify the phrase "significantly compromise" [in

the 1992 Board resolution that "BCBSA should not attempt to regulate activities by [Non-Blue Affiliates], unless such activities in the opinion of the Board *significantly compromise* protection of the names and marks," *see* Paragraph 380, *supra*].

Position B: *Competition is good for the consumer* and that is who we are obliged to serve.  It makes the Plans more effective.  *No harm has ever been demonstrated to the name and marks from unbranded competition.*  It would be impractical to regulate and likely a violation of antitrust law.  BCBSA should not attempt to regulate unbranded competition.[92]

The Report noted that 28 Plan CEOs supported Position A and 31 supported Position B.  Those that supported Position A "emphasized the importance of teamwork and cohesion among Plans," while those in favor of Position B "maintained that competition is good for Plans and the ultimate consumer and pointed out the potential for anti-trust issues if the Association were to intervene."

383.    That is, from the outset, the Blues understood that regulating each others' Non-Blue Affiliates (Position A) is inconsistent with protecting competition for consumers (Position B).  Also from the outset, the Blues recognized that the purpose of regulating Non-Blue Affiliates was not to protect the Blue Marks but rather to promote their joint "teamwork" and "cohesion," and that this anticompetitive conduct could result in antitrust liability.

384.    Also in 1994, BCBSA ceased requiring Blue Plans to be not-profit entities.  *The Blues History* explained that the "trade-off" for ending the non-profit requirement "that would be necessary to protect the value of the brands was the incorporation of new safeguards into the licensing agreements concerning for-profit Plans."  According to a "Handbook for the BCBSA Board of Directors," the "best efforts" standard was "[a]dopted as part of the discussion permitting for-profits to obtain Licenses."  The Handbook explained that the "'best efforts' standard ensured a minimum commitment to the Brands, regardless of Plan structure."

---

[92] Exhibit 252 to Subscriber Plaintiffs' Notice of Filing Redactions, or Excerpts, of Previously Sealed Standard of Review Exhibits at 16, *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406* (2:2013-cv-20000), ECF No. 2450-47 (emphases added).

385.    In 1994, BCBSA and the Blues adopted the Local Best Efforts Rule, which provides "at least eighty percent of a Plan's annual health revenue from within its designated [ESA] must be derived from services offered under the Blue Marks."[93]

386.    *The Blues History* reported in 1997 that even after the Local Best Efforts Rule passed, Tresnowski warned that "potential competition between branded and unbranded subsidiaries was still a 'major point of tension.'"  In 1994, Thomas Hefty, President and CEO of BCBS-WI, wrote to Tresnowski and noted that before the vote on the Local Best Efforts Rule, he had asked whether "the new resolution [had] been reviewed by outside antitrust counsel" and was told "no."  Hefty then affirmed:

> I am very concerned about the antitrust implications of the Best Efforts Standard and the interpretive guidelines. You are well aware that BCBSA's exclusive territorial licensing of its service marks is potentially subject to antitrust scrutiny.  The imposition of additional restrictions, even under the guise of an attempt to secure a licensee's "best efforts" to promote the service marks, might be considered an unreasonable additional restraint on a licensee under Section 1 of the Sherman Act.  Ancillary restraints continued in an exclusive trademark licensing agreement may not extend beyond marketing arrangements reasonably necessary to effectuate the rights granted.  See, Instructional Systems Dev. V. Aetna Cas. & Sur., Co., 817 F.2d 639 (10th Cir. 1987).  The requirement imposed by the Standard and the interpretive guideline, that 80% of the Plan's licensable services in its designated service area be marketed under the licensed marks by January 1, 1999, could be deemed an unreasonable restriction, even if it is arguably directed at obtaining a Plan's best efforts at promoting the licensed marks.  In other words, there appear to be far less restrictive means to advance the Association's goal of maximizing the worth and value of the mark.  Furthermore, there was no evidence presented that percentage of unbranded or diversified activity has any relationship to the value of the brand in a particular franchise territory.  In fact, the most recent studies, by the Association's own staff, of financial stability, growth, and customer satisfaction show no relationship between the value of the "Blue" brand and the percentage of unbranded or diversified activities.

387.    Similarly, the MDL Court noted: "The record reveals that, before the [BCBSA] enacted the National Best Efforts Rule, an attorney representing Anthem's predecessors expressed

---

[93] MDL Standard of Review Order at 1255-56.

'significant doubt whether, under the antitrust laws, an association like BCBSA could lawfully bar members from engaging in unbranded business outside their exclusive territories.'"[94]

388.    In 1996, the Board adopted an additional threshold Brand commitment requirement for companies seeking a License for the first time, because they have no "Blue family" track record.  The "two-thirds test" stipulates that such a company must demonstrate that "at least 66-2/3% of its consolidated gross revenues attributable to Health Services would be sold, marketed, underwritten or administered under" the Brands.  This requirement applied to new Blue Plan owners only.  However, as of 2005, all current members of the Blue "family" complied with this requirement.

389.    In an April 30, 2001 memorandum to the Blue Plans, BCBSA expressed concern about Blues competing as Non-Blue Affiliates.  According to BCBSA, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area.  Now, Blue-based organizations are competing with each other for core health customers.  Each success of an unbranded venture was a loss for a local Blue Plan."  For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

390.    Despite the Blues' joint adherence to this two-thirds threshold, a May 2001 BCBSA document reported: "Plan CEO's [*sic*] are united in their desire to strengthen Brand performance, but divided on questions of how to do so," and that supporters of a national best efforts requirement "argue that such a requirement will assure the commitment from all Plans that is necessary to grow the Blue Brand."  A 2001 memorandum recommending at least a 51% threshold noted that the Blues recommended a revenue threshold instead of "additional rules, regulations and requirements" which would require the creation of "extensive and expensive bureaucracy to monitor and regulate a myriad of potential future actions.  Instead, the "key is to assure that our interests, as individual Plans, remain aligned with our collective interests in the strength of the Brands and in the success of our fellow Plans."

---

[94] MDL Standard of Review Order at 1269.

391.    Ultimately, these supporters won.  In 2005, the Blues jointly extended the 1996 threshold brand commitment to require the same commitment from one another.  This revenue calculation includes all "health care products," "ASC and ASO premium equivalents," "ceded health premium under reinsurance agreements," and "all other health revenue as listed in the BCBSA Quarterly Financial Report."  It does not include "Medicare, Medicaid and CHAMPUS fiscal intermediary contracts and CHAMPUS risk contracts," "life insurance," and "worker's compensation."

392.    The initial term of the National Best Efforts Rule lasted until 2015, at which point Defendants agreed to its continuation.

393.    In each License Agreement with BCBSA, each Blue agrees: "Nothing herein shall be construed to prevent the Plan from engaging in lawful activity anywhere under other marks and names not confusingly similar to the Licensed Marks and Name, provided that engaging in such activity does not and will not dilute or tarnish the unique value of the Licensed Marks and Name."

394.    The Guidelines delineate how compliance with these standards is implemented.  As of 2016, pursuant to the Guidelines,[95] the best efforts requirements were implemented by and among Defendants as follows:

> Standard 10: Local and National Best Efforts
>
> The Standard is:
>
> Notwithstanding any other provision in this License Agreement, during each year, a Plan and its Controlled Affiliate(s) engaged in providing licensable services . . . shall use their best efforts to promote and build the value of the Blue Cross [for Blue Cross Licensees] and Blue Shield [for Blue Shield Licensees] Marks.
>
> Determination of Compliance:

---

[95] Section 6(G) of BCBSA's "Guidelines to Administer the Controlled Affiliate License Agreement(s) and Standards" contain the same language.  Exhibit 188 to Subscriber Plaintiffs' Notice of Filing Redactions, or Excerpts, of Previously Sealed Standard of Review Exhibits at 36, *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406* (2:2013-cv-20000), ECF No. 2450-17.

1. Guidelines Subject to Immediate Termination

1.1  None

2. Guidelines Subject to Mediation/Arbitration

2.1  At least 80% of the annual Combined Local Net Revenue of a Plan* and its Licensable Controlled Affiliates attributable to health care plans and related services and hospital services . . . offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names.

2.2  At least 66-2/3% of the annual Combined National Net Revenue of a Plan** and its Licensable Controlled Affiliates attributable to health care plans and related services . . . must be sold, marketed, administered or underwritten under the Licensed Marks and Names.
. . .
. . .

* Combined Local Net Revenue shall have the meaning ascribed to it in Attachment V to these Guidelines.
**Combined National Net Revenue shall have the meaning ascribed to it in Attachment V to these Guidelines.[96]

395.    The MDL Court held that the National Best Efforts Rule is "an output restriction on a Plan's non-Blue business," which "limits the extent to which the Plans can compete with Blue branded business under non-Blue marks."[97]  Both best efforts rules reduce the incentive for Blues to develop Non-Blue Affiliates because they know that the potential for that business is limited.  To earn non-Blue revenue outside of its ESA, the Blue would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third national cap.  Should the Blue offer services and products under the non-Blue brand within its ESA (which is likely, since that is its base of operations and many contracts with providers force all providers in-network for the local Blue Plan to be in-network

---

[96] Exhibit 176 to Subscriber Plaintiffs' Notice of Filing Redactions, or Excerpts, of Previously Sealed Standard of Review Exhibits at 34, 42, *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406* (2:13-cv-20000), ECF No. 2450-5.  The referenced Attachment V is redacted.  *See also* MDL Standard of Review Order at 1256 (MDL Court noted that the agreed-upon National Best Efforts Rule "requires a Plan to derive at least sixty six and two-thirds percent of its national health insurance revenue under its Blue brands").
[97] MDL Standard of Review Order at 1273.

for its Non-Blue Affiliate), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its ESA. Thus, the potential upside of making an investment in developing business outside of its ESA is severely limited, which creates a disincentive ever to make that investment.

**2)** **The Blues Have Agreed to Continue the National Best Efforts Rule**

396.    On April 27, 2021, the BCBSA Board of Directors passed a resolution that "the National Best Efforts Requirement is hereby eliminated and shall no longer be enforced."[98] The resolution defined the "National Best Efforts Requirement" only as Standard 10(2.2) of the BCBSA Guidelines to Administer Membership Standards Applicable to Regular Members as well as the identical Standard 6(G)(2.2) of the Guidelines to Administer the Controlled Affiliate License Agreement(s) and Standards.[99] The resolution specified that the elimination of Standard 10(2.2) and the identical Standard 6(G)(2.2) was a result of the proposed class action settlement with the putative subscriber class of the MDL.[100]

397.    Despite BCBSA's resolution, in the years since adoption, the Blues ***have not*** increased competition in the offering of Commercial Health Benefit Products via Non-Blue Affiliates outside of their ESAs. Instead, the Blues continue to limit the extent to which they can compete with one another via Non-Blue Affiliates. The Blues have continued to enforce on each other an output restriction on each Blue's Non-Blue Affiliate business. For example, in 2024, HCSC agreed to acquire Cigna's Medicare business but it refrained from acquiring Cigna's Commercial Health Benefit Product business, which would have made economic sense but would have put it out of compliance with the very much still-enforced National Best Efforts rule.

398.    Indeed, the ESA markets have remained unchanged. Plaintiffs have not received outreach or other inquiries to contract with any new or expanded Commercial Health Benefit Products offered by a Non-Blue Affiliate of any Blue since April 2021. As Table 1 reveals, only

---

[98] Exhibit 321 to Evidentiary Submission in Support of Defendants' Motion Regarding the Antitrust Standard of Review Applicable to Provider Plaintiffs' Section 1 Claims Pursuant to Federal Rule of Civil Procedure 56 at 2, *In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406* (2:2013-cv-20000), ECF No. 2735-33.

[99] *Id.*

[100] *Id.*

six Blues currently offer employer-sponsored Commercial Health Benefit Products through Non-Blue Affiliates:

**Table 1:**
**Non-Blue Affiliates Offering Employer-Sponsored Commercial Health Benefit Products**

| Blue | Blue's ESAs | Non-Blue Affiliate(s) | Geographic Operations of Non-Blue Affiliate(s) | Affiliate(s) Competition Outside of ESA |
|------|-------------|----------------------|------------------------------------------------|------------------------------------------|
| Elevance | California, Connecticut, Colorado, Nevada, Georgia, Indiana, Kentucky, Maine, Missouri, New Hampshire, New York, Ohio, Virginia, and Wisconsin | (i) HealthLink, Inc.; and (ii) IEC, Group, Inc. d/b/a AmeriBen. | (i) Missouri, Illinois, and Kansas counties in and near Kansas City; (ii) Arizona, Utah, Colorado, and Oregon. | (i) Most of Illinois and Kansas counties in and near Kansas City; (ii) Arizona, Utah, and Oregon. |
| Cambia | Idaho, Oregon, Utah, and most counties in Washington | (i) Asuris Northwest Health; (ii) BridgeSpan Health Company; and (iii) Healthcare Management Administrators, Inc. | (i) Eastern Washington; (ii) Oregon, Utah, and Washington; (iii) Idaho, Michigan, Oregon, Washington, and Utah. | (i) Washington counties of Adams, Benton, Chelan, Douglas, Ferry, Franklin, Grant, Kittitas, Lincoln, Okanogan, Pend Oreille, Spokane, Stevens, and Whitman; (ii) Washington counties of Benton, Franklin, and Spokane; (iii) Michigan, and the Washington counties of Adams, Benton, Chelan, Douglas, Ferry, Franklin, Grant, Kittitas, Lincoln, Okanogan, Pend Oreille, Spokane, Stevens, and Whitman. |
| Premera | Washington State (excluding Clark County) and Alaska | LifeWise Health Plan of Washington | Washington | Clark County, Washington |
| Excellus | Central New York | Univera Healthcare | New York counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming | New York counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming |
| Independence | Southeastern Pennsylvania | AmeriHealth, Inc. | New Jersey | New Jersey |
| Capital | Central Pennsylvania | Avalon Insurance Company | Pennsylvania | Northeastern, Western, and Southeastern Pennsylvania |

399.    Table 2 likewise reveals there are only six Blues with Non-Blue Affiliates that currently offer Exchange Plans:

**Table 2: Non-Blue Affiliates Offering Exchange Plans**

| Blue | ESAs | Non-Blue Affiliate(s) | Geographic Operations of Non-Blue Affiliate(s) | Geographic Operations Outside of ESA |
|------|------|----------------------|------------------------------------------------|--------------------------------------|
| Elevance | California, Connecticut, Colorado, Nevada, Georgia, Indiana, Kentucky, Maine, Missouri, New Hampshire, New York, Ohio, Virginia, and Wisconsin | Wellpoint | Florida, Maryland, and Texas | Florida, Maryland, and Texas |

**COMPLAINT**

| Cambia | Idaho, Oregon, Utah, and most counties in Washington | Asuris Northwest Health; BridgeSpan Health Company | Oregon, Washington, and Utah | -- |
| Premera | Washington State (excluding Clark County) and Alaska | LifeWise Health Plan of Washington | Washington | Clark County, Washington |
| Excellus | Central New York | Univera Healthcare | New York counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming | New York counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming |
| Independence | Southeastern Pennsylvania | AmeriHealth, Inc. | New Jersey | New Jersey |
| Independence and BCBS-MI | Southeastern Pennsylvania and Michigan | AmeriHealth Caritas | Delaware, Florida, North Carolina, and South Carolina | Delaware, Florida, North Carolina, and South Carolina |

400.    As part of their settlement of subscriber class claims, Defendants also agreed to eliminate Standards 10(2.2) and 6(G)(2.2), which were both in subsection (2), "Guidelines Subject to Mediation/Arbitration."  Significantly, however, Defendants have not eliminated the principal language contained in Standards 10 and 6(G) themselves, which continue to require:

> [D]uring each year, a Plan and its Controlled Affiliate(s) engaged in providing licensable services . . . ***shall use their best efforts*** to promote and build the value of the Blue Cross [for Blue Cross Licensees] and Blue Shield [for Blue Shield Licensees] Marks.

(emphasis added).  Nor have Defendants eliminated Section 9(b) of the BCBSA's License Agreement, which empowers themselves to vote to terminate a Blue Plan's license for:

> [S]uch other reason as is determined in good faith immediately and irreparable to threaten the integrity and reputation of BCBSA, the Plans and/or the Licensed Marks.

The Guidelines and License Agreement implemented *by* BCBSA are anticompetitive restraints and regulations negotiated and agreed to by and amongst the Blues.  That is, the Blues have agreed, and continue to agree, that each will use "their best efforts" and that each can be terminated by a vote of the others for essentially any reason.

401.    In addition, there are multiple facts plausibly indicating and even confirming an agreement among the Blues to continue to limit the extent to which the Blues can compete with Blue Plans via Non-Blue Affiliates.  This includes at least the facts alleged in the remainder of this subsection.

402.     First, Defendants have a demonstrated ability to reach agreement.  As detailed throughout this Complaint, the Blues have a history of entering into and abiding by anticompetitive agreements.  Defendants do not deny that many of these agreements, including the anticompetitive ESA allocation agreements, continue to be enforced.  The BCBSA Board of Directors also maintains the ability to terminate for breaches of the ESA allocation agreements, among other purported violations of unlawful restraints.

403.     Second, Defendants' collective continued control over entry into the so-called "family" facilitates and maintains the agreements not to compete.  An industry's social structure affects its conduct.  It is easier for competitors to reach agreement, detect cheating, and punish deviations from an agreement in markets anchored by familiar social structures.  Industries that are close-knit and in which competitors are friendly with each other are more likely to reach collusive arrangements. It is hard to imagine a relationship among competitors more conducive to collusion than the relationship among the Blues.  Defendants have agreed that entry to the conspiracy is controlled such that no "strangers" outside of the Blue "family" can join.  This enables the conspiracy to avoid including entities that would cheat on the conspiracy by competing or allowing any shareholders to acquire enough equity in any entity that they may induce the entity to cheat on the conspiracy.

404.     In addition, Blue Plan CEOs have and continue to have fiduciary responsibilities to both their individual Blue Plan and BCBSA.  The BCBSA Handbook unequivocally provides the following directive for Blue Plan CEOs: "As a BCBSA decision-maker, you are ultimately responsible—whether acting as a Member Plan representative, Board or Committee members—for advancing BCBSA's Brand-building activities."  Blue Plan CEOs are also instructed to: "Consider issues from the point of view of the Blue System as a whole.  Consider proposed actions separately from whether they coincide or diverge from your Plan's individual interests."

405.     The Blues also participate in inter-plan programs such as the BlueCard Program.  This activity further facilitates the "family" atmosphere, as explained in the BCBSA Handbook:

> You'll find in your various roles that it's not always easy to get everyone in the Blue family to agree.  One of your key challenges will be finding appropriate ways to create connections among the

> Plans that strengthen the Brands by better serving customers. . . . To build these Plan connections, your predecessors made it a License requirement for Plans to participate in certain inter-Plan programs: for example, the BlueCard/ITS program enables Plans to transmit claims data . . . .

406.    Third, Defendants have the ability to detect breaches of the agreement.  It is easier for competitors to reach agreement and punish cheating on an agreement in markets where detection of cheating is possible.  Regular monitoring allows quicker responses to correct a defector's behavior.  BCBSA continues to receive information regarding each Non-Blue Affiliate's financial performance—in fact, this information is necessary to enforce the Local Best Efforts Rule.  As detailed in Section VII.D.3, *supra*, each Blue submits quarterly and annual reports regarding its finances and/or subsidiaries, and BCBSA further facilitates the cooperation and communications between the Blue Plans to suppress competition.

407.    In fact, the Blues initially imposed monitoring of Non-Blue Affiliates specifically to ensure that they did not grow enough to meaningfully compete with the Blue Plans.  In 1992, the BCBSA Board of Directors passed a resolution which provided that BCBSA should not regulate Non-Blue Affiliates unless they "significantly compromise protection of the names and marks."  The Board also resolved that where there is a "significant reason to believe that unbranded activities are impairing the" Blue Marks, BCBSA staff is authorized to collect information about "all subsidiaries" "beyond current general practices."  Thus, Defendants can monitor each others' compliance with their anticompetitive agreements.

408.    Fourth, Defendants also have the ability to punish breaches.  As detailed in Section VII.D.1, *supra*, the Blues have agreed with one another that each would face enormous penalties if its license were terminated.  These penalties include the loss of the use of the Blue Marks, astronomical financial penalties (some of which would be used to fund a local competitor to the terminated Blue Plan), and, via the Uncoupling Regulations, the loss of the use of trademarked terms other than the Blue Marks (*i.e.* "Anthem").  Defendants have also agreed that a Blue Plan can be terminated by a vote of the Blue Plans for any "such other reason . . . to threaten the integrity and reputation of BCBSA, the Plans and/or the Licensed Marks"—that is, essentially any reason agreed to by vote of the Blues.

409.    Fifth, Defendants have a history of agreeing to and implementing anticompetitive rules and restraints that extend beyond written contractual commitments.  In fact, that is exactly what Defendants did with the National Best Efforts Rule, which was applied and adhered to well before it was formalized in the now partially-revoked Guidelines.  As detailed herein, in the late 1980s and early 1990s, the Blues' Non-Blue Affiliates competed with Blues.  In 1996, the BCBSA Board of Directors adopted a rule that mimics the later National Best Efforts Rule but limited its application only to companies seeking a BCBSA license for the first time.  Nevertheless, the Blues collectively abided by the rule even before Standards 10(2.2) and 6(G)(2.2) were explicitly adopted in 2005.  Thus, even when a rule was not yet or no longer contractual, the Blues did and continue to do what is necessary to ensure the success of the larger anticompetitive scheme.[101]

410.    Sixth, the Blues have acted and continue to act contrary to their own economic self-interest by limiting the extent to which the Blues can compete via Non-Blue Affiliates.  It is undisputed that the Blues are potential competitors.  In competitive markets where collusion is not present, firms expand and compete.  Before they agreed in 1996 to limit the growth of Non-Blue Affiliates, the Blues grew their Non-Blue Affiliates and competed via those affiliates.  Since 1996, however, they have jointly refrained from such competition, and instead have offered Commercial Health Benefit Products (including the offering of Self-Funded Health Benefit Plans) largely within each Blue Plan's ESA, a practice they continue to the present.  This refusal to compete does not make economic sense.  In a truly competitive market, the Blues would operate Non-Blue Affiliates that could and would compete in other Blues' ESAs.

### 3) In All Events, Competition is Still Limited as a Result of the National Best Efforts Rule

411.    In short, the status quo created by the National Best Efforts Rule remains unchanged.  Whether or not by agreement, since putatively terminating the National Best Efforts

---

[101] Defendants' history of abiding by the National Best Efforts Rule before it was formalized is consistent with the fact that many of the Blues have entered into what they call "gentlemen's agreements" not to compete in ways that are even more limited than what they are allowed to do under BCBSA's written agreements.

Rules, the Blues **have not** taken steps to increase competition via Non-Blue Affiliates.  The

distortion caused by the National Best Efforts Rule persists post-2021 and continues to have

enduring anticompetitive consequences and effects, including injury to Plaintiffs specifically.

## VIII.    THE BLUES' HORIZONTAL AGREEMENTS, INCLUDING TO LIMIT NON-BLUE COMPETITION, ARE PER SE VIOLATIONS OF THE SHERMAN ACT

412.    After years of litigation and extensive summary judgment briefing, the MDL Court

found that the ESA Allocation Agreements, together with the additional output restrictions of the

National Best Efforts Rule, constitute a per se violation of the Sherman Act.[102]  Thus, Defendants'

conduct is presumed to be illegal without further inquiry into the restraint's actual effects on the

markets or the intentions of those individuals engaged in the unlawful conduct.

413.    The MDL Court also expressly found, over Defendants' challenges, that the

stringent per se standard of review would likewise apply to providers' allegations "involving the

aggregation of ESAs and the [National Best Efforts Rule]."[103]  The Court reasoned that

"restricting the development of non-Blue insurance options for Subscribers could also have the

effect of reducing the options available to Providers to contract with non-Blue health insurers."[104]

414.    Defendants' conduct, which the MDL Court already found to be per se unlawful,

continued through at least April 2021, when the Blues purportedly eliminated the National Best

Efforts Rule.  And even then, as detailed above, because Defendants' unlawful conduct persists—

*i.e.*, despite the resolution to terminate the National Best Efforts Rule, nothing has changed and

the Blues continue to limit the extent to which they can compete with one another via Non-Blue

---

[102] MDL Standard of Review Order at 1273.

[103] MDL Provider Standard of Review Order at *6.

[104] *Id.*  Indeed, the MDL Court's analysis and conclusion is consistent with Plaintiffs' own experience.  As detailed herein, Non-Blue Affiliates, in the limited instances where they do exist, do not increase the options available to Provider Plaintiffs to contract with payors outside of the Blue Plans.  For certain Plaintiffs (Allina, CentraCare, Fairview, and UF Health), they simply do not have operations in any of the geographic areas in which competition between a Blue and a Blue's Non-Blue Affiliate exist.  And for other Plaintiffs (Mayo Clinic, UCMC, RWJ Barnabas, and Atlantic), to the extent a Non-Blue Affiliate exists in one of the geographic areas in which the system operates, the Non-Blue Affiliate—due to the National Best Efforts Rule—does not have significant enough market share to meaningfully increase the options available to Plaintiffs that operate in those ESAs.

Affiliates—it constitutes a per se violation of the antitrust laws beyond April 2021 and continuing through the present.

415.    In all events, even assuming the per se violation concluded in April 2021 (which, for the reasons provided herein, it did not), the anticompetitive effects of the per se violation, and thus, injury to Plaintiffs are continuing through the present.

## IX.    EVEN UNDER A RULE OF REASON STANDARD, THE BLUES' CONDUCT VIOLATES FEDERAL AND STATE ANTITRUST LAW

416.    Defendants' conduct is per se unlawful under both federal and state antitrust law. However, were the quick look or rule or reason standard to apply, Defendants' conduct would still be unlawful under federal and state antitrust laws.

417.    The Blues participate in a number of markets which have been affected by their horizontal market allocation and other anticompetitive conduct as alleged herein.  The Blues have high market share in many markets, and in those markets and in markets where they do not have high market shares, they have market power or have otherwise exploited anticompetitive actions by leveraging the volume of their combined members and the BlueCard Program.

418.    The Blues have carried out their agreements with an intent to increase their "differentials," *i.e.*, their unlawfully obtained reductions in reimbursements to healthcare providers such as Plaintiffs.  Due to the Blue Plans' subscriber base and market power, healthcare providers such as Plaintiffs have no choice but to contract with their local Blue Plans to be included in the provider network.  As a result, Plaintiffs and other healthcare providers are harmed by the would-be competitor Blues, who maintain artificially low reimbursement rates to healthcare providers through their unlawful horizontal market allocation.

### A.    Relevant Product Market

419.    The Relevant Product Market is the purchase by Commercial Health Insurance Companies of goods and services from healthcare providers, excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid programs.

420.    Commercial Health Insurance Companies are in the business of selling Commercial Health Benefit Products and may offer other products or plans as well, such as

products or plans purchased or offered by government programs, including Medicare, Medicare Advantage, Medicaid, and managed Medicaid. However, because of Defendants' agreements to carve up the market and not compete, the only Blue Plan that will contract with a Plaintiff is the Blue Plan with the ESA that covers a given Plaintiff's geographic region.[105]

421.    Because healthcare providers compete for in-network contracts, which account for a broad array of healthcare goods and services, the Relevant Product Market is not segmented by the type of healthcare goods or services at issue. The extent to which individual covered goods and services compete or do not compete with each other or with goods and services not covered by a particular health plan is not relevant.

422.    The purchase of goods and services from healthcare providers through government programs, including Medicare Advantage and managed Medicaid, are excluded from the Relevant Product Market. The negotiations between healthcare providers and Commercial Health Insurance Companies of contracts and reimbursement rates for patients covered by government programs are typically done separately than those negotiations for patients covered by Commercial Health Benefit Products. Further, reimbursement rates for government programs, including Medicare Advantage and managed Medicaid are normally significantly lower than those for Commercial Health Benefit Products. As a result, Plaintiffs and other healthcare providers make little to no profit and sometimes lose money by treating patients covered by these government programs.

423.    Here, the Relevant Product Market satisfies the hypothetical monopsonist test. A profit-maximizing hypothetical monopsonist in the Relevant Product Market would likely lower reimbursement rates for healthcare goods and services provided by Plaintiffs and other healthcare providers by imposing at least a small but significant and non-transitory reduction in price

---

[105] There are limited exceptions for certain facilities in counties contiguous to other Blue Plans' ESAs which allow two, and only two, Blue Plans to contract with a provider. In addition, Plaintiffs with facilities in more than one ESA, such as Mayo Clinic, contract with more than one Blue Plan. However, Defendants have jointly agreed that each facility must contract only with the Blue Plan with the ESA covering that facility, meaning that each facility can contract with only one Blue Plan.

(SSNRP). Plaintiffs would be forced to accept a SSNRP because they have no reasonable substitutes to treating patients covered by Commercial Health Benefit Products.

424. Plaintiffs and other healthcare providers earn revenue by treating patients covered by Commercial Health Benefit Products and those who are not (*i.e.*, patients covered by government insurance programs and patients who pay entirely out of pocket). However, the vast majority of Plaintiffs' revenue in excess of costs is from patients covered by Commercial Health Benefit Products. In fact, healthcare providers, including Plaintiffs, often rely on revenue from treating patients covered by Commercial Health Benefit Products to cover the losses they suffer from treating other patients, as government program reimbursement rates are extremely low and it is often hard to collect payment from patients that agree to pay out of pocket. Thus, solely treating patients covered by government programs and who pay out-of-pocket would result in significant losses to Plaintiffs and other healthcare providers.

425. For healthcare providers, including Plaintiffs, the substitutability between Commercial Health Insurance Companies and other payors (patients paying out-of-pocket and government insurers) of healthcare goods and services, is low, as reflected in measures such as a low cross elasticity of demand.

426. In the alternative, three relevant product submarkets exist within the Relevant Product Market (the "Relevant Product Submarkets"): (i) the purchase by Commercial Health Insurance Companies of goods and services from healthcare professionals; (ii) the purchase by Commercial Health Insurance Companies of goods and services from healthcare facilities; and (iii) the purchase by Commercial Health Insurance Companies of durable medical equipment ("DME") by residents and regions in which Plaintiffs operate.

427. Like the Relevant Product Market, each of the Relevant Product Submarkets excludes purchases of prescription drugs and purchases for Medicare Advantage and managed Medicaid.

428. Practical indicia support the segmentation into these alternative Relevant Product Submarkets. For example, the healthcare industry recognizes distinctions among healthcare professional services, healthcare facility services, and DME, and insurers often differ in the

reimbursement methodologies they employ for each of these groups.  Many healthcare providers, including most Plaintiffs, have separate contracts with Commercial Health Insurance companies covering professional services, facility services, and DME.

429.    Commercial Health Insurance Companies' contracting teams and processes often differ among these alternative Relevant Product Submarkets.  Plaintiffs and other providers of healthcare facility services and healthcare professional services face the same options for the purchase of their goods and services described above.  As a result, in each alternative Relevant Product Submarkets, the substitution between Commercial Health Insurance Companies and other payors is low, as reflected in measures such as a low cross elasticity of demand.  A profit-maximizing hypothetical monopsonist in these alternative Relevant Product Submarkets would likely reduce amounts paid to Plaintiffs and other healthcare providers below competitive levels by imposing at least a SSNRP.

**B.    Relevant Geographic Markets**

430.    For the Relevant Product Market and the alternative Relevant Product Submarkets (other than for alternative Relevant Product Submarket for DME), the Relevant Geographic Markets are each Blue Plan's ESA in which a Plaintiff has operated since July 24, 2008.  For DME, the Relevant Geographic Market is nationwide because DME can be shipped across state lines.

431.    As previously detailed, most Blue Plans' ESAs are coterminous with state boundaries.  For example, BCBS-FL's ESA is the entire State of Florida.  BCBS-MN's ESA is the entire state of Minnesota.  These ESAs are referenced by each Blue's License Agreements with BCBSA.

432.    But for the conspiracy, each Blue would compete or would potentially compete in multiple Relevant Geographic Markets, if not throughout the entire United States.

433.    The Relevant Geographic Markets are consistent with industry practice and commercial realities.  Plaintiffs have built their patient base and have invested in physical assets to treat patients located in their respective Relevant Geographic Markets.

434.    When Plaintiffs contract with the Blue Plans for provider reimbursement, the negotiations are generally done on an ESA-by-ESA basis.  For example, Plaintiff Mayo Clinic negotiates one contract with BCBS-MN for its facilities and services provided in Minnesota, one contract with BCBS-FL for its facilities and services provided in Florida, and one contract with BCBS-AZ for its facilities and services provided in Arizona.

435.    The Relevant Geographic Market also satisfies the hypothetical monopsonist test. Healthcare providers, such as Plaintiffs, who have built their patient base and invested in physical assets located in their home states, are unlikely or unable to respond to a SSNRP by moving their facilities and practices out of their respective Relevant Geographic Market.  Therefore, a profit-maximizing hypothetical monopsonist in the Relevant Product Markets or alternative Relevant Product Submarkets in the Relevant Geographic Markets would likely reduce amounts paid to Plaintiffs and other healthcare providers below competitive levels by imposing at least a SSNRP.

436.    In the alternative, for the Relevant Product Market and the alternative Relevant Product Submarkets (other than for alternative Relevant Product Submarket for DME), the Relevant Geographic Submarkets are the Core-Based Statistical Areas ("CBSAs"), which include Metropolitan Statistical Areas ("MSAs"), Micropolitan Statistical Areas ("μSAs"), and counties not included in either an MSA or μSA, in the ESAs in which Plaintiffs are located.

437.    Core-Based Statistical Areas are defined by the U.S. Office of Management and Budget according to published standards applied to U.S. Census Bureau data.  The U.S. Office of Management and Budget states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."

438.    Healthcare providers usually provide services to patients living or working in relatively close proximity to their offices or other facilities.  Plaintiffs have invested in physical capital in their local geographic areas constituting the Relevant Geographic Submarkets and invested in their human capital (reputation and referral patterns) that is specific to their local geographic areas constituting the Relevant Geographic Submarkets.  Plaintiffs also often define

their primary service areas based on where the majority of their patients live or work, regardless of whether they are familiar with the term Core-Based Statistical Area.

439.    As alleged above, healthcare providers, such as Plaintiffs, that have built their patient base and invested in physical assets located in their home states, are unlikely or unable to respond to a SSNRP by moving their facilities and practices out of their respective Relevant Geographic Submarket.

440.    The disincentive to moving is even stronger because each Blue Plan has market power throughout its ESA and healthcare providers cannot contract with Blue Plans that operate in ESAs other than that in which the provider is located.  Therefore, leaving the provider's local area makes little difference unless the provider is willing to leave the ESA entirely.  Even if a provider were to move to another ESA, it would still be subject to whichever Blue Plan has market power in that ESA, and thus still injured by Defendants' anticompetitive arrangement.

441.    Hence, for the Relevant Product Market or alternative Relevant Product Submarkets, the substitution between Commercial Health Insurance Companies in the Relevant Geographic Markets or alternative Relevant Geographic Submarkets and Commercial Health Insurance Companies outside the Relevant Geographic Markets or alternative Relevant Geographic Submarkets identified above is low, as reflected in measures such as a low cross elasticity of demand.  A profit-maximizing hypothetical monopsonist in the Relevant Product Market or alternative Relevant Product Submarkets in the Relevant Geographic Markets or alternative Relevant Geographic Submarkets would likely reduce prices below competitive levels by imposing at least a SSNRP.

### C.    The Blues Have Market Power in the Relevant Markets

442.    The Blues have carried out their anticompetitive agreements to establish and maintain market power in the Relevant Markets and alternative Submarkets described above. According to an internal BCBSA Assembly of Plans report, ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . .  Stronger provider agreements for the same reason."  Section III of this Complaint, *supra*, explains, including with detailed

statistics, that Defendants have large provider networks, and a large share of Members, subscribers and national accounts.

443.    BCBS-AZ has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and CBSAs throughout the state of Arizona, including the areas where Plaintiff Mayo Clinic has operated during the relevant time period.  BCBS-AZ's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA. For example, in 2023, BCBS-AZ had 25% of the market of commercially insured patients in Arizona.  In addition to BCBS-AZ's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-AZ to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

444.    BCBS-FL has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Florida, including the areas where Plaintiffs Mayo Clinic and UF Health have operated during the relevant time period.  BCBS-FL's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-FL had 36% of the market of commercially insured patients in Florida, the largest share of any commercial insurer in the state.  It also has the largest share of commercially insured patients in every MSA throughout Florida.  For example, in the Jacksonville MSA, where both Plaintiffs Mayo Clinic and UF Health have facilities, BCBS-FL had 53% of the market of commercially insured patients in 2023.  In the Gainesville MSA, where Plaintiff UF Health is headquartered and has substantial facilities, BCBS-FL had 69% of the market of commercially insured patients in 2023.  In addition to BCBS-FL's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-FL to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

445.    HCSC, operating as BCBS-IL, has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Illinois, including the areas where Plaintiff UCMC has operated during the relevant time period. BCBS-IL's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-IL had 63% of the market of commercially insured patients in Illinois, the largest share of any commercial insurer in the state.  It also has the largest share of commercially insured patients in various CBSAs throughout Illinois.  In the Chicago-Naperville-Elgin MSA, where Plaintiff UCMC is headquartered and has substantial facilities, BCBS-IL had 61% of the market of commercially insured patients in 2023.  In addition to BCBS-IL's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-IL to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

446.    BCBS-IN, a subsidiary of Elevance, has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Indiana, including the areas where Plaintiff UCMC has operated during the relevant time period.  BCBS-IN's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-IN had 56% of the market of commercially insured patients in Indiana, the largest share of any commercial insurer in the state.   In addition to BCBS-IN's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-IN to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

447.    BCBS-IA, a subsidiary of Wellmark, has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Iowa, including the areas where Plaintiff Mayo Clinic has operated during the relevant

time period.  BCBS-IA's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-IA had 47% of the market of commercially insured patients in Iowa, the largest share of any commercial insurer in the state.  In addition to BCBS-IA's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-IA to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

448.    BCBS-MN has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Minnesota, including the areas where Plaintiffs Allina, CentraCare, Fairview, and Mayo Clinic, have operated during the relevant time period.  BCBS-MN's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-MN had 38% of the market of commercially insured patients in Minnesota, the largest share of any commercial insurer in the state.  It also has the largest share of commercially insured patients in every MSA throughout Minnesota.  For example, in the Mankato MSA, where both Plaintiffs Allina and Mayo Clinic operate, BCBS-MN had 56% of the market of commercially insured patients in 2023.  In the Minneapolis-St. Paul-Bloomington MSA, where Plaintiffs Allina, CentraCare, Fairview, and Mayo Clinic operate, BCBS-MN had 32% of the market of commercially insured patients in 2023.  In the St. Cloud MSA, where Plaintiff CentraCare operates, BCBS-MN had 43% of the market of commercially insured patients in 2023.  In the Rochester MSA, where Plaintiff Mayo Clinic has substantial facilities, BCBS-MN had 56% of the market of commercially insured patients in 2023.  In addition to BCBS-MN's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-MN to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

449.     BCBS-NJ has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of New Jersey, including the areas where Plaintiffs Atlantic and RWJ Barnabas have operated during the relevant time period.  BCBS-NJ's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-NJ had 39% of the market of commercially insured patients in New Jersey, the largest share of any commercial insurer in the state.  It also has the largest share of commercially insured patients in every MSA throughout New Jersey.  For example, in the Atlantic City-Hammonton MSA, where Plaintiff Atlantic operates, BCBS-NJ had 77% of the market of commercially insured patients in 2023.  In the Ocean City MSA, where Plaintiff RWJ Barnabas operates, BCBS-NJ had 74% of the market of commercially insured patients in 2023.  In addition to BCBS-NJ's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-NJ to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

450.     BCBS-NYC-Albany, a subsidiary of Elevance, has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout its ESA, including the areas where Plaintiff RWJ Barnabas has operated during the relevant time period.  BCBS-NYC-Albany's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-NYC-Albany had 16% of the market of commercially insured patients in New York, the second-largest share of any commercial insurer in the state.  In addition to BCBS-NYC-Albany's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-NYC-Albany to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

451.    Independence has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout its ESA, including the areas where Plaintiff RWJ Barnabas has operated during the relevant time period.  Independence's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in the Philadelphia-Camden-Wilmington MSA, where Plaintiff RWJ Barnabas operates, Independence had 36% of the market of commercially insured patients in 2023.

452.    Highmark, operating as Highmark Blue Shield, has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Pennsylvania, including the areas where Plaintiff RWJ Barnabas has operated during the relevant time period.  Highmark's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  Because Highmark only entered the Southeastern Pennsylvania (Philadelphia) market, where Plaintiff RWJ Barnabas operates, in 2024, specific market share data are not yet available.  In addition to Highmark's and Independence's own Members, their market power is also derived from their agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in the ESA in which both Independence and Highmark operate must contract with Independence or Highmark to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico

453.    BCBS-WI, a subsidiary of Elevance, has market power in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA and in CBSAs throughout the state of Wisconsin, including the areas where Plaintiffs Allina, Fairview, and Mayo Clinic have operated during the relevant time period.  BCBS-WI's market power derives from its total enrollment and enrollment share of commercially insured patients in the Relevant Product Markets or alternative Relevant Product Submarkets in its ESA.  For example, in 2023, BCBS-WI had 20% of the market of commercially insured patients in Wisconsin.  It also has the largest share of commercially insured patients in various CBSAs throughout Wisconsin.  For example, in

the Milwaukee-Waukesha MSA, where Plaintiff Allina operates, BCBS-WI had 22% of the market of commercially insured patients in 2023.  In the Eau Claire MSA, where Plaintiff Mayo Clinic operates, BCBS-WI had 31% of the market of commercially insured patients in 2023.  In addition to BCBS-WI's own Members, its market power is also derived from its agreement to the anticompetitive ESA allocation and related programs, including the BlueCard Program.  These agreements mean that providers in its ESA must contract with BCBS-WI to access Blue Plan Members in all 50 states, Washington D.C., and Puerto Rico.

454.    But for the anticompetitive ESA allocation and related agreements, one or more Blues would have entered the ESAs above and competed with the incumbent Blues, and/or a third party "stranger" to the conspiracy would have acquired one or more Blue Plans.  Through the acquisition restrictions, the Blues have conspired to force competitors to build their own networks and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue Plan's business.  This entry or potential entry would have reduced the market power of the incumbent Blue, resulting in higher reimbursement rates paid to Plaintiffs and other health care providers.  The ESA allocation and related agreements therefore produce an anticompetitive barrier to entry, reducing the likelihood of entry by a Commercial Health Insurance Company unaffiliated with the Blues, and thereby operate as an output restriction.

455.    Moreover, if the anticompetitive conduct which erects contractual barriers to entry were to cease, many non-incumbent Blue Plans would face fewer barriers to entry into many new ESAs than other entities would face.  Many Blue Plans have a significant number of Members outside of their ESA through the BlueCard Program and/or National Accounts Program.  The Blue Plans may also offer affiliated Medicare, Medicaid, or non-Blue affiliate commercial plans and already have provider relationships outside of their ESA.  In addition, a "stranger" third party may choose to acquire a network by buying some or all of an existing plan doing business in that area.  Therefore, Defendants' anticompetitive agreements work to prevent competition by the potential competitors, which face the lowest barriers to entry and thereby operate as an output restriction.

456.     There are significant barriers to entry for a commercial insurer to enter the Relevant Markets and alternative Submarkets.  The barriers to entry include, among others: (i) establishing a provider network; (ii) establishing a subscriber base; and (iii) complying with state regulatory requirements.  These barriers to entry are particularly detrimental to the entry of new competitors where Defendants' anticompetitive conduct has allowed an incumbent Blue to achieve substantial market power.

457.     Defendants' anticompetitive agreements inhibit interbrand competition by, among other things, promoting local dominance and creating barriers to entry by Commercial Health Insurance Companies other than the Blues, as well as hindering the Blues' own ability to compete with other brands through innovation such as cost control and value-based payment.

458.     Blues have taken other actions to protect their market power.  Most Blue Plans have a policy of prohibiting assignments of Blue Plan benefits from Members to providers, including Plaintiffs.  This effort helps force providers, including Plaintiffs, to remain in network. The Blue Plans also structure and implement out-of-network benefits for Members to discourage Members from using those out-of-network benefits.  Some Blue Plans also eliminate or cap out-of-network benefits.  The Blue Plans have retaliated or threatened retaliation against health care providers who attempt to operate outside of a Blue network.

459.     Although they are independent entities that should be in heated competition with one another, the individual Blue Plans use their ability to steer (or not steer) patients through the BlueCard and National Accounts Programs as a means to exercise market power.

**D.     Defendants' Conduct is Anticompetitive**

460.     As detailed throughout this Complaint, Defendants' conduct is an unreasonable and undue restraint on trade.

461.     The following anticompetitive acts by Defendants violate the antitrust laws both independently and collectively:

- Defendants have created the ESAs, which are facially anticompetitive because they both protect each Blue from other Blues entering, or potentially entering, their ESA (a

protective fence) and prohibit each Blue from entering, or potentially entering, any other Blue's ESA (a restrictive cage).

- The Blues' agreements to Local Best Efforts and National Best Efforts rules are anticompetitive. These rules explicitly limit the amount of non-Blue business each Blue may conduct and also reduce the total amount of business each Blue conducts since their Blue Plan business is already limited by joint agreement. These agreements artificially limit competition between commercial insurers purchasing health care goods, services, and facilities, disincentivize the health care goods, services, and facilities in Plaintiffs' states and regions, and reduce the overall output of health care purchasing.

- Defendants have collectively implemented the BlueCard and National Accounts Programs. Pursuant to these programs, the Blues gain additional power within their conspiracy-created ESAs and also significantly increase Plaintiffs' administrative costs, claim denials, underpayments, and payment delays, and dissuade non-local Blues from negotiating contracts with Plaintiffs even if doing so makes economic and practical sense.

- Certain Blue Plans have established side agreements not to compete with Blue Plans in contiguous areas even where ostensibly permitted to do so by the Licensing Agreements.

- The Blues share Plaintiffs' competitively-sensitive contract information among themselves either directly or through third parties created or controlled by the Blue Plans. This decreases reimbursement rates paid to Plaintiffs and harms competition even within those limited geographic areas where the Blue Plans are (or should be) direct competitors.

- The Blues engage in various other conduct—possible only because of the anticompetitive agreements—that discourages health care providers such as Plaintiffs from being out-of-network.

462.    As alleged above, Defendants have jointly implemented additional constraints to fortify these anticompetitive agreements, including agreeing to astronomical termination

penalties, jointly controlling entry into the conspiracy family, and monitoring each others' compliance with the anticompetitive agreements.

463.    The Blues expressly designed the anticompetitive agreements to combat Blue-on-Blue competition that was perceived to harm the Blue Plans' collective "differentials."

464.    Defendants' anticompetitive conduct has prevented both new Blue Plans and non-Blue brands from entering Plaintiffs' states and regions, while also preventing Plaintiffs from negotiating with non-local Blue Plans on the rate of reimbursement for providing goods and services to their Members.  But for the anticompetitive conduct described above, the Blues would compete with each other.  In the absence of the illegal conduct, at least one more additional Blue would operate in each of the geographic markets in which Plaintiffs operate, or the threat of such entry would reduce the local Blue Plan's ability to exploit its market power through the possibility of potential entry.

465.    Defendants' anticompetitive conduct has resulted in the Blues having monopsony power in the Relevant Markets or alternative Relevant Submarkets in which they operate.

466.    Defendants' success in exercising their market power is also evidenced by the Blues' consistent achievement of outsized profits.

467.    The Blues' anticompetitive conduct has no procompetitive benefits or, if there could be any procompetitive benefits from some aspect of Defendants' conduct, those benefits are far outweighed by the anticompetitive effects of the conduct.  More specifically:

- Defendants have not created or adopted new products or services that would not otherwise exist absent their anticompetitive conduct.

- The formation of ESAs and the other anticompetitive agreements are not necessary to protect any common law trademark rights that might exist.  Blue Plans other than the St. Paul and Buffalo Plans never gained independent common law exclusive rights to the Blue Cross and/or Blue Shield trade markets and trade names, either because they were abandoned or because the other Blues were licensees.  Additionally, BCBSA has acknowledged that overlapping services areas do not cause consumer confusion.  In the limited areas where multiple Blue Plans currently compete (*e.g.*, California, Idaho,

and parts of New York, Pennsylvania, and Washington), there is also no evidence of customer confusion.

- The Blues would be able to compete with other commercial health care insurers under Blue or non-Blue brands on a local, state, and/or nationwide basis without the anticompetitive agreements.

- Defendants' anticompetitive conduct has not increased efficiencies for individual Blues. Reduced competition has suppressed innovation by the Blues and Defendants' anticompetitive agreements are not necessary for Blues to determine whether to remain focused on a single geographic area or to expand.

- The anticompetitive agreements are not necessary to prevent "free riding" on investments in the Blue Marks, as there are other, procompetitive means of preventing such free riding, none of which require anticompetitive market divisions and prohibitions on operating under non-Blue brands pursuant to the National Best Efforts and/or Local Best Efforts rules.

- The BlueCard and National Accounts Programs also increase inefficiencies and reduce consumer welfare. Any purported procompetitive effects of the national programs are outweighed by the anticompetitive effects that they create. Other health insurers and managed care companies have been able to offer nationwide networks of health care coverage without anticompetitive agreements.

## X.   DEFENDANTS HAVE INJURED COMPETITION THROUGHOUT THE UNITED STATES

### A.   The Blues Would Compete if They Did Not Agree to Restrain Competition

468.   As alleged above, Defendants, who are horizontal competitors, have agreed to refrain from competition. The individual Blues, as licensees, members, and parts of the governing body of BCBSA, have conspired with each other (the member plans of BCBSA) and with BCBSA to create, approve, abide by, and enforce the restraints and regulations of BCBSA, including the per se illegal ESA allocation agreements and the agreements that fortify these policies, including the best efforts rules and disciplinary rules, in the License Agreements and

Guidelines.  As detailed in Section VII.A.2, *supra*, the MDL Court already found that Defendants themselves, in internal documents, have recognized the anticompetitive nature of their illegal conduct.

469.    Since the ESAs were added to the License Agreements in 1991, the Blues have abided by the ESAs and have refused to compete against each other within each ESA. Defendants have admitted in federal court that no Blue has operated its Blue-branded business outside of its ESA except as otherwise permitted by the License Agreements, Membership Standards, and/or Guidelines.  As detailed in Section VII.B, *supra*, each Blue has refused to contract with providers outside of its ESA.  Therefore, each Plaintiff has only one Blue Plan that will contract with it to provide services within each ESA in which Plaintiff operates, with limited exceptions for contiguous counties.

470.    By definition, Defendants have harmed competition by virtue of their horizontal agreements in that they have agreed not to compete with one another.  The Blues are potential competitors to contract with providers and sell Commercial Health Benefit Products.  Defendants have reduced output by reducing the number of health insurance companies competing with each Blue throughout its ESA(s) and unreasonably limiting the entry of competitor health insurance companies into each ESA.  The effect has been to prevent two of the largest five, five of the largest ten, and eleven of the largest twenty-five health insurance or managed care companies from competing in other states, reducing competition throughout the country in various ways, including by increasing market concentration and health insurer power over health insurance and related services buyers and healthcare providers, including Plaintiffs.  While the Blues offer numerous Blue Plans and could offer Non-Blue Affiliates that could and would compete effectively in the provision of Commercial Health Benefit Products in each other's ESAs but for the territorial restrictions, almost none offer Commercial Health Benefit Products outside their ESAs via Non-Blue Affiliates.[106]  But for these illegal agreements, many of the Blues would otherwise be significant competitors for contracting with providers and barriers to entry for other Commercial Health Insurance Companies would be lower, thereby increasing output.

---

[106] *See* Tables 1 and 2, *supra*, Section VII.E.2.

471.    But for the illegal acts alleged herein, the Blues could and would enter each other's ESAs and compete effectively against each other to contract with providers and to sell Commercial Health Benefit Products.  The anticompetitive agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition.

472.    The likelihood of increased competition in the absence of the illegal conspiracy is further demonstrated in several ways.

### 1)    Blue-on-Blue Competition Has Occurred When Not Banned By Joint Agreement

473.    History shows that the Blues can successfully compete with one another, unless and until they agree to stop competing.  As detailed herein, Blue Cross and/or Blue Shield Plans competed against each other for many years prior to the 1991 License Agreements.  Further, Blue Cross and/or Blue Shield Plans currently compete against each other in certain places, including California, New York, Washington, Idaho, and in parts of Pennsylvania and Georgia.  These examples of competition demonstrate that competition among Blue Plans is possible and does not undermine the Blue Marks.  The markets discussed herein are far from competitive even when two Blues compete due to the agreements of all other Blues not to compete in these ESAs.

#### a)    BCBSA Allowed Blue-on-Blue Competition in Ohio to Avoid an Antitrust Ruling, Which Was Successful Until Terminated by BCBSA

474.    The 1985 Ohio Blues litigation[107] resulted from the predecessor of Elevance's desire to compete outside of its ESA in the 1980s.  As a condition of settlement after the Ohio Attorney General asserted that the BCBSA ESA allocation system violated antitrust laws, BCBSA ultimately agreed to allow all of Ohio's Blue Plans to compete with each other from 1987 through 1991.

475.    In a 1987 letter to the Ohio Attorney General, BCBSA stated: "BCBSA recognizes that there presently exists throughout the State of Ohio sales and marketing under the BLUE

---

[107] *See* Section VII.A.1, *supra*.

CROSS and BLUE SHIELD names without regard to the former service areas, including vigorous competition among all three Member Plans in Ohio for all types of accounts."

476. Following the settlement, an attorney for CMIC declared that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers."

477. At least two of the Blue Plans saw competition as beneficial to consumers. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue Plan available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier."

478. And, of course, competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990. Nevertheless, in 1991, BCBSA proposed four "voluntary" options to the Ohio Blue Plans to eliminate this imagined problematic competition: i) merge into a single entity; ii) centralize coordination; iii) return to original ESAs; and iv) negotiate new ESAs. If the Blue Plans could not agree to any of these, BCBSA planned to require options iii or iv, or "[t]erminate all three Plans' licenses and re-license the names and marks in Ohio to a Plan best able to serve Ohio consumers and preserve and enhance the value of the names and marks."

In 1996, BCBSA achieved what it desired all along. After Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue Marks to Columbia/HCA, BCBSA revoked Blue Cross and Blue Shield of Ohio's license and transferred the license to CMIC/Anthem/Elevance, now making it the only Blue Plan operating in the state of Ohio.

1
2

        **b)**     **BCBSA Also Allowed Blue-on-Blue Competition in Maryland to Avoid an Antitrust Ruling, Which Was Successful Until the Competitors Merged**

3

     479.    As it did in Ohio, BCBSA agreed to allow competition in Maryland to avoid an

4

adverse decision from the court on pending antitrust challenges.  As of 1984, BCBSA had divided

5

Maryland between two Blue Plans.  Group Hospitalization and Medical Services, Inc.

6

("GHMSI") operated in Prince George's County and the Montgomery County suburbs of the

7

District of Columbia, while Blue Cross and Blue Shield of Maryland, Inc. ("BCBSM") operated

8

in the remainder of the state.  The State of Maryland filed suit in the U.S. District Court for the

9

District of Maryland against BCBSA, GHMSI, and BCBSM, "alleging that its use of ESAs

10

violated federal and state antitrust laws."[108]

11

     480.    The court described the defendants' agreement as "horizontal market allocation

12

among insurance companies."  During discovery, BCBSM offered testimony that its marketing

13

department expressed interest from time to time in marketing across the boundary separating it

14

from GHMSI's territory, but its CEO was determined not to do so in part because it was

15

prohibited by BCBSM's agreement with BCBSA.

16

     481.    Shortly before the court was scheduled to rule on whether the case should be tried

17

on a per se theory or under the rule of reason, defendants settled the case.  The MDL Court noted

18

that BCBSA "agreed to a settlement that allowed two Plans to compete using the Blue Marks

19

throughout the State of Maryland until 'completion of the Assembly of Blue Cross and Blue

20

Shield Plans' or January 1, 1991, whichever was later."[109]

21

     482.    Describing the settlement, Maryland's Attorney General stated: "The settlement

22

promotes the purpose of the antitrust laws by ensuring that the business decisions of potential

23

competitors are made independently and without regard to artificial marketing barriers."

24

25

26

[108] MDL Standard of Review Order at 1253 (discussing *Maryland v. BCBSA*, 620 F. Supp. 907

27

(D. Md. 1985)) (internal quotation marks omitted).  The White Paper prepared for the Assembly of Plans noted that a factor behind this lawsuit was that "only the Maryland Plan bid on a state

28

employees' contract."
[109] MDL Standard of Review Order at 1253.

483.    Of course, competition in Maryland was also not fatal to the two Blue Plans.  In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHMSI's core business was profitable in 1992. GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.  BCBSM likewise reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well.  GHMSI and BCBSM both continued to exist until they merged in 1998 to become Defendant CareFirst, which further limited Blue-on-Blue competition.

**c)**    **Despite Gentlemen's Agreements Constraining Competition in Parts of Pennsylvania, Blue-on-Blue Competition Has Been Successful in Other Parts of Pennsylvania**

484.    The history of Blue Plans in Pennsylvania reveals repeated attempts to use agreements, gentlemen's agreements, and consolidation to avoid competition, as well as the success of Blue-on-Blue competition when it has occurred.

485.    In 1995, there were five Blue Plans in Pennsylvania.  Western Blue Cross, Capital Blue Cross, Blue Cross of Northeastern Pennsylvania ("BC-NEPA"), and Independence Blue Cross each operated in non-overlapping ESAs.  Western Blue Cross's ESA was in the western half of the state, Capital Blue Cross's ESA was in the central part of the state, BC-NEPA's ESA was in the northeastern part of the state, and Independence Blue Cross's ESA was in the southeastern part of the state (which includes Philadelphia).  Each of these Blue Cross Plans also had joint operating agreements with Pennsylvania Blue Shield, which had a license throughout the state to jointly offer Blue Cross and Blue Shield coverage.

486.    By way of background, in 1986, Pennsylvania Blue Shield formed Keystone Health Plan East ("KHPE"), an HMO that competed in Independence's Philadelphia-area Southeastern Pennsylvania ESA against Independence's wholly-owned HMO, Delaware Valley. In 1991, KHPE became profitable and, in that same year, Pennsylvania Blue Shield sold 50% of KHPE to Independence.  At the same time, Independence transferred its HMO into the jointly-

135

**COMPLAINT**

owned KHPE, ending the competition between HMOs owned by Pennsylvania Blue Shield and Independence.

487.     In 1996, Western Blue Cross and Pennsylvania Blue Shield merged and renamed their consolidated entity Highmark.  Although Highmark was licensed to operate statewide, it did not intend to compete with other Blue Plans, as made clear by an executive that testified before the Pennsylvania Insurance Department.

488.     After Highmark was formed in 1996, it transferred its interest in KHPE to Independence, and Highmark and Independence entered into a ten-year agreement in which Highmark agreed not to compete with Independence's Blue business within the Southeastern Pennsylvania ESA.  At the time, many industry observers, including the Pennsylvania Medical Society, speculated that Highmark sold its interest in KHPE to gain Independence's support for the merger of Pennsylvania Blue Shield and Western Blue Cross.  Highmark and Independence justified this non-compete as protecting the investment, demonstrating that the two companies were potential competitors in Southeastern Pennsylvania during the length of the non-compete.

489.     In 2003, Highmark sought and obtained regulatory approval to acquire a share (including supermajority voting power) of a for-profit subsidiary of BC-NEPA that operated in Northeastern Pennsylvania, and in 2007, BC-NEPA announced that all insurance products would be written through that subsidiary.  By 2015, BC-NEPA and Highmark officially merged.

490.     Later, when the Highmark-Independence non-compete period expired, the two companies announced their intention to merge.  After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark and Independence withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition . . . to the detriment of the insurance buying public."  Commissioner Ario stated that the "fundamental condition" for approval of the merger was "expanding Blue on Blue competition." Commissioner Ario stated that his department "raised the option of having a replacement competitor use one of the Blue trademarks to compete," by the merged entity, a structural remedy by "divesting itself of one Blue trademark and working with its national association to have the

trademark awarded to a qualified competitor." However, "the applicants were not willing to engage on this condition" and therefore the merger approval could not proceed.

491. After their merger failed due to their refusal to agree to local Blue competition, Highmark and Independence refrained from competing with each other for fifteen years, until 2024.

492. Meanwhile, market history in Central Pennsylvania demonstrates the success of Blue-on-Blue competition in one of the few places it has been possible for two Blue Plans to compete. Before merging to become Highmark, Pennsylvania Blue Shield had a joint operating agreement in Capital's Central Pennsylvania ESA. During its 1996 formation, Highmark insisted that it would not compete with Capital. After its formation, Highmark made several attempts to acquire Capital, but Capital rejected these overtures. In response to this rejection, Highmark ended the gentlemen's agreement: Highmark terminated its joint operating agreement and began competing in Capital's ESA, as it had long been entitled to do.

493. In January 2009, Pennsylvania Insurance Commissioner Joel Ario commented that his experts "concluded that this region produced the best results for consumers and this was backed up by the overwhelming weight of testimony from providers, competitors, consumer groups, and others who submitted comments." The President and CEO of the Insurance Federation of Pennsylvania noted in the mid-2000s that premiums had not risen in Central Pennsylvania as quickly as they had in other counties, a fact agreed to by Capital in testimony. Interviews of health care customers during this time indicated a "'strong sentiment' that Blue vs. Blue competition gave them increased leverage to negotiate lower premiums" and cited a "car dealer commenting that he had a bid from Capital that was $25,000 to $30,000 lower than the current annual premium he pays to Highmark." This competition also increased innovation and the quality of local healthcare.

494. Capital has attempted to operate outside of its ESA through its non-Blue branded for profit subsidiary, Avalon. When Defendant Highmark developed a dispute with the largest provider in its ESA, UPMC, Capital Blue Cross through Avalon attempted to offer Members of the Blue Plans a means to obtain treatment at UPMC on an in-network basis. Highmark objected,

and BCBSA prohibited Capital from offering this arrangement.  Defendants Highmark and

BCBSA prevented competition from Defendant Capital in Highmark's ESA and Capital agreed to

restrict its competition.  The efforts by Capital through its Non-Blue Affiliate demonstrate that if

it were not for the agreement not to expand outside of each Blue Plan's ESA, Capital would be

operating outside of its ESA.

495.    **Figure 5**, reprinted below, illustrates the current areas of competition in

Pennsylvania.



**Figure 5 (reprinted): Blue ESAs, Pennsylvania**

**2)      While Abiding by Their Horizontal Agreements, Blue Plans Have
Demonstrated an Interest in Expanding Beyond Their ESAs**

496.    Various Blue Plans have indicated their interest in expanding beyond their ESAs

while still abiding by their horizontal agreements.  First, several Blue Plans have, in fact,

expanded beyond their initial ESAs by merging with other Blue Plans.  For example, Elevance,

formerly Anthem, was initially the BCBSA licensee for Indiana, and, by 2000, expanded to

become the BCBSA licensee for eight states through various acquisitions.  In 2004, Elevance

merged with WellPoint, which was initially the Blue Cross licensee for California.  Elevance is

currently the BCBSA licensee for fourteen states.  A representative of Elevance provided

testimony in the MDL Litigation addressing "the prospect of competing for national accounts

outside of its fourteen-Blue service area"; the executive explained:

> "[O]ur current market is confined to the 14 states. We have the Blue
> Cross/Blue Shield license, and we have any number of customers and
> consultants that express an interest in working with us, and we're
> prohibited from doing that.  To be able to go from—I know we're a
> national plan. We're a national plan that operates in 14 states.  To be
> an [*sic*] national plan that operates in 50 states and have unfettered
> access, without asking permission to have a conversation with a
> prospect, would be—I don't know—exhilarating, I would say."[110]

497.    As a public company, Elevance engages in fierce competition where possible,

including a steady beat of Blue Plan acquisitions, stopped only by regulators, such as in 2023

when its plan to acquire BCBS-LA was blocked by regulators.  Nonetheless, Elevance competes

with one hand tied behind its back—its anticompetitive agreements with the other Blues.  For

example, Elevance attempted to acquire BCBS-LA, proving an interest in competing in that ESA.

However, after regulators blocked its acquisition of BCBS-LA, Elevance has refrained from

opening a Non-Blue Affiliate in BCBS-LA's ESA.

498.    The Blue Plans' practice of "ceding" accounts shows that they are ready and

willing to do business outside their ESAs when they permit each other to do so.  A Vice-President

of Sales at Elevance (at that time, Anthem) provided additional testimony that Elevance competes

when it can within the limitations imposed by the Blues:

> Q:    If a customer wants to work with Anthem outside of the
>       Anthem 14 states and requests a cede, do you pursue that
>       opportunity?
> A:    We would love to pursue that opportunity.  It's dependent
>       upon the customer expressing that wish and having the home
>       Blue plan agree to that wish.
> Q:    If the customer expresses that wish and you get the cede, do
>       you pursue that opportunity?
> A:    Vigorously.

Undoubtedly, absent the current restrictions, Elevance would readily compete in additional ESAs

and, in all likelihood, would compete nationally.  In fact, it's already "licensed to conduct

---

[110] MDL Standard of Review Order at 1257.

insurance operations in all 50 states, the District of Columbia and Puerto Rico through [its] subsidiaries."

499.    In 2016, in a trial challenging Anthem's proposed acquisition of Cigna, a non-Blue competitor, Jerry Kertesz, Vice-President of Sales at Anthem, provided the following testimony further confirming the effects of the illegal agreements restricting competition:

> Q.    Do you ever compete with another Blue plan?
> A.    Very rarely. We've got rules against competing against one another. There'll be occasions where we're invited into an opportunity to share our capabilities, but there's a prohibition to ever compete and put our fees or rates in front of a customer and have another Blue plan do the same."

500.    As described herein, the Blues have agreed, via the National Best Efforts Rule, to limit their non-Blue competition with one another by limiting Non-Blue Affiliate revenue, but this revenue calculation does not include Medicare or Medicaid contracts. That is, the Blues are more tolerant of one another competing via Non-Blue Affiliates with Medicare and Medicaid compared to competing with employer-sponsored health plans. It is therefore not surprising that the Blues operate many more non-Blue Medicare and Medicaid plans than non-Blue Commercial Health Benefit Products in each other's ESAs. Compare Table 3, below, which provides the Non-Blue Affiliates of the Blues that currently offer Medicare or Medicaid plans along with their geographic scope, with the previously presented Tables 1 and 2, in Section VII.E.2, *supra*.

**Table 3: Non-Blue Affiliates Offering Medicare and/or Medicaid Plans**

| Blue | ESAs | Non-Blue Affiliate(s) | Geographic Operations of Non-Blue Affiliate(s)' Medicare and/or Medicaid Business | Geographic Operations Outside of ESA |
|---|---|---|---|---|
| Elevance | California, Connecticut, Colorado, Nevada, Georgia, Indiana, Kentucky, Maine, Missouri, New Hampshire, New York, Ohio, Virginia, and Wisconsin | Wellpoint, Amerigroup, Colorado Community Health Alliance, Simply Healthcare, and HealthSun Health Plans | Arizona, Colorado, District of Columbia, Florida, Georgia, Iowa, Maryland, New Jersey, New Mexico, Tennessee, Texas, and Washington | Arizona, District of Columbia, Florida, Iowa, Maryland, New Jersey, New Mexico, Tennessee, Texas, and Washington |
| Cambia | Idaho, Oregon, Utah, and most counties in Washington | Asuris Northwest Health, and BridgeSpan Health Company | Washington | -- |
| Excellus | Central New York | Univera Healthcare | New York counties of | New York counties of Allegany, |

| | | | Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming | Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming |
|---|---|---|---|---|
| Independence Health Group, Inc. | Southeastern Pennsylvania | AmeriHealth, Inc. | New Jersey | New Jersey |
| Independence Health Group, Inc. and BCBS-MI | Southeastern Pennsylvania and Michigan | AmeriHealth Caritas | Delaware, District of Columbia, Florida, Louisiana, Michigan, New Hampshire, North Carolina, Ohio, Pennsylvania, and South Carolina | Delaware, Florida, Louisiana, New Hampshire, North Carolina, Ohio, Pennsylvania (other than Southeastern Pennsylvania), and South Carolina |
| HCSC | Illinois, Montana, New Mexico, Oklahoma, and Texas | In March 2025, HCSC completed the purchase of Cigna's Medicare business.[111] | Alabama, Arkansas, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Kansas, Kentucky, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington | Alabama, Arkansas, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Kansas, Kentucky, Maryland, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, and Washington |

The fact that the Blues are willing to compete via their Non-Blue Affiliates in Medicare and Medicaid programs demonstrates that they are potential competitors and would expand beyond their assigned ESAs and compete if not for their jointly-imposed anticompetitive limitations.

501.    As reflected in Table 3, Elevance operates Medicare or Medicaid plans competitively in a number of states outside of its ESAs through its Non-Blue Affiliates.  But the story is very different as it pertains to Commercial Health Benefit Products.  Elevance and its predecessors have made a consistent effort to limit non-Blue business from competing with the Blue Plans.

502.    In the 1990s, Wellpoint Health Networks, Inc. was the BCBSA licensee for multiple ESAs, including Blue Cross of California.  It also operated a robust non-Blue business through non-Blue Affiliates HealthLink and UniCare.  In the late 1990s, UniCare provided

---

[111] The states listed are where Cigna operated its Medicare business at the time of purchase.

medical services to approximately 1.1 million members, focusing on the large employer market with medical members in all 50 states.  It also worked actively to expand this business in various states such as Georgia, Illinois, Indiana, Maryland, Ohio, Texas and Virginia.  But as the Blues began to focus on the threat of non-Blue competition, and after the 1996 adoption of the threshold brand commitment requirement for companies seeking a license for the first time, Wellpoint Health Networks, Inc. began to limit competition between its non-Blue Affiliates and Blue Plans. For example, after acquiring the BCBSA license for Georgia in 2000, Wellpoint Health Networks, Inc. transitioned all of the UniCare Georgia business to BCBS-GA.  It also transitioned its non-Blue Affiliate Wisconsin business to BCBS-WI, after acquiring Cobalt Corp., the holder of the BCBSA license for Wisconsin, in 2003.

503.    In 2004, Anthem, Inc. acquired Wellpoint Health Networks, Inc., including its non-Blue Affiliates HealthLink and UniCare, to create Wellpoint, Inc (now Elevance).  In 2006, Elevance further limited Non-Blue Affiliate competition by agreeing with the other Blues to the Best Efforts Rule.  By 2008, Elevance was considering selling UniCare entirely to "[e]liminate[] source of friction with other Blues."  In 2009, Elevance sold its entire Illinois and Texas commercial UniCare business to HCSC, citing a "strategic decision to exit commercial health insurance markets in Illinois and Texas."  HCSC gained over 200,000 commercial health insurance Members into its Blue Plans from this transition.  Today, UniCare no longer offers employer-sponsored Commercial Health Benefit Products, and HealthLink operates only in Missouri, Illinois, and Kansas counties in and near Kansas City.

504.    During the 2017 Anthem-Cigna merger trial, then-Senior Vice President of Anthem, Inc. (formerly Wellpoint, Inc. and now Elevance, Inc.) testified that the merger would immediately throw Anthem out of compliance with both best efforts rules.[112]  The court found that Anthem, in order to stay in compliance with its License Agreement, would convert a large portion of the Cigna business to Blue-branded business post-merger, and it relied heavily on this finding in ultimately blocking the merger.[113]

---

[112] *United States v. Anthem, Inc.*, 855 F.3d 345, 359 (D.C. Cir. 2017).
[113] *Id. at* 358-60.

505.    The Blues' relative willingness to compete via their Non-Blue Affiliates in Medicare and Medicaid programs reflects and confirms the nature of their relationship—they are potential competitors and would compete outside their assigned ESAs if not for the illegal territorial restrictions and output limitations imposed by the conspiracy alleged herein.[114]

### 3)    Barriers to Competition Between the Blues Would be Lower Than Novel Entry by a New Competitor If Not For the Anticompetitive Conduct

506.    The Blues have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets, and have limited the ability of other health insurers to compete in other markets.  The barriers to entry for Blues to compete in each other's ESAs is therefore much lower than they would be for a novel entrant with no experience in that ESA.

507.    By way of example, there are three Blues licensed to operate in states contiguous to Minnesota: Elevance (BCBS-WI), Wellmark (BCBS-IA and BCBS-SD), and BCBS-ND. HCSC is licensed to operate in Illinois, a nearby state.  Elevance (in Wisconsin) and HCSC (in Illinois) are the second and fifth largest health insurers in the country depending upon the measure.  In 2023, Elevance was the largest health insurer by market share in 21% of the country's MSAs, while HCSC was in 12% and Highmark was in 7%.  Given their size and prominence, it would not be difficult to compete in Minnesota, but under the anticompetitive restraints, they do not.

508.    Moreover, Elevance, HCSC, and other Blue Plans have large numbers of enrollees that receive services in states in which they are not licensed through their national accounts, which would likewise dramatically lower the costs of geographic expansion by such Blue Plans. For example, in 2023 alone, many thousands of Elevance Members and HCSC Members were treated at Mayo Clinic's Rochester, Minnesota facilities.  With operations in the state and provider contracts in place for those plans, the cost to introduce Commercial Health Benefit Products in

---

[114] As a further example, in March 2025, HCSC acquired Cigna's Medicare businesses but not Cigna's Commercial Health Benefit Product business, which would have put it out of compliance with the still-in-place National Best Efforts Rule.  In addition, the fact that the Blues have expanded beyond their ESAs and have operations outside of their ESAs, albeit for limited purposes, shows that the Blues would compete in the Commercial Health Benefit Product business but for the illegal restraints.

Minnesota would be relatively low, but Elevance subsidiaries still do not offer Commercial

Health Benefit Products in Minnesota.  In addition, the fact that many Blues have Members who

live and receive medical treatment at facilities outside the Blues' designated ESAs indicates that

they could successfully compete in the sale of Commercial Health Benefit Products outside of

their ESAs.

### 4) Defendants Entered into the Anticompetitive Agreements Due to the Strong Likelihood of Competition Without Such Agreements

509.    The anticompetitive ESA allocation agreements and best efforts rules were put in

place specifically to eliminate competition between the Blues.  If the likelihood of competition

were zero, the restrictions would have been unnecessary.  Notably, the ESA allocation agreements

did not initially address competition by Non-Blue Affiliates owned by Defendants; however,

when it became evident that such competition was an "increasing problem" the restrictions were

revised to address this as well and Defendants enabled themselves to monitor one another's

compliance.

### B. The Illegal Agreements Injure Providers, Including Plaintiffs

510.    Defendants' illegal conduct has resulted in antitrust injury to Plaintiffs, including

lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened

future harm to Plaintiffs' business and property.  Defendants' illegal conduct restricts Plaintiffs'

choices in the market.  Because the Blues have agreed not to compete outside their ESAs and

have restricted competition via Non-Blue Affiliates, Plaintiffs cannot contract directly with any

Blue Plan other than the Blue Plan in the service location's ESA and can only rarely contract with

a Non-Blue Affiliate of a Blue.

511.    Internally, the Blues have noted that restricting Blue-on-Blue competition has

exactly the market effect that economics predicts.  C. Rufus Rorem, who was associated with the

Blue Cross system from its inception through 1985, declared in an affidavit filed in 1985 that one

consideration in the Blue Plans' imposition of the ESAs was that the ESAs "minimized health

care costs because the Plans' ability to bargain effectively with providers in negotiating contracts

was enhanced when only one Plan operated in a single service area."  Another Blue has

acknowledged that in areas where more than one Blue Plan competes "it is very difficult to obtain or maintain market share with 'premium' pricing levels" and that such competition creates "enormous downward pressure on premium price levels, and upward pressure on provider contracting." A BCBSA presentation slide, aptly entitled "Blue Networks: Provide Deep Provider Discounts," explains that "Blue Accounts . . . benefit from market scale." In interviews conducted by BCBSA itself, Blue CEOs have expressed that ESAs create "[l]arger market share because other Blues stay out and do not fragment the market" and this allows for aggressive bargaining by the Blue Plans. A 1999 BCBSA mediation brief further revealed the motivations behind their conduct: "Enabling the Member Plans to share discounts was an important reason for the BlueCard Program in the first place."

512.    It is textbook economics that when there is less competition among buyers within a market, sellers will be paid less on average throughout that market. This is because concentration in the insurer market leads to greater bargaining power for insurers and lower prices paid to providers. Defendants' illegal suppression of competition means not only that they themselves can reimburse providers at less favorable rates, but also that other health insurers—including highly sophisticated players such as Aetna, Cigna, and UnitedHealthcare—can adopt a harder line in their own reimbursement-rate negotiations with providers, and ultimately pay providers less than they would have if Defendants had not illegally suppressed competition. Providers, including Plaintiffs, who have provided services to Members of Commercial Health Benefit Products administered by a Blue Plan have consequently received significantly lower reimbursements from all of the Blue Plans than they would have received absent Defendants' illegal conduct.

513.    Defendants' restraints on competition have also enabled them to impose unfair, inefficient, and burdensome contract provisions that the Blues use to delay and reduce reimbursements to healthcare providers, including Plaintiffs. In many cases, Defendants have leveraged their market position, achieved through anticompetitive conduct, to include contractual language permitting them to unilaterally change their reimbursement policies and procedures. Their ill-gotten market position has also enabled them to unilaterally implement prior

authorization, claim processing, and appeals requirements in their provider contracts through "provider manuals," as well as independent coverage and reimbursement policies. These policies and procedures are intended to reduce reimbursements to Plaintiffs and other healthcare providers, to arbitrarily deny legitimate claims under the guise of "cost savings" to reduce reimbursements, to delay payment to, and drain the administrative resources of, Plaintiffs and other healthcare providers who submit claims for reimbursement to the Blue Plans.

514. For many Plaintiffs, the ability to terminate their contracts with their local Blue Plan is made effectively impossible by the Blue Plans' policy of ignoring assignment of benefits forms that direct the Blue Plans to make claim reimbursement payments directly to Plaintiffs. Instead, when Plaintiffs submit out-of-network claims, the Blue Plans direct reimbursement checks to the patients. This requires the Plaintiffs to pursue patients in order to obtain payment for services provided to the Blue Plans' Members when Plaintiffs do not have a participation agreement with the Blue Plans. This is untenable from an administrative resource and financial perspective. The Blue Plans are the only major commercial payors that have adopted this delay and uncertainty tactic, which effectively has forced nearly all Plaintiffs to remain in-network with their local Blue Plan and substantially eliminates any leverage many Plaintiffs may have to even threaten termination.

515. Moreover, the BlueCard Program is highly inefficient, which results in further injuries to Plaintiffs. Under the BlueCard Program, when a Member of an out-of-ESA "Home Plan" (even a Member who lives in the same ESA as the provider) obtains services from a Plaintiff, the Plaintiff is providing services to a Member of a plan with whom the provider is not contracted. The out-of-ESA Home Plans do not obligate themselves to the Host Plan's terms and conditions.

516. When a Plaintiff bills the Host Plan for a Blue Plan Member accessing its goods and/or services via BlueCard, in compliance with the Host Plan's terms and conditions, the claim may ultimately be denied for improper billing by the out-of-ESA Home Plan. Plaintiffs must comply with the rules and policies of the Member's Home Plan, including relating to preauthorization, coverage, and payment, which are constantly changing and they often do not

1    have access to.  Just complying with these dozens of sets of rules and policies alone creates

2    significant administrative burdens and expenses for Plaintiffs.

3         517.    To make matters worse, Plaintiffs rarely have contacts at the out-of-ESA Home

4    Plans.  This lack of contacts at the out-of-ESA Home Plans makes appeals difficult and time-

5    consuming.  Meanwhile, Members, especially those who live within Plaintiffs' ESAs, often do

6    not understand that their coverage may differ from their neighbors' coverage, and Plaintiffs (who

7    bill the patients) are on the receiving end of patient complaints regarding differing policies.

8    When patients' claims are denied due to these varying policies, patients often end up directing

9    their complaints to Plaintiffs, and Plaintiffs suffer losses due to unrealized collections.  And while

10   Host Plans and their competitors are subject to state prompt pay laws for fully insured claims,

11   these laws do not apply to BlueCard Program claims, even when a Plaintiff is serving a Member

12   who lives in an ESA in which the Plaintiff provides services.

13        518.    The lack of innovation resulting from Defendants' anticompetitive agreements also

14   causes harm to Plaintiffs.  Collaboration and risk-sharing agreements between health insurers and

15   providers is a key way to lower costs, improve quality of services and health outcomes, and

16   encourage innovation in healthcare.  Defendants' illegal conduct limits the extent to which

17   Plaintiffs can develop and implement such agreements with Blue Plans.  Certain Plaintiffs have

18   entered into limited collaboration and risk-sharing agreements with their local Blue Plan.

19   However, even when these agreements exist, Defendants' illegal conduct limits the scope and

20   power of these arrangements.  These agreements require extensive data tracking and reporting.

21   The BlueCard Program means that Plaintiffs often do not have a contract with the payor for

22   patients who live within the area Plaintiffs serve and who use primary care services from

23   Plaintiffs, limiting the data available.  And Defendants' underinvestment in technology, enabled

24   by their limited competitive pressure due to their illegal agreements, exacerbates this problem.

25   Defendants' illegal conduct limits their ability to enter into and maintain such agreements and

26   limits the quality and innovative features of such agreements.

27

28

C.    **The Illegal Agreements Enabled Substantial Financial Windfalls to Defendants and Their Executives**

519.    Defendants' illegal horizontal agreements have enabled them to pay healthcare providers less than they otherwise would.  Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits.  These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace.  Indeed, as Defendant BCBS-MI explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."

520.    The illegal anticompetitive conduct of the Blues has also led to immense financial windfalls for the Blues and their executives.  During the 1980s and afterwards, the Blues began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In the Tax Reform Act of 1986, 26 U.S.C. § 833, Congress revoked the Blue Plans' tax-exempt status, freeing them to form for-profit subsidiaries.[115]  And in 1994, BCBSA removed the requirement that Blues be non-profit entities.  As a result, many Blues converted to for-profit status.

521.    The overall profitability of Defendants' conspiracy is illustrated by the financials of Elevance, the only publicly-traded Blue, and therefore the Blue with the most public financial information.  Elevance has used its anticompetitively-protected market position to stay consistently and highly profitable, obtaining net income of at least $2.47 billion in every year since 2006 (including during both the 2008-2009 Great Recession and the more recent pandemic-affected years) and approximately $6 billion of net income in each of the last four years.  The company has been so consistently profitable that between 2008 and 2024, it returned a total of more than $51 billion of its excess cash to its shareholders via cash dividends and common stock repurchases—an average of more than $3 billion each year.  And despite having paid out such enormous sums to its stockholders over the years, Elevance still holds massive amounts in

---

[115] 26 U.S.C. § 833 also carved out a deduction specific to Blue Cross Blue Shield companies that, according to analysts minimizes their tax bills.  In 2021, the U.S. Treasury Department estimated that this special BCBS tax break will cost the federal government over $4 billion from 2021-2031.

reserve, a total of more than $35 billion in cash and other highly liquid assets as of the end of 2024.

522.    Even the Blues that remain nominally "non-profit" entities hold massive excess surplus levels built off the net income spread between the high premiums they charge subscribers and the sub-competitive payments to providers.  For example, the Consumers Union of Consumer Reports found that nine non-profit Blues held excess reserves of over $12 billion at the end of 2014.  While Defendants often claim these surpluses are designed as insurance reserves for future payments, they are more often used as strategic monies allowing acquisitions of competitors, market share, or provider practices.  Those excessive surplus levels have also come at the expense of higher premiums to consumers.  As of September 30, 2010, 33 "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by BCBSA. While some capital holdings are prudent for insurance companies, these holdings are many times larger than the amount BCBSA calculated as the required capital for each Blue Plan.  HCSC, for example, held over $7 billion in reserve—more than ten times the amount of required capital. BCBS-FL and BS-CA likewise each held over $3 billion, twelve and thirteen times, respectively more than the required capital, and BCBS-NJ held over $1.7 billion, over six times the required capital.  And many of the Blues understate their actual surplus substantially by citing only the surplus from the mainline company, but not the general surplus on the companies' combined reporting statements, which accounts for all lines of business.

523.    Moreover, the manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.  Often these holding company systems include both "not-for-profit" and "for-profit" affiliates.[116]

524.    In addition, the numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel.  For instance, Blues often charge "hidden fees" to long time subscribers including "retained" amounts that are not used to

---

[116] In North Carolina, this both "not-for-profit" and "for-profit" structure required a change in law by the state legislature, for which BCBS-NC successfully lobbied its passage.

cover medical claims but rather are kept by the company or one of its affiliated entities. BCBS-MI was found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans. Unlike for-profit companies that have shareholders, most Defendants are often accountable to no one other than their officers.

525.    The Blues have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel, and even excess medical claim benefit perks. These perks offer privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation. Sometimes Blues' executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services. Often, substantial campaign contributions or lobbying fees paid by Blue-affiliated "charitable foundations" are designed only to perpetuate loose regulations. The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

526.    Many of the Blues also pay their affiliated executives substantial compensation. About three-quarters of the Blues whose top-executive pay has been publicly reported paid more than $2 million in annual pay to their CEOs, and the average of these annual compensation packages is over $4 million. This excessive compensation results in higher costs to consumers. The supracompetitive profits that feed these salaries are built on Defendants' anticompetitive conduct. A spokeswoman for BSBS-SC noted that outrageous increases are priced "to reflect its superior networks." In sum, the market power of the Blues allows them to pay sub-competitive rates to providers. This leads to huge surplus profits for companies (many of which are supposedly organized as not-for-profit or charitable companies) and enormous compensation for their leaders.

1

**D.      The Illegal Agreements Injure Consumers**

2       527.    Economic consensus has found that consumer welfare is best protected by a

3    competitive marketplace for purchasing provider services.  As explained above, Defendants have

4    earned and retained mind-boggling profits in addition to providing substantial compensation to

5    their executives and board members.

6       528.    When Blue Plans have competed in the same ESA, it has benefited consumers.  An

7    economic analysis commissioned by the Pennsylvania Insurance Commissioner considering the

8    proposed merger of Highmark and Capital in the late 2000s expressly "rejected the idea that using

9    market leverage to reduce provider reimbursements below competitive levels will translate into

10   lower premiums, calling this an 'economic fallacy' and noting that the clear weight of economic

11   opinion is that consumers do best when there is a competitive market for purchasing provider

12   services."  The analysis "found this theory to be borne out by the experience in central

13   Pennsylvania, where competition between Highmark and Capital Blue Cross has been good for

14   providers and good for consumers."

15      529.    Defendants' illegal conduct has injured subscribers.  Defendants' illegal conduct

16   has increased health care costs, inflated premiums, and decreased the options available to

17   healthcare consumers, including depriving subscribers of the opportunity to purchase Commercial

18   Health Insurance and Self-Funded Health Benefit Plans from one or more additional Blue Plans

19   and/or Non-Blue Affiliates, at a lower premium rate and/or at a price set by a market free from the

20   non-price restraints imposed by Defendants' anticompetitive agreements.  It has also reduced the

21   availability and quality of agreements that could increase innovation and quality of care.

22      530.    The inefficiency of the BlueCard Program also injures Members.  As detailed

23   herein, forcing providers to comply with policies promulgated by dozens of Blue Plans with

24   whom they do not contract with and have no direct relationship with can cause delays, denied

25   claims, and patient confusion with respect to coverage.  For example, Mayo Clinic often treats

26   patients through the BlueCard Program who have traveled to Mayo Clinic because of the high

27   quality care it provides.  For Mayo Clinic, the BlueCard Program delays obtaining prior

28

authorizations, often forcing patients to stay away from home, work, and family for a longer

period of time than they otherwise would.

531.    In 2003, R. Hewitt Pate, a former Assistant Attorney General of the Antitrust

Division, in a statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the
> merged firm pays for its inputs, consumers will necessarily benefit.
> The logic seems to be that because the firm is paying less, the firm's
> customers should expect to pay less also.  But that is not necessarily
> the case . . . [A]n efficiency reducing exercise of market power that
> will reduce economic welfare, lower prices for suppliers, and also
> result in higher prices charged to final consumers.

532.    Defendants' illegal conduct has further reduced output, stifled innovation, and

reduced quality of care, all of which harm consumers.

## XI.    <u>INTERSTATE COMMERCE</u>

533.    The activities of Defendants that are the subject of this Complaint are within the

flow of, and have substantially affected, interstate trade and commerce.

534.    Plaintiffs provide services, supplies, or equipment to persons who reside in other

states.  Plaintiffs use interstate banking facilities and have purchased substantial quantities of

goods and services across state lines for use in providing healthcare services.

535.    As alleged above, Defendant Blues and their affiliates insure and/or provide

administrative services for Members who use healthcare services in ESAs other than the ESA(s)

in which each Blue Plan is licensed.  Defendant BCBSA licenses trademarks in every ESA and is

owned and controlled by its licensees.  Defendants' national programs, including the BlueCard

Program and the National Accounts Programs, are involved in interstate commerce and

transactions for healthcare services.

## XII.    <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

536.    Because of the ongoing nature of Defendants' illegal conspiracy to not compete

and to allocate the market, for as long as Defendants continue to depress provider reimbursements

by avoiding competition with each other in contracting with healthcare providers and allocating

the market through ESAs, Plaintiffs continue to accrue losses, including in the form of under-

reimbursements.  In other words, each reimbursement agreement negotiated between Defendant Blues and their affiliates and Plaintiffs and each under-reimbursement of a claim paid to Plaintiffs: (i) is a new and independent act occurring in furtherance of Defendants' conspiracies and (ii) inflicts a new and accumulating injury to each Plaintiff in the form of anticompetitive reimbursement rates and unfavorable contract terms for the duration of each new contract and beyond.  As such, federal and state statutes of limitation do not bar this case.

537.    In addition, Plaintiffs' claims are timely under the tolling rule established in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny.  The statute of limitations began tolling when the first provider class action was filed in 2012 and continued throughout the pendency of the provider track proceedings in the MDL.  Plaintiffs are purported members of the proposed provider class actions.  The pendency of those Class Action Complaints, and any amendments thereto, against Defendants for their illegal conspiracy to not compete and to allocate the market tolled the running of the statute of limitations on each of Plaintiffs' claims.

## XIII.    <u>CLAIMS FOR RELIEF</u>

538.    In the Claims laid out below, Plaintiffs hereby demand a trial by jury and seek damages, reasonable attorneys' fees and costs, and injunctive relief against all Defendants under federal law and Elevance and BS-CA under California state law.

539.    The agreements between some of the Defendants for some of Plaintiffs' services contain what Defendants will likely argue are binding arbitration provisions.  Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of this Complaint, Plaintiffs providing services pursuant to agreements containing arbitration agreements covering the claims or parties at issue in this litigation expressly only bring suit against those Defendants who are not parties to the arbitration provisions in the agreements covering such services.

**<u>FIRST CLAIM FOR RELIEF</u>**
**VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**

540.    Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

541.    Plaintiffs bring this claim against all Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages, interest, attorneys fees and costs, and injunctive relief.

542.    Defendants have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to: (1) divide and allocate ESAs among Blues, and decide through collective action that (with limited exceptions) they will not contract with providers or sell Commercial Health Benefit Products outside of those ESAs; (2) adhere to the National Best Efforts Rule; (3) adhere to the Local Best Efforts Rule; and (4) adhere to additional restrictions to fortify these restraints, including limiting entrants and disciplining potential deviations from the conspiracy.

543.    By entering into these horizontal agreements, Defendants have agreed to limit output, suppress competition between actual or potential competitors, and increase their profits by decreasing payments to healthcare providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.

544.    These horizontal agreements constitute per se violations of Section 1 of the Sherman Act.  In 2018, the MDL Court held that Defendants' horizontal market allocations, together with the additional output restrictions of the National Best Efforts Rule, are per se violations of the antitrust laws.  The MDL Court held that this per se treatment applies to providers' Section 1 claims for horizontal market allocations, together with the additional output restrictions of the National Best Efforts Rule, as well.[117]  As such, Defendants' conduct is presumed to be illegal without further inquiry into the restraint's actual effects on the markets or the intentions of those individuals engaged in the wrongful conduct.

545.    Defendants' per se unlawful conduct continued through at least April 2021, when the BCBSA Board of Directors passed a resolution eliminating Standard 10(2.2) of the BCBSA Guidelines to Administer Membership Standards Applicable to Regular Members as well as the

[117] MDL Provider Standard of Review Order at *6.

identical Standard 6(G)(2.2) of the Guidelines to Administer the Controlled Affiliate License

Agreement(s) and Standards, purportedly eliminating the National Best Efforts Rule.

546.    Despite BCBSA's resolution, the Blues continue to agree to limit the extent to

which they can compete with one another via Non-Blue Affiliates.  As such, Defendants' per se

illegal conduct has continued beyond April 2021 and through to the present.  Alternatively, even if

enforcement of the National Best Efforts Rule ceased, the effect of past enforcement of the

National Best Efforts Rule continue to limit competition.

547.    In the alternative, Defendants' agreements to limit output, increase their profits by

decreasing payments to healthcare providers, and suppress competition between actual or

potential competitors in the Relevant Markets or alternative Relevant Submarkets also constitute

violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the "quick look" analysis

because the agreements have an effect on markets and market participants that an observer with

even a rudimentary understanding of economics would conclude is anticompetitive.  Defendants'

agreements have no pro-competitive effects.  Nor have the agreements resulted in the

establishment of any new product or innovation.  No inquiry into market power is required to

determine that Defendants violated Section 1 of the Sherman Act.

548.    In the further alternative, Defendants' agreements to limit output, increase their

profits by decreasing payments to healthcare providers, and suppress competition between actual

or potential competitors in the Relevant Markets or alternative Relevant Submarkets also

constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "rule of reason"

analysis.  Defendants' agreements have no pro-competitive effects.  Nor have the agreements

resulted in the establishment of any new product or innovation.

549.    As a direct and proximate result of the Defendants' continuing violations of

Section 1 of the Sherman Act described above, Plaintiffs have suffered antitrust injury in that they

have been denied the opportunity to sell health services at a price set by a market free from the

anticompetitive agreements, paid less than they would have by the Defendants and other market

participants, and subject to decreased innovation.  The decreased payments have occurred on no

less than a monthly basis and each payment to Defendants has caused injury to Plaintiffs. Plaintiffs' injury is of the type that the federal antitrust laws were designed to prevent.

550.    Defendants are jointly and severally liable to Plaintiffs in treble the amount of the actual damages suffered by Plaintiffs plus interest, an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, and injunctive relief, all as provided for by Section 4 of the Clayton Act, 15 U.S.C. § 15.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF THE CARTWRIGHT ACT

551.    Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

552.    Plaintiffs bring this claim under California Business and Professions Code §§ 16720, et seq., for Defendants Elevance and BS-CA's violations of California's Cartwright Act for threefold or trebled damages, interest, attorneys fees and costs, and injunctive relief.

553.    Elevance and BS-CA, with all other Defendants, have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to: (1) divide and allocate ESAs among Blues, and decide through collective action that (with limited exceptions) they will not contract with providers or sell Commercial Health Benefit Products outside of those ESAs; (2) adhere to the National Best Efforts Rule; (3) adhere to the Local Best Efforts Rule; and (4) adhere to additional restrictions to fortify these restraints, including limiting entrants and disciplining potential deviations from the conspiracy.

554.    By entering into these horizontal agreements, Defendants have agreed to limit output, suppress competition between actual or potential competitors, and increase their profits by decreasing payments to healthcare providers in violation of the Cartwright Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.

555.    These horizontal agreements constitute per se violations of the Cartwright Act.  As such, Defendants' conduct is presumed to be illegal without further inquiry into the restraint's actual effects on the markets or the intentions of those individuals engaged in the wrongful conduct.

556.    In the alternative, Defendants' agreements to limit output, increase their profits by decreasing payments to healthcare providers, and suppress competition between actual or potential competitors in the Relevant Markets or alternative Relevant Submarkets also constitute violations of the Cartwright Act under the "quick look" analysis because the agreements have an effect on markets and market participants that an observer with even a rudimentary understanding of economics would conclude is anticompetitive. Defendants' agreements have no pro-competitive effects. Nor have the agreements resulted in the establishment of any new product or innovation. No inquiry into market power is required to determine that Defendants violated the Cartwright Act.

557.    In the further alternative, Defendants' agreements to limit output, increase their profits by decreasing payments to healthcare providers, and suppress competition between actual or potential competitors in the Relevant Markets or alternative Relevant Submarkets also constitute violations of the Cartwright Act under a "rule of reason" analysis. Defendants' agreements have no pro-competitive effects. Nor have the agreements resulted in the establishment of any new product or innovation.

558.    As a direct and proximate result of the individual Blues and BCBSA's continuing violations of the Cartwright Act described above, there has been harm to competition in California in a manner that the Cartwright Act was designed to prevent, and Plaintiffs have suffered antitrust injury in that they have been denied the opportunity to sell health services at a price set by a market free from the anticompetitive agreements, paid less than they would have by the Defendants and other market participants, and subject to decreased innovation. The decreased payments have occurred on no less than a monthly basis and each payment to Defendants has caused injury to Plaintiffs. Plaintiffs' injury is of the type that California's antitrust laws were designed to prevent.

559.    Elevance and BS-CA are jointly and severally liable to Plaintiffs in treble the amount of the actual damages suffered by Plaintiffs plus interest, injunctive relief, and an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by California Business and Professions Code §§ 16750, *et seq.*

**THIRD CLAIM FOR RELIEF**
**VIOLATIONS OF THE CARTWRIGHT ACT**
**GROUP BOYCOTT**

560.    Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

561.    Plaintiffs bring this claim under California Business and Professions Code §§ 16720, et seq., for Defendants Elevance and BS-CA's violations of California's Cartwright Act through their horizontal market allocation, constituting a horizontal group boycott among competitors, for threefold or trebled damages, interest, attorneys fees and costs, and injunctive relief.

562.    Elevance and BS-CA, with all other Defendants, have agreed to assign specific geographic markets to particular Blue Plans and all other Blues have refused to purchase healthcare services, supplies, and equipment from Plaintiffs' hospitals providing healthcare services to the Blue Plans' Members and/or to sell their Commercial Health Benefit Products to subscribers in other than their assigned territories and to boycott all other territories.

563.    By so doing, Elevance and BS-CA, with all other Defendants, have agreed to suppress competition and to increase their profits by decreasing payments to Plaintiffs in violation of the Cartwright Act.

564.    Defendants' agreement is a horizontal group boycott among competitors and is per se unlawful under the Cartwright Act.  As such, Defendants' conduct is presumed to be illegal without further inquiry into the restraint's actual effects on the markets or the intentions of those individuals engaged in the wrongful conduct.

565.    In the alternative, Defendants' agreement to increase their profits by decreasing payments to healthcare providers and suppress competition between actual or potential competitors in the Relevant Markets or alternative Relevant Submarkets also constitutes a violation of the Cartwright Act under the "quick look" analysis because the agreement has an effect on markets and market participants that an observer with even a rudimentary understanding of economics would conclude is anticompetitive.  Defendants' agreement has no pro-competitive effects.  Nor has the agreement resulted in the establishment of any new product or innovation.

No inquiry into market power is required to determine that Defendants violated the Cartwright Act.

566.    In the alternative, Defendants' agreement to increase their profits by decreasing payments to healthcare providers and suppress competition between actual or potential competitors in the Relevant Markets or alternative Relevant Submarkets also constitutes a violation of the Cartwright Act under a "rule of reason" analysis.  Defendants' agreement has no pro-competitive effects.  Nor has the agreement resulted in the establishment of any new product or innovation.

567.    Defendants' continuing violations of the Cartwright Act have denied Plaintiffs the opportunity to sell their healthcare services at a price set by a market free from the anticompetitive agreements, denied Plaintiffs the opportunity to purchase health benefits products free from the anticompetitive agreements, and denied Plaintiffs a wider, lower-cost choice of healthcare products and services as well as of increased innovation.

568.    Defendants' horizontal group boycott has substantial and unreasonable anticompetitive effects, including but not limited to, the following:

- Reducing the number of Blue Plans competing for Plaintiffs' healthcare services and reducing the number of Blue Plans competing to sell Commercial Health Benefit Products;

- Unreasonably limiting the entry of competitor Commercial Health Insurance Companies into ESAs in which Plaintiffs operate;

- Allowing the Blues to maintain and enlarge their market power in their ESAs;

- Allowing the Blues to lower reimbursements to Plaintiffs for their healthcare services;

- Allowing the Blues to raise the prices for Commercial Health Benefit Products charged to purchasers of Commercial Health Benefit Products by artificially inflated, unreasonable, and/or supra-competitive amounts; and

- Depriving Plaintiffs the full benefits of free and open competition.

569.    As a direct and proximate result of Defendants' continuing violations of the Cartwright Act, there has been harm to competition in California in a manner that the Cartwright

Act was designed to prevent, and Plaintiffs have suffered and continue to suffer injury and damages of the type that California's antitrust laws were designed to prevent. Defendants' conduct was a substantial factor in causing Plaintiffs' injury and damages. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages include: having been paid less for healthcare services, equipment and/or supplies than they would have but for Defendants' anticompetitive agreement; having been forced to accept far less favorable rates and other contract terms; and having access to far fewer patients.

570. Elevance and BS-CA are jointly and severally liable to Plaintiffs in treble the amount of the actual damages suffered by Plaintiffs plus interest, injunctive relief, and an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by California Business and Professions Code §§ 16750, *et seq*.

### FOURTH CLAIM FOR RELIEF
### VIOLATIONS OF THE CARTWRIGHT ACT
### PRICE-FIXING

571. Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

572. Plaintiffs bring this claim under California Business and Professions Code §§ 16720, et seq., for Defendants Elevance and BS-CA's ' per se violations of California's Cartwright Act through their agreement to fix prices. In addition to reinforcing the illegal ESA allocation, the BlueCard Program operates as price fixing. The Blues are separate legal and economic entities and have agreed among themselves the rates at which they will reimburse Plaintiffs and other health care providers—that is, the Host Plan's artificially low rates. There is no opportunity for Plaintiffs and other health care providers to negotiate higher rates with the Home Plan directly: the Blues' ESA allocation scheme prevents the Home Plan from contracting with Plaintiffs and other health care providers. Through their agreement to fix prices, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs.

573. By so doing, Elevance and BS-CA, along with all other Defendants, have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than

1    competitive levels in violation of the Cartwright Act, as well as limit output, suppress competition

2    between actual or potential competitors, and to increase their profits by decreasing payments to

3    healthcare providers in violation of the Cartwright Act.

4         574.    Defendants' agreement is price fixing among competitors and is per se unlawful

5    under the Cartwright Act.  As such, Defendants' conduct is presumed to be illegal without further

6    inquiry into the restraint's actual effects on the markets or the intentions of those individuals

7    engaged in the wrongful conduct.

8         575.    In the alternative, Defendants' agreement to suppress competition by fixing and

9    maintaining payments to healthcare providers at less than competitive levels in the Relevant

10   Markets or alternative Relevant Submarkets also constitutes a violation of the Cartwright Act

11   under the "quick look" analysis because the agreement has an effect on markets and market

12   participants that an observer with even a rudimentary understanding of economics would

13   conclude is anticompetitive.  Defendants' agreement has no pro-competitive effects.  Nor has the

14   agreement resulted in the establishment of any new product or innovation.  No inquiry into

15   market power is required to determine that Defendants violated the Cartwright Act.

16        576.    In the further alternative, Defendants' agreement to increase their profits by

17   decreasing payments to healthcare providers and suppress competition between actual or potential

18   competitors in the Relevant Markets or alternative Relevant Submarkets also constitutes a

19   violation of the Cartwright Act under a "rule of reason" analysis.  Defendants' agreement has no

20   pro-competitive effects.  Nor has the agreement resulted in the establishment of any new product

21   or innovation.

22        577.    As a direct and proximate result of Defendants' continuing violations of the

23   Cartwright Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that

24   California's antitrust laws were designed to prevent.  Defendants' conduct was a substantial factor

25   in causing Plaintiffs' injury and damages.  Such injury flows directly from that which makes

26   Defendants' conduct unlawful.  These damages include: having been paid less for healthcare

27   services, equipment and/or supplies; having been forced to accept far less favorable rates and

28

1    other contract terms; and having access to far fewer patients than they would have but for

2    Defendants' anticompetitive agreement.

3        578.    Elevance and BS-CA are jointly and severally liable to Plaintiffs in treble the

4    amount of the actual damages suffered by Plaintiffs plus interest, injunctive relief, and an award

5    of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for

6    by California Business and Professions Code §§ 16750, *et seq.*

7    **XIV.    <u>RELIEF REQUESTED</u>**

8    WHEREFORE, Plaintiffs request that this Court:

9        a.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

10       b.    Adjudge and decree that Elevance and BS-CA have violated the California Cartwright

11             Act;

12       c.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any

13             agreements that restrict the territories or geographic areas in which any Blue may

14             compete;

15       d.    Permanently enjoin Defendants from continuing with the horizontal market allocation and

16             to remedy all effects or vestiges of that market allocation;

17       e.    Under the BlueCard Program, permanently enjoin the following:

18             1)    Defendants from refusing to contract with Providers in Plaintiffs' home states even

19                   though those Providers are outside of the Defendants' ESAs or adjacent counties

20                   thereto.

21             2)    Defendants from refusing to contract with national and regional hospital systems

22                   with hospitals in Plaintiffs' home states to provide services to their Members

23                   throughout the country, in the same manner that the Blue Plans are allowed to

24                   negotiate with national and regional pharmacy chains.

25             3)    Defendants from requiring participation in the BlueCard Program.

26       f.    Permanently enjoin Defendants from developing any other program or structure that is

27             intended to or has the effect of fixing prices paid to healthcare providers;

28

g.  Permanently enjoin Defendants from continuing with the horizontal group boycott and to remedy all effects or vestiges of that group boycott;

h.  Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

i.  Require on-going periodic reporting on compliance by the Defendants, monitored by the Court, and a process through which Plaintiffs will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

j.  Hold Defendants jointly and severally liable and award Plaintiffs damages in the form of three times the amount of damages suffered by Plaintiffs as proven at trial;

k.   Award costs and attorneys' fees to Plaintiffs;

l.  Award prejudgment interest;

m. For a trial by jury of all issues so triable; and

n.  Award any such other and further relief as may be just and proper.


Dated: August 4, 2025                          Respectfully submitted,


                                               */s/ Cindy Reichline*
                                               Cindy Reichline
                                               Keith Butler
                                               Shira Liu
                                               Taylor Keating
                                               Ryan Roth
                                               **BRS LLP**
                                               2121 Avenue of the Stars
                                               Suite 800
                                               Los Angeles, CA 90067
                                               Tel: (310) 295-9524
                                               creichline@brsllp.com
                                               kbutler@brsllp.com
                                               sliu@brsllp.com
                                               tkeating@brsllp.com
                                               rroth@brsllp.com


                                               *Attorneys for Plaintiffs*

**APPENDIX A – BLUE PLANS AND BLUES BY STATE**

| State | Blue(s) (and associated Blue Plans) | Areas With More Than One Licensed Blue Plan[1] | Additional Notes |
|---|---|---|---|
| Alabama | BCBS-AL | None | |
| Alaska | Premera (BCBS-AK) | None | |
| Arizona | BCBS-AZ | None | |
| Arkansas | BCBS-AR | None | |
| California | Elevance (BC-CA); BS-CA | California | Both plans are licensed and operate throughout California. |
| Colorado | Elevance (BCBS-CO) | None | |
| Connecticut | Elevance (BCBS-CT) | None | |
| Delaware | Highmark (BCBS-DE) | None | |
| District of Columbia | CareFirst (BCBS-DC) | None | |
| Florida | Guidewell (BCBS-FL) | None | |
| Georgia | Elevance (BCBS-GA); BCBS-TN | Catoosa, Dade, and Walker counties. | Elevance is licensed and operates throughout Georgia. BCBS-TN has been licensed in Catoosa, Dade, and Walker counties for at least 15 years but only started offering insurance plans in 2022. |
| Hawaii | BCBS-HI | None | |
| Idaho | Cambia (BS-ID); BC-ID | Idaho | Both plans are licensed and operate throughout Idaho. |
| Illinois | HCSC (BCBS-IL) | None | |
| Indiana | Elevance (BCBS-IN) | None | |
| Iowa | Wellmark (BCBS-IA) | None | |
| Kansas | BCBS-KS; BCBS-KC | None | BCBS-KS is licensed and operates throughout the state |

---

[1] All ESAs with overlapping licensees have two licensees in the ESA, other than the following counties in New York which have three: Clinton, Essex, Fulton, and Montgomery.

| | | | except Johnson and Wyandotte counties, which are licensed and operated by BCBS-KC. |
|---|---|---|---|
| Kentucky | Elevance (BCBS-KY) | None | |
| Louisiana | BCBS-LA | None | |
| Maine | Elevance (BCBC-ME) | None | |
| Maryland | CareFirst (BCBS-MD) | None | |
| Massachusetts | BCBS-MA | None | |
| Michigan | BCBS-MI (BCBS-MI) | None | |
| Minnesota | BCBS-MN | None | |
| Mississippi | BCBS-MS | None | |
| Missouri | Elevance (BCBS-MO); BCBS-KC | None | Elevance is licensed and operates in all of Missouri except for the following counties, all of which are licensed and operated by BCBS-KC: Andrew, Atchison, Bates, Benton, Buchanan, Caldwell, Carroll, Cass, Clay, Clinton, Daviess, DeKalb, Gentry, Grundy, Harrison, Henry, Holt, Jackson, Johnson, Lafayette, Livingston, Mercer, Nodaway, Pettis, Platte, Ray, Saline, St. Clair, Vernon, and Worth. |
| Montana | HCSC (BCBS-MT) | None | |
| Nebraska | BCBS-NE | None | |
| Nevada | Elevance (BCBS-NV) | None | |
| New Hampshire | Elevance (BCBS-NH) | None | |
| New Jersey | BCBS-NJ | None | |
| New Mexico | HCSC (BCBS-NM) | None | |
| New York | Elevance (BCBS-NYC-Albany); Highmark | Albany, Clinton, Columbia, Delaware, Essex, Fulton, | Elevance, Excellus, and Highmark are all licensed and operate in Clinton, Fulton, |

A2

| | | | |
|---|---|---|---|
| | (BCBS-WNE-NY); Excellus | Greene, Montgomery, Rensselaer, Saratoga, Schenectady, Schoharie, Warren, and Washington counties. | Montgomery, and Essex counties.<br><br>Elevance and Highmark are both licensed and operate in Albany, Columbia, Greene, Rensselady, Saratoga, Schenectady, Schoharie, Warren, and Washington counties.<br><br>Elevance and Excellus are both licensed and operate in Delaware county.[2] |
| North Carolina | BCBS-NC | None | |
| North Dakota | BCBS-ND | None | |
| Ohio | Elevance (BCBS-OH) | None | |
| Oklahoma | HCSC (BCBS-OK) | None | |
| Oregon | Cambia (BCBS-OR) | None | |
| Pennsylvania | Highmark (Highmark Blue Cross Blue Shield and Highmark Blue Shield); Capital; Independence | Central Pennsylvania: Adams, Berks, parts of Centre, Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, | Highmark is licensed and operates in all counties in Pennsylvania.<br><br>Independence is licensed and operates in the Southeastern Pennsylvania (Philadelphia areas) counties of Bucks, Chester, Delaware, Montgomery, and Philadelphia, and competes with Highmark in its entire service area.<br><br>Capital is licensed and operates in the Central Pennsylvania, counties of Adams, Berks, parts of Centre, Columbia, |

---

[2] Appendix A reflects the counties in New York in which there is overlap between Blues' ESAs. For a full list of the New York ESAs by Blue, *see* Sections IV.B.1.a.i, IV.B.1.a.iv, and IV.B.1.b.xv, *supra*.

| | | and York counties.<br><br>Southeastern Pennsylvania (Philadelphia areas): Bucks, Chester, Delaware, Montgomery, and Philadelphia counties. | Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York, and competes with Highmark in its entire service area. |
|---|---|---|---|
| Puerto Rico | Guidewell (BCBS-PR) | None | |
| Rhode Island | BCBS-RI | None | |
| South Carolina | BCBS-SC | None | |
| South Dakota | Wellmark (BCBS-SD) | None | |
| Tennessee | BCBS-TN | None | |
| Texas | HCSC (BCBS-TX) | None | |
| Utah | Cambia (BCBS-UT) | None | |
| Vermont | BCBS-MI (BCBS-VT) | None | |
| Virginia | Elevance (BCBS-VA); CareFirst (BCBS-DC) | None | Elevance is licensed and operates in all of Virginia except the cities of Alexandria and Fairfax, the town of Vienna, Arlington Country, and the areas of Fairfax and Prince William Counties east of Virginia State Route 123, all of which are licensed and operated by CareFirst. |
| Washington | Cambia (BS-WA); Cambia (BCBS-OR); Cambia (BS-ID); PREMERA. | Asotin, Clallam, Columbia, Cowlitz, Garfield, Grays Harbor, Island, Jefferson, King, Kitsap, Klickitat, Lewis, Mason, Pacific, Pierce, | PREMERA is licensed and operates in all of Washington State other than Clark County.  Cambia is licensed and operates in Asotin, Clallam, Clark, Columbia, Cowlitz, Garfield, Grays Harbor, Island, Jefferson, King, Kitsap, Klickitat, |

| | | San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Walla Walla, Whatcom, and Yakima counties. | Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Walla Walla, Whatcom, and Yakima counties. |
|---|---|---|---|
| West Virginia | Highmark (BCBS-WV) | None | |
| Wisconsin | Elevance (BCBS-WI) | None | |
| Wyoming | BCBS-WY | None | |

**APPENDIX B**

| Allina Health System[1] |
|---|
| Abbott Northwestern – WestHealth |
| Abbott Northwestern – WestHealth Emergency Department |
| Abbott Northwestern General Medicine Associates |
| Abbott Northwestern General Medicine Associates |
| Abbott Northwestern Hospital – Wound Clinic |
| Abbott Northwestern Hospital (Acute Care, Adoles Partial Hospitalization MH Program) |
| Abbott Northwestern Hospital (CK Rehab) |
| Abbott Northwestern Hospital (Lab) |
| Abbott Northwestern Hospital (Psych-Adult) |
| Abbott Northwestern Hospital Plastic Surgery Services |
| Abbott Northwestern Intensivists |
| Abbott Northwestern Kidney Transplant Providers |
| Abbott Northwestern Professional Services |
| Abbott Northwestern Specialty Clinic |
| Abbott Northwestern WestHealth Imaging |
| Abbott Northwestern's Neuroscience Institute |
| Allina Health – Radiation Oncology – Minneapolis |
| Allina Health – Radiation Oncology – St. Paul |
| Allina Health Addiction Assessment and Psychotherapy – Mercy Hospital – Unity Campus |
| Allina Health Annandale Clinic |
| Allina Health Apple Valley Clinic |
| Allina Health Apple Valley Pharmacy |
| Allina Health Assessment and Referral |
| Allina Health Bandana Square Clinic |
| Allina Health Bandana Square Sleep Center (Lab) |
| Allina Health Blaine Clinic |
| Allina Health Bloomington Clinic |
| Allina Health Brooklyn Park Clinic |
| Allina Health Buffalo Specialty Clinic |
| Allina Health Cambridge Clinic |
| Allina Health Cambridge Pharmacy |
| Allina Health Cancer Institute – Buffalo |
| Allina Health Cancer Institute – Coon Rapids |
| Allina Health Cancer Institute – Faribault |
| Allina Health Cancer Institute – Minneapolis |
| Allina Health Cancer Institute – Piper Breast Center |
| Allina Health Cancer Institute – Piper Breast Center – Plymouth |

[1] The list of entities and/or provider DBA names on Appendix B is based upon reasonable diligence and current knowledge. Each entity listed may have multiple NPIs. Plaintiffs reserve the right to amend or supplement this Appendix.

| Allina Health System[1] |
|---|
| Allina Health Cancer Institute – River Falls |
| Allina Health Cancer Institute – Saint Paul |
| Allina Health Centennial Lakes Clinic |
| Allina Health Champlin Clinic |
| Allina Health Chaska Clinic |
| Allina Health Clinic – Buffalo |
| Allina Health Clinic – Buffalo Crossroads |
| Allina Health Cokato Clinic |
| Allina Health Community Paramedic Program |
| Allina Health Coon Rapids Clinic |
| Allina Health Cottage Grove Clinic |
| Allina Health Cottage Grove Pharmacy |
| Allina Health Dean Lakes Clinic |
| Allina Health Eagan Clinic |
| Allina Health Eagan Women's Health Clinic |
| Allina Health East Lake Street Clinic |
| Allina Health Elk River Clinic |
| Allina Health Emergency Medical Services |
| Allina Health Faribault Clinic |
| Allina Health Faribault Medical Center |
| Allina Health Faribault Medical Center Professional Services |
| Allina Health Faribault Pharmacy |
| Allina Health Farmington Clinic |
| Allina Health Float Pool |
| Allina Health Forest Lake Clinic |
| Allina Health Fridley Clinic |
| Allina Health Greenway Clinic |
| Allina Health Hastings Clinic |
| Allina Health Heart Hospital Pharmacy |
| Allina Health Highland Park Clinic |
| Allina Health Home Health |
| Allina Health Home Infusion Therapy Services |
| Allina Health Hospice & Palliative Care |
| Allina Health Hospital Services |
| Allina Health Imaging Center – Edina |
| Allina Health Inpatient Addiction Treatment – Mercy Hospital – Unity Campus |
| Allina Health Inver Grove Heights Clinic |
| Allina Health Isanti Clinic |
| Allina Health Isles Clinic |
| Allina Health Laboratory |
| Allina Health Lakeville North Clinic |
| Allina Health Lakeville South Clinic |
| Allina Health Maple Grove Clinic |

| Allina Health System[1] |
|---|
| Allina Health Maplewood Clinic |
| Allina Health Mental Health – Abbott Northwestern Clinic |
| Allina Health Mental Health – Cambridge Clinic |
| Allina Health Mental Health – Mercy Hospital, Unity Campus |
| Allina Health Mental Health – New Ulm Clinic |
| Allina Health Mental Health – United Clinic |
| Allina Health Mercy General Surgery Clinic |
| Allina Health Mercy Pharmacy |
| Allina Health Mercy Professional Services |
| Allina Health Mercy Women's Health Clinic |
| Allina Health Minneapolis Heart Institute |
| Allina Health Minneapolis Heart Institute Surgery Center |
| Allina Health New Ulm Pharmacy |
| Allina Health Nicollet Mall Clinic |
| Allina Health Nininger Road Clinic |
| Allina Health Non-Hospice Palliative Care |
| Allina Health Northfield Clinic |
| Allina Health Oakdale Clinic St. Paul |
| Allina Health On Demand Virtual Visits |
| Allina Health On Demand Virtual Visits KeyCare |
| Allina Health Orthopedic, Podiatry and Spine Clinic – Faribault |
| Allina Health Orthopedics – Brooklyn Park |
| Allina Health Orthopedics – Coon Rapids |
| Allina Health Orthopedics – Edina |
| Allina Health Orthopedics – Joint Replacement Center – Fridley |
| Allina Health Orthopedics – Joint Replacement Center – St. Paul |
| Allina Health Orthopedics – Minneapolis |
| Allina Health Orthopedics – Plymouth |
| Allina Health Orthopedics – St. Paul |
| Allina Health Outpatient Addiction Services – Cambridge Medical Center (OP SA, MH, CCDTF) |
| Allina Health Outpatient Addiction Services – Mercy Hospital – Unity Campus (MH, SA, CCDTF) |
| Allina Health Palliative Care |
| Allina Health Piper Building Pharmacy |
| Allina Health Plymouth Clinic |
| Allina Health Professional Services |
| Allina Health Ramsey Clinic |
| Allina Health Richfield Clinic |
| Allina Health River Falls Clinic |
| Allina Health Savage Clinic |
| Allina Health Senior Health |
| Allina Health Shakopee Clinic |
| Allina Health Shoreview Clinic |

| Allina Health System[1] |
|---|
| Allina Health Specialty Clinic River Falls |
| Allina Health St. Francis Pharmacy |
| Allina Health St. Michael Clinic |
| Allina Health Surgery Center – Brooklyn Park |
| Allina Health Surgery Center – Lakeville |
| Allina Health Surgery Center – Vadnais Heights |
| Allina Health Surgical Specialists |
| Allina Health United Family Physicians |
| Allina Health United General Surgery Clinic |
| Allina Health United Hospital – Hastings Regina Campus |
| Allina Health United Lung & Sleep Clinic |
| Allina Health United Medical Specialties Clinic |
| Allina Health United Pharmacy |
| Allina Health United Women's Health Clinic |
| Allina Health Unity Pharmacy |
| Allina Health Uptown Clinic |
| Allina Health Urgent Care – Apple Valley |
| Allina Health Urgent Care – Bandana Square (St. Paul) |
| Allina Health Urgent Care – Buffalo Crossroads |
| Allina Health Urgent Care – Centennial Lakes (Edina) |
| Allina Health Urgent Care – Champlin |
| Allina Health Urgent Care – Coon Rapids |
| Allina Health Urgent Care – Faribault |
| Allina Health Urgent Care – Greenway (Minneapolis) |
| Allina Health Urgent Care – Inver Grove Heights |
| Allina Health Urgent Care – Savage |
| Allina Health Urgent Care – Shoreview |
| Allina Health Urgent Care – Woodbury |
| Allina Health Vadnais Heights Clinic |
| Allina Health Weight Management – Abbott Northwestern |
| Allina Health Weight Management – Mercy |
| Allina Health Weight Management – United |
| Allina Health West St. Paul Clinic |
| Allina Health WestHealth Pharmacy |
| Allina Health Woodbury Clinic |
| Allina Health Woodbury Pharmacy |
| Ambulatory Clinic – Mercy Hospital, Unity Campus |
| Buffalo Hospital |
| Buffalo Hospital – CRNA |
| Buffalo Hospital Inpatient Pharmacy |
| Buffalo Hospital Sleep Center |
| Cambridge Medical Center |
| Cambridge Medical Center CRNA |
| Center for Restorative Surgery at Maple Grove, LLC |

| Allina Health System[1] |
|---|
| Chronic Pain Management |
| Courage Kenny Kids |
| Courage Kenny Kids (Peds)/Courage Kenny |
| Courage Kenny Rehabilitation Associates |
| Courage Kenny Rehabilitation Associates (Program name: Courage Kenny Institute's Community Services) |
| Courage Kenny Rehabilitation Institute – Abbott |
| Courage Kenny Rehabilitation Institute – Abbott Northwestern Hospital (OP) |
| Courage Kenny Rehabilitation Institute – Albertville (OP) |
| Courage Kenny Rehabilitation Institute – Buffalo (IP) |
| Courage Kenny Rehabilitation Institute – Buffalo (OP) |
| Courage Kenny Rehabilitation Institute – Burnsville (OP) |
| Courage Kenny Rehabilitation Institute – Cambridge (IP) |
| Courage Kenny Rehabilitation Institute – Cambridge (OP) |
| Courage Kenny Rehabilitation Institute – Cancer Rehab – Mercy Hospital, Unity Campus |
| Courage Kenny Rehabilitation Institute – Edina, Centennial Lakes (OP) |
| Courage Kenny Rehabilitation Institute – Faribault |
| Courage Kenny Rehabilitation Institute – Faribault |
| Courage Kenny Rehabilitation Institute – Forest Lake (OP) |
| Courage Kenny Rehabilitation Institute – Golden Valley Campus (OP) |
| Courage Kenny Rehabilitation Institute – Hastings, Nininger Road |
| Courage Kenny Rehabilitation Institute – Mercy (IP) |
| Courage Kenny Rehabilitation Institute – Mercy Hospital (OP) |
| Courage Kenny Rehabilitation Institute – Mercy Hospital, Unity Campus (IP) |
| Courage Kenny Rehabilitation Institute – New Ulm (IP) |
| Courage Kenny Rehabilitation Institute – New Ulm (OP) |
| Courage Kenny Rehabilitation Institute – New Ulm (OP) Winthrop |
| Courage Kenny Rehabilitation Institute – Owatonna (IP) |
| Courage Kenny Rehabilitation Institute – Owatonna (OP) |
| Courage Kenny Rehabilitation Institute – River Falls (IP) |
| Courage Kenny Rehabilitation Institute – River Falls (OP) |
| Courage Kenny Rehabilitation Institute – St. Croix (OP) |
| Courage Kenny Rehabilitation Institute – United (IP) |
| Courage Kenny Rehabilitation Institute – United Hospital (OP) |
| Courage Kenny Rehabilitation Institute's ABLE |
| Courage Kenny Rehabilitation Institute's acute inpatient unit at United |
| Courage Kenny Rehabilitation Institute's Chronic Pain Rehab Program |
| Courage Kenny Rehabilitation Institute's Transitional Rehab Program |
| Courage Kenny Sports & Physical Therapy – Annandale |
| Courage Kenny Sports & Physical Therapy – Apple Valley |
| Courage Kenny Sports & Physical Therapy – Buffalo, Fitness Center |

| Allina Health System[1] |
|---|
| Courage Kenny Sports & Physical Therapy – Champlin |
| Courage Kenny Sports & Physical Therapy – Coon Rapids, Mercy Specialty Center |
| Courage Kenny Sports & Physical Therapy – Coon Rapids, Springbrook |
| Courage Kenny Sports & Physical Therapy – Cottage Grove |
| Courage Kenny Sports & Physical Therapy – Eagan |
| Courage Kenny Sports & Physical Therapy – Edina, Center for Outpatient Care |
| Courage Kenny Sports & Physical Therapy – Elk River |
| Courage Kenny Sports & Physical Therapy – Fridley, Unity Professional Building |
| Courage Kenny Sports & Physical Therapy – Hastings YMCA |
| Courage Kenny Sports & Physical Therapy – Isanti |
| Courage Kenny Sports & Physical Therapy – Maple Grove |
| Courage Kenny Sports & Physical Therapy – Minneapolis |
| Courage Kenny Sports & Physical Therapy – Plymouth |
| Courage Kenny Sports & Physical Therapy – Ramsey |
| Courage Kenny Sports & Physical Therapy – Richfield |
| Courage Kenny Sports & Physical Therapy – Shoreview |
| Courage Kenny Sports & Physical Therapy – St. Paul, Bandana Square |
| Courage Kenny Sports & Physical Therapy – St. Paul, Doctor's Professional Building |
| Courage Kenny Sports & Physical Therapy – Vadnais Heights |
| Courage Kenny Sports & Physical Therapy – Woodbury |
| Edina Family Physicians |
| Greenway Surgical Suites, LLC |
| J.A. Wedum Residential |
| John Nasseff Neuroscience Specialty Clinic |
| Lamberton Clinic – New Ulm Medical Center |
| Mercy Hospital |
| Mercy Hospital – Pain Management |
| Mercy Hospital – Unity Campus |
| Mercy Hospital – Unity Campus (Geriatric Psych Unit) |
| Metropolitan Heart & Vascular Institute |
| Minneapolis Heart Institute at Ridgeview Heart Center |
| Minnesota Perinatal Physicians |
| Minnesota Perinatal Physicians Mercy |
| Neurosurgical Associates |
| New Ulm Medical Center |
| New Ulm Medical Center |
| New Ulm Medical Center – CRNA/ER |
| New Ulm Medical Center (Psych Unit) |
| Orthopaedic Institute Surgery Center |
| Orthopedics by Twin Cities Orthopedics |

| Allina Health System[1] |
| --- |
| Owatonna Behavioral Health |
| Owatonna Hospital |
| Owatonna Hospital (Psych Unit) |
| Penny George Institute for Health and Healing |
| Penny George Institute for Health and Healing – Buffalo |
| Penny George Institute for Health and Healing – WestHealth |
| Phillips Eye Institute Professional Services |
| Regina Hospital Pharmacy |
| Regina Specialty Services |
| River Falls Area Hospital (Acute, Critical Access) |
| River Falls Area Hospital (Swing Bed) |
| River Falls Professional Services |
| Sharpe, Dillon, Cockson & Associates |
| Springfield Clinic – New Ulm Medical Center |
| St. Francis – Jordan Clinic |
| St. Francis Express Care – Savage |
| St. Francis Express Care – Shakopee |
| St. Francis Professional Services |
| St. Francis Regional Medical Center |
| St. Francis Regional Medical Center – CRNA |
| St. Francis Specialty Services |
| St. Francis Urgent Care |
| St. Francis Urgent Care – Southbridge |
| St. Paul Cardiothoracic Surgical Services |
| Telepsychiatry Services |
| Twin Cities Spine Center |
| United Hospital |
| United Hospital – Midwest Spine and Brain Institute |
| United Hospital (CK Rehab) |
| United Hospital Inpatient Pharmacy |
| United Neonatal |
| United Pain Center |
| United Plastic Surgery Clinic |
| WestHealth Surgery Center |
| WestHealth Urgent Care |
| Winthrop Area Clinic – New Ulm Medical Center |
| Women's Health Consultants |

**APPENDIX C**

| Atlantic Health System[1] |
|---|
| Chilton Medical Center, AHS Hospital Corp |
| Hackettstown Medical Center, AHS Hospital Corp |
| Hackettstown Medical Center, Outpatient Behavioral Health |
| Morristown Medical Center, AHS Hospital Corp |
| Morristown Medical Center, Outpatient Behavioral Health |
| Newton Medical Center, AHS Hospital Corp |
| Overlook Medical Center, AHS Hospital Corp |
| Overlook Medical Center, Outpatient Behavioral Health |

---

[1] The list of entities and/or provider DBA names on Appendix C is based upon reasonable diligence and current knowledge. Each entity listed may have multiple NPIs. Plaintiffs reserve the right to amend or supplement this Appendix.

**APPENDIX D**

| CentraCare Health System[1] |
|---|
| CentraCare – Albany Clinic |
| CentraCare – Albany Rehabilitation |
| CentraCare – Baxter Clinic |
| CentraCare – Becker Clinic |
| CentraCare – Benson |
| CentraCare – Big Lake Clinic |
| CentraCare – Clearwater Clinic |
| CentraCare – Cold Spring Clinic |
| CentraCare – Coordinated Care Clinic |
| CentraCare – Dental Clinic |
| CentraCare – Family Health Center |
| CentraCare – Long Prairie Clinic |
| CentraCare – Long Prairie Hospital |
| CentraCare – Long Prairie Swing Bed |
| CentraCare – Melrose Clinic |
| CentraCare – Melrose Hospital |
| CentraCare – Melrose Swing Bed |
| CentraCare – Midsota Plastic Surgery |
| CentraCare – Monticello Hospital |
| CentraCare – Monticello Specialty Clinic |
| CentraCare – Monticello Swing Bed |
| CentraCare – New London Clinic |
| CentraCare – Northway Clinic |
| CentraCare – Paynesville Clinic |
| CentraCare – Paynesville Hospital |
| CentraCare – Paynesville Swing Bed |
| CentraCare – Plaza Clinic |
| CentraCare – Plaza Clinic (& Urgent Care) |
| CentraCare – Plaza Rehabilitation |
| CentraCare – Plaza Surgery Center |
| CentraCare – Redwood |
| CentraCare – Redwood Eye Center |
| CentraCare – Rice Memorial Hospital |
| CentraCare – River Campus Clinic |
| CentraCare – Sartell Clinic |
| CentraCare – Sartell Rehabilitation |
| CentraCare – Sauk Centre Clinic |
| CentraCare – Sauk Centre Hospital |

---

[1] The list of entities and/or provider DBA names on Appendix D is based upon reasonable diligence and current knowledge. Each entity listed may have multiple NPIs. Plaintiffs reserve the right to amend or supplement this Appendix.

| CentraCare Health System[1] |
|---|
| CentraCare – Sauk Centre Swing Bed |
| CentraCare – Southway Clinic |
| CentraCare – Southway Rehabilitation |
| CentraCare – St Cloud Hospital Addiction Services |
| CentraCare – St Cloud Hospital Inpatient Rehabilitation |
| CentraCare – St. Cloud Hospital Behavioral Health |
| CentraCare – St. Joseph Clinic |
| CentraCare – Urology Clinic |
| CentraCare – Willmar |
| CentraCare – Willmar Clinic |
| CentraCare – Willmar Lakeland Clinic |
| CentraCare – Willmar Skylark Clinic |
| CentraCare Clinic – Midtown |
| CentraCare Clinic Anesthesiology |
| CentraCare Clinic Health Plaza – Family Medicine |
| CentraCare Emergency Medical Services |
| CentraCare Eye Center |
| CentraCare Health System |
| CentraCare Home Health |
| CentraCare Hospice |
| CentraCare Laboratory Services |
| CentraCare Neurosciences Headache Center |
| CentraCare Occupational Health |
| CentraCare Paynesville – Eden Valley Clinic |
| CentraCare Paynesville – Richmond Clinic |
| CentraCare Pharmacy Northway |
| CentraCare Sleep Center |
| CentraCare  St. Cloud Hospital Clara's House |
| CentraCare Willmar Surgery Center |
| CentraCare Wound Center |
| Central Minnesota Child Advocacy Center |
| Extended Contract Inpt Psych Services |
| Intensive Cardiac Rehabilitation |

**APPENDIX E**

| Fairview Health Services[1] |
|---|
| (Range) Fairview University Medical Center - Mesabi (45 Days) |
| (Range) Fairview University Medical Center - Mesabi (Psych) |
| Aurora on France (Assisted Living) |
| Aurora on France (Transitional Care) |
| Behavioral Healthcare Providers |
| Columbia Park Medical Group |
| Ebenezer Adult Day Program |
| Ebenezer Integrated Care & Rehabilitation |
| Ebenezer Ridges Care Center |
| Fairview Blaine Clinic (DME) |
| Fairview Blaine Physical Therapy |
| Fairview Center for Bladder Control |
| Fairview Centro de Salud |
| Fairview Chisago Lakes Clinic |
| Fairview Clinics - Bloomington Lake - Minneapolis |
| Fairview Clinics - Chaska |
| Fairview Clinics - Memory Care, Burnsville |
| Fairview Clinics - North Branch |
| Fairview Clinics - Pine City |
| Fairview Clinics - Riverside |
| Fairview Clinics - Specialty Memory Care, Burnsville |
| Fairview Clinics - St. Francis |
| Fairview Clinics - Primary Care Skin |
| Fairview Clinics St Francis |
| Fairview Columbia Heights Clinic (DME) |
| Fairview Columbia Heights Clinic (Eyewear) |
| Fairview Counseling Center |
| Fairview Elk River Clinic |
| Fairview Express Care |
| Fairview Fridley Physical Therapy |
| Fairview Frontiers |
| Fairview Hand Center |
| Fairview Health Services CRNAS (Southdale) |

---

[1] The list of entities and/or provider DBA names on Appendix E is based upon reasonable diligence and current knowledge. Each entity listed may have multiple NPIs. Plaintiffs reserve the right to amend or supplement this Appendix.

| Fairview Health Services[1] |
|---|
| Fairview Home Medical Equipment |
| Fairview Home Medical Equipment - Virginia |
| Fairview Hugo Clinic |
| Fairview Hugo Clinic (EPIC) |
| Fairview Jonathan Clinic |
| Fairview Lino Lakes Clinic |
| Fairview Medical Weight Loss Clinic |
| Fairview Mesaba Clinic - Hibbing |
| Fairview Mesaba Clinic - Mountain Iron |
| Fairview Mesaba Clinic - Nashwauk |
| Fairview Milaca Clinic |
| Fairview North Branch Clinic |
| Fairview Northeast Clinic |
| Fairview Orthotics and Prosthetics |
| Fairview Oxboro Clinic |
| Fairview Pain and Palliative Care Center |
| Fairview Pain Management Center - Burnsville |
| Fairview Partners |
| Fairview Pediatric Rehabilitation |
| Fairview Pediatric Rehabilitation- Monticello |
| Fairview Plymouth Clinic |
| Fairview Princeton Clinic |
| Fairview Ridges Clinic |
| Fairview Ridges Oncology Clinic |
| Fairview Ridges Women's Imaging Center |
| Fairview Riverside Women's Clinic |
| Fairview Rush City Clinic |
| Fairview Sleep Centers - Chisago City |
| Fairview Southdale Breast Center |
| Fairview Southdale Diagnostic Sleep Center |
| Fairview Southdale Hospital (Psych Unit) |
| Fairview Sports and Orthopedic Care |
| Fairview Sports and Orthopedic Care - Oak Ridge |
| Fairview University Medical Center - Mesabi (Range) |
| Fairview Urgent Care - Bloomington |
| Fairview Wyoming Clinic |
| Fairview Zimmerman Clinic |

| Fairview Health Services[1] |
|---|
| Fairview-Paul Larson Clinic |
| Grand Itasca Clinic and Hospital |
| Grand Itasca Clinic and Hospital Home Care |
| Grand Itasca Pharmacy |
| Grand Itasca Professional Building |
| Grand Itasca YMCA Clinic |
| HealthEast Heart Care Riverfalls |
| HealthEast Hospitalist Service |
| HealthEast Medical Imaging |
| HealthEast Outpatient Services, LLC |
| HEALTHEAST VADNAIS HEIGHTS CLINIC |
| Healthline - Transportation Services |
| Healthline HomeCare |
| Healthline Medical Supply - Hibbing |
| Healthline Medical Supply - International Falls |
| Healthline Medical Supply - Virginia |
| Institute for Athletic Medicine |
| Institute for Occupational Rehab |
| Lions Children's Hearing and ENT |
| M Health Clinics and Surgery Center - Minneapolis |
| M Health Fairview Achievement Center |
| M Health Fairview Acute Rehabilitation Center |
| M Health Fairview Adolescent Residential Center |
| M Health Fairview Audiology and Aural Rehabilitation Clinic Minneapolis |
| M Health Fairview Autism Spectrum & Neurodevelopmental Disorders |
| M Health Fairview Bethesda Hospital |
| M Health Fairview Bethesda Hospital (HB Mental Health and Addiction Services) |
| M Health Fairview Breast Care Southdale |
| M Health Fairview Breast Center - Edina |
| M Health Fairview Breast Center - Maplewood |
| M Health Fairview Breast Center Woodbury |
| M Health Fairview Cancer Care Clinic - Maple Grove |
| M Health Fairview Cancer Center - Burnsville |
| M Health Fairview Cancer Center - Edina |
| M Health Fairview Cancer Center - Maplewood |
| M Health Fairview Cancer Center - Wyoming |
| M Health Fairview Cancer Center Woodbury |

E3

| Fairview Health Services[1] |
|---|
| M Health Fairview Center for Bleeding and Clotting Disorders |
| M Health Fairview Center for Children with Cancer and Blood Disease |
| M Health Fairview Center for Pediatric Blood and Marrow Transplantation |
| M Health Fairview Center for Women - Edina |
| M Health Fairview Clinic - Andover |
| M Health Fairview Clinic - Apple Valley |
| M Health Fairview Clinic - Bass Lake |
| M Health Fairview Clinic - Bethesda |
| M Health Fairview Clinic - Blaine |
| M Health Fairview Clinic - Brooklyn Park |
| M Health Fairview Clinic - Burnsville |
| M Health Fairview Clinic – Children's |
| M Health Fairview Clinic - Chisago City |
| M Health Fairview Clinic - Columbia Heights |
| M Health Fairview Clinic - Cottage Grove |
| M Health Fairview Clinic - Downtown St. Paul |
| M Health Fairview Clinic - Eagan |
| M Health Fairview Clinic - Eden Prairie |
| M Health Fairview Clinic - Edina |
| M Health Fairview Clinic - Elk River |
| M Health Fairview Clinic - Farmington |
| M Health Fairview Clinic - Forest Lake ISD 831 |
| M Health Fairview Clinic - Fridley |
| M Health Fairview Clinic - Grand Avenue |
| M Health Fairview Clinic - Hiawatha |
| M Health Fairview Clinic - Highland Park |
| M Health Fairview Clinic - Hugo |
| M Health Fairview Clinic - Integrated Primary Care |
| M Health Fairview Clinic - Lakeville |
| M Health Fairview Clinic - Lino Lakes |
| M Health Fairview Clinic - Maple Grove |
| M Health Fairview Clinic - Maplewood |
| M Health Fairview Clinic - Midway |
| M Health Fairview Clinic - Milaca |
| M Health Fairview Clinic - New Brighton |
| M Health Fairview Clinic - North Branch |
| M Health Fairview Clinic - North Hennepin Community College |

| Fairview Health Services[1] |
|---|
| M Health Fairview Clinic - Oakdale |
| M Health Fairview Clinic - Oxboro |
| M Health Fairview Clinic - Phalen Village |
| M Health Fairview Clinic - Pine City |
| M Health Fairview Clinic - Princeton |
| M Health Fairview Clinic - Prior Lake |
| M Health Fairview Clinic - Rice Street |
| M Health Fairview Clinic - Riverside |
| M Health Fairview Clinic - Rogers |
| M Health Fairview Clinic - Roselawn |
| M Health Fairview Clinic - Rosemount |
| M Health Fairview Clinic - Roseville |
| M Health Fairview Clinic - Rush City |
| M Health Fairview Clinic - Savage |
| M Health Fairview Clinic - Smileys |
| M Health Fairview Clinic - Stillwater |
| M Health Fairview Clinic - Tamarack |
| M Health Fairview Clinic - Uptown |
| M Health Fairview Clinic - Vadnais Heights |
| M Health Fairview Clinic – Woodwinds |
| M Health Fairview Clinic - Wyoming |
| M Health Fairview Clinic - Xerxes |
| M Health Fairview Clinic - Zimmerman |
| M Health Fairview Clinic River Falls |
| M Health Fairview Clinical Research Unit |
| M Health Fairview Clinics and Surgery Center - Maple Grove |
| M Health Fairview Clinics and Surgery Center - Minneapolis |
| M Health Fairview Community Advancement Mobile Clinic |
| M Health Fairview Counseling Edina |
| M Health Fairview Counseling Forest Lake |
| M Health Fairview Counseling Minneapolis |
| M Health Fairview Crisis Transition Clinic |
| M Health Fairview Critical Care Bethesda |
| M Health Fairview Dermatology Clinic Bloomington |
| M Health Fairview Diagnostic Laboratory (Lakes) Outreach Lab Department |
| M Health Fairview Diagnostic Laboratory (Northland) Outreach Lab Department |

| Fairview Health Services[1] |
|---|
| M Health Fairview Diagnostic Laboratory (Ridges), Outreach Lab Department |
| M Health Fairview Diagnostic Laboratory (Southdale), Outreach Lab Department |
| M Health Fairview Diagnostic Laboratory (UMMC), Outreach Lab Department |
| M Health Fairview Emergency Medical Services |
| M Health Fairview Eye Clinic |
| M Health Fairview Geriatric Services |
| M Health Fairview Hand Clinic - Hiawatha |
| M Health Fairview Hand Therapy Blaine |
| M Health Fairview Hand Therapy Burnsville |
| M Health Fairview Hand Therapy Edina |
| M Health Fairview Hand Therapy Elk River |
| M Health Fairview Hand Therapy Fulton |
| M Health Fairview Hand Therapy Maple Grove |
| M Health Fairview Heart Clinic - Burnsville |
| M Health Fairview Heart Clinic - Edina |
| M Health Fairview Heart Clinic - Fridley |
| M Health Fairview Heart Clinic - Fulton |
| M Health Fairview Heart Clinic - Wyoming |
| M Health Fairview Heart Clinic Hudson |
| M Health Fairview Heart Clinic Maplewood |
| M Health Fairview Heart Clinic St Paul |
| M Health Fairview Heart Clinic Stillwater |
| M Health Fairview Heart Clinic Woodwinds |
| M Health Fairview Home Medical Equipment - Hibbing |
| M Health Fairview Home Medical Equipment Lakes |
| M Health Fairview Home Medical Equipment Maplewood |
| M Health Fairview Home Medical Equipment Ridges |
| M Health Fairview Home Medical Equipment Southdale |
| M Health Fairview Home Medical Equipment St Paul |
| M Health Fairview Home Medical Equipment Woodbury |
| M Health Fairview Hospitalist Service - St. Joseph's |
| M Health Fairview Hospitalist Service Bethesda |
| M Health Fairview Hospitalist Services - St John's |
| M Health Fairview Hospitalist Services - Woodwinds |
| M Health Fairview Imaging - Maplewood |

| Fairview Health Services[1] |
|---|
| M Health Fairview Imaging - Edina |
| M Health Fairview Kidney Transplant Clinic |
| M Health Fairview Lakes Medical Center |
| M Health Fairview Lifeline |
| M Health Fairview Liver Clinic St Cloud |
| M Health Fairview Lung Center |
| M Health Fairview Masonic Cancer Clinic |
| M Health Fairview Masonic Institute for the Developing Brain Clinic |
| M Health Fairview Maternal-Fetal Medicine Clinic |
| M Health Fairview Maternal-Fetal Medicine Clinic Burnsville |
| M Health Fairview Maternal-Fetal Medicine Clinic Edina |
| M Health Fairview Medical Laboratory |
| M Health Fairview Mental Health and Addiction Clinic |
| M Health Fairview Ministerial Health |
| M Health Fairview Neonatal Services |
| M Health Fairview Neurology Clinic - Maplewood |
| M Health Fairview Neurology Clinic - St. Paul |
| M Health Fairview Neurology Clinic Edina |
| M Health Fairview Neurology Clinic Woodbury |
| M Health Fairview Neurosurgery Clinic Edina |
| M Health Fairview Northland Medical Center |
| M Health Fairview Orthopedic Clinic - Blaine |
| M Health Fairview Orthopedic Clinic Northland |
| M Health Fairview Orthopedic Clinic -Ridges |
| M Health Fairview Orthopedics |
| M Health Fairview Orthopedics Eden Prairie |
| M Health Fairview Orthopedics Lakes |
| M Health Fairview Orthotics and Prosthetics Blaine |
| M Health Fairview Orthotics and Prosthetics Lakes |
| M Health Fairview Orthotics and Prosthetics Maplewood |
| M Health Fairview Orthotics and Prosthetics Northland |
| M Health Fairview Orthotics and Prosthetics Ridges |
| M Health Fairview Orthotics and Prosthetics Southdale |
| M Health Fairview Orthotics and Prosthetics St Paul |
| M Health Fairview Orthotics and Prosthetics Woodwinds |
| M Health Fairview Outreach |
| M Health Fairview Outreach Services |

| Fairview Health Services[1] |
|---|
| M Health Fairview Pain Center |
| M Health Fairview Pain Clinic - Lakes |
| M Health Fairview Pain Clinic - Minneapolis |
| M Health Fairview Pain Clinic - Ridges |
| M Health Fairview Pain Clinic Edina |
| M Health Fairview Pediatric Developmental Behavioral Clinic |
| M Health Fairview Pediatric Specialty Clinic - Burnsville |
| M Health Fairview Pediatric Specialty Clinic - Discovery |
| M Health Fairview Pediatric Specialty Clinic - Explorer |
| M Health Fairview Pediatric Specialty Clinic - Hudson |
| M Health Fairview Pediatric Specialty Clinic - Minnetonka |
| M Health Fairview Pediatric Specialty Clinic - Voyager |
| M Health Fairview Pediatric Specialty Clinic - Woodbury |
| M Health Fairview Pediatric Specialty Clinic Chaska |
| M Health Fairview Pediatric Specialty Clinic Journey |
| M Health Fairview Pediatric Therapy - Maplewood |
| M Health Fairview Pediatric Therapy - New Hope |
| M Health Fairview Pediatric Therapy - Woodbury |
| M Health Fairview Psychiatry Clinic |
| M Health Fairview Radiation Oncology Clinic |
| M Health Fairview Recovery Clinic |
| M Health Fairview Recovery Services Burnsville |
| M Health Fairview Recovery Services Crystal |
| M Health Fairview Recovery Services Edina |
| M Health Fairview Recovery Services Forest Lake |
| M Health Fairview Recovery Services Maplewood |
| M Health Fairview Recovery Services Princeton |
| M Health Fairview Rehabilitation Hugo |
| M Health Fairview Rehabilitation - Eagan |
| M Health Fairview Rehabilitation - Maplewood |
| M Health Fairview Rehabilitation - Midway |
| M Health Fairview Rehabilitation - Stillwater |
| M Health Fairview Rehabilitation - Woodwinds |
| M Health Fairview Rehabilitation Bloomington |
| M Health Fairview Rehabilitation Burnsville Specialty Care Center |
| M Health Fairview Rehabilitation Eden Prairie |
| M Health Fairview Rehabilitation Edina |

| Fairview Health Services[1] |
|---|
| M Health Fairview Rehabilitation Elk River |
| M Health Fairview Rehabilitation Golden Valley |
| M Health Fairview Rehabilitation Uptown |
| M Health Fairview Rehabilitation - Highland Park |
| M Health Fairview Rehabilitation St Anthony |
| M Health Fairview Renal Dialysis Center, UMMC (ESRD) |
| M Health Fairview Ridges Hospital |
| M Health Fairview Sexual and Gender Health Clinic |
| M Health Fairview Sleep Center - Brooklyn Park |
| M Health Fairview Sleep Center - Minneapolis |
| M Health Fairview Sleep Center - Northland |
| M Health Fairview Sleep Center - Ridges |
| M Health Fairview Sleep Center - Southdale |
| M Health Fairview Sleep Center - Virtual Clinic |
| M Health Fairview Southdale Hospital |
| M Health Fairview Specialty - Maple Grove |
| M Health Fairview Specialty Clinic Beam |
| M Health Fairview Specialty Clinic Edina |
| M Health Fairview Specialty Clinic Hazelwood |
| M Health Fairview Specialty Clinic Woodbury |
| M Health Fairview Specialty Services |
| M Health Fairview Spine and Neurosurgery |
| M Health Fairview Spine and Rehabilitation Clinic |
| M Health Fairview Sports & Physical Therapy Apple Valley |
| M Health Fairview Sports & Physical Therapy Arbor Lakes |
| M Health Fairview Sports & Physical Therapy Blaine |
| M Health Fairview Sports & Physical Therapy Blaine NSC |
| M Health Fairview Sports & Physical Therapy Bloomington |
| M Health Fairview Sports & Physical Therapy Brooklyn Park |
| M Health Fairview Sports & Physical Therapy Burnsville |
| M Health Fairview Sports & Physical Therapy Eagan |
| M Health Fairview Sports & Physical Therapy Eden Prairie |
| M Health Fairview Sports & Physical Therapy Edina |
| M Health Fairview Sports & Physical Therapy Elk River |
| M Health Fairview Sports & Physical Therapy Fridley |
| M Health Fairview Sports & Physical Therapy Fulton |
| M Health Fairview Sports & Physical Therapy Golden Valley |

| Fairview Health Services[1] |
|---|
| M Health Fairview Sports & Physical Therapy Hugo |
| M Health Fairview Sports & Physical Therapy Lakeville |
| M Health Fairview Sports & Physical Therapy Maple Grove |
| M Health Fairview Sports & Physical Therapy Minneapolis |
| M Health Fairview Sports & Physical Therapy Plymouth CC |
| M Health Fairview Sports & Physical Therapy Rosemount |
| M Health Fairview Sports & Physical Therapy St Paul |
| M Health Fairview Sports & Physical Therapy St. Anthony |
| M Health Fairview Sports & Physical Therapy Uptown |
| M Health Fairview St Joseph's Behavioral Health |
| M Health Fairview St. John's Hospital |
| M Health Fairview St. Joseph's Hospital |
| M Health Fairview Surgical Consultants - Bloomington |
| M Health Fairview Surgical Consultants - Ridges |
| M Health Fairview Surgical Consultants - Southdale |
| M Health Fairview Transitional Care |
| M Health Fairview University Anesthesia Providers |
| M Health Fairview University of Minnesota Medical Center |
| M Health Fairview Urgent Care - Andover |
| M Health Fairview Urgent Care - Brooklyn Park |
| M Health Fairview Urgent Care - Eagan |
| M Health Fairview Urgent Care - Edina |
| M Health Fairview Urgent Care - Highland Park |
| M Health Fairview Urgent Care - Lakeville |
| M Health Fairview Urgent Care - North Branch |
| M Health Fairview Urgent Care - Oxboro |
| M Health Fairview Urgent Care Maplewood |
| M Health Fairview Urgent Care River Falls |
| M Health Fairview Urgent Care Woodwinds |
| M Health Fairview Urology Clinic Edina |
| M Health Fairview Vascular Clinic - Maplewood |
| M Health Fairview Vascular Clinic - Woodbury |
| M Health Fairview Vein Clinic Maple Grove |
| M Health Fairview Vein Clinic Southdale |
| M Health Fairview Walk In Clinic Mall of America |
| M Health Fairview Weight Management Clinic - Southdale |
| M Health Fairview Weight Management Clinic Southdale |

E10

| Fairview Health Services[1] |
|---|
| M Health Fairview Wilson Tool Onsite Clinic |
| M Health Fairview Women's Clinic |
| M Health Fairview Woodwinds Hospital |
| M Health Fairview Woodwinds Hospital Cardiac Rehab Clinic |
| M Health Fairview Woodwinds Hospital Non-Invasive Cardiac |
| Meadows on Fairview |
| Minnesota Gynecology and Surgery - Fairview |
| Minnesota Heart Clinic |
| Minnesota Lions Children's Eye Clinic |
| Neurology Associates of St Paul |
| North Star Hospice Healthline, LLC |
| Northside Life Care Center |
| Radiation Oncology Clinic |
| Range - Greenview - Alzheimer's Unit |
| Range Pharmacy/DME |
| Rapid Clinic |
| Southside Life Care Center |
| Surgical Consultants |
| Surgical Consultants - Minnesota Vascular Clinic |
| Surgical Consultants / Oxboro |
| Surgical Consultants / VeinSolutions |
| Surgical Consultants Bloomington Lakes Clinic, Mpls- General Surgery |
| Surgical Consultants Bloomington Lakes Clinic, Xerxes- General Surgery |
| Surgical Consultants- Vascular |
| UMMC Riverside Primary Care Clinic |
| UMMC, Fairview (CRNA) |
| UMMC, Fairview (Psych Unit) |
| UMMC, Fairview Counseling Center |
| UMMC, Fairview Recovery Services |
| UMMC, Fairview Renal Dialysis Center |
| University of Minnesota Physicians Heart at Fairview |
| University Orthopedics Therapy Center |
| Urologic Physicians |
| Vibrant Health Family Clinics |

**APPENDIX F**

| Mayo Clinic[1] |
|---|
| Charterhouse |
| Charterhouse Inc |
| Gold Cross Ambulance Service |
| JOHN E HERMAN HOME AND TREATMENT FACILITY, LLC |
| Luther Hospital |
| Mayo Clinic |
| Mayo Clinic Ambulance |
| Mayo Clinic Arizona |
| Mayo Clinic Florida |
| Mayo Clinic Health System –  Lake City |
| Mayo Clinic Health System –  New Prague |
| Mayo Clinic Health System –  St James |
| Mayo Clinic Health System – Albert Lea and Austin |
| Mayo Clinic Health System – Austin |
| Mayo Clinic Health System – Cannon Falls |
| Mayo Clinic Health System – Chippewa Valley Inc |
| Mayo Clinic Health System – Eau Claire Clinic, Inc. |
| Mayo Clinic Health System – Fairmont |
| Mayo Clinic Health System – Faribault |
| Mayo Clinic Health System – Franciscan Medical Center, Inc. |
| Mayo Clinic Health System – Lake City |
| Mayo Clinic Health System – Mankato |
| Mayo Clinic Health System – Northland Inc |
| Mayo Clinic Health System – Northwest Wisconsin Region, Inc. |
| Mayo Clinic Health System – Oakridge, Inc. |
| Mayo Clinic Health System – Owatonna |
| Mayo Clinic Health System – Pharmacy & Home Medical, Inc. |
| Mayo Clinic Health System – Red Cedar, Inc. |
| Mayo Clinic Health System – Red Wing |
| Mayo Clinic Health System – Southeast Minnesota Region |
| Mayo Clinic Health System – Southwest Wisconsin Region, Inc. |
| Mayo Clinic Health System – Springfield |
| Mayo Clinic Health System – St James |
| Mayo Clinic Health System – Waseca |
| Mayo Clinic Hospital – Rochester |
| Mayo Clinic Jacksonville |
| Mayo Clinic Methodist Hospital |
| Mayo Collaborative Services, Inc |

---

[1] The list of entities and/or provider DBA names on Appendix F is based upon reasonable diligence and current knowledge.  Each entity listed may have multiple NPIs.  Plaintiffs reserve the right to amend or supplement this Appendix.

| Mayo Clinic[1] |
| --- |
| Mayo Foundation for Medical Education & Research |
| Parkview Care Center Albert Lea Medical Center |
| SOUTHERN METRO MEDICAL CLINIC |

**APPENDIX G**

| RWJ Barnabas Health, Inc.[1] |
|---|
| A Woman's Place, LLC |
| Advanced Endoscopy & Surgical Center, LLC (Eatontown) |
| Advanced Gastroenterology Group, LLC |
| Advanced Surgical & Endoscopy |
| Affiliated Holdco, LLC |
| Ambulatory Surgical Center of Morris County, LLC. dba Ridgedale Surgery Center |
| Ambulatory Surgical Pavilion at Robert Wood Johnson, LLC |
| Anesthesia Specialists of NJ, LLC |
| Associates in Otolaryngology of NJ, LLC |
| Atlantic Ambulatory Anesthesia Associates, L.L.C. |
| Avenel Iselin Medical Group, LLC |
| Bariatric Surgical Associates LLC |
| BARNABAS HEALTH MEDICAL GROUP PC {North} |
| BARNABAS HEALTH MEDICAL GROUP, PC {South} |
| BARNABAS HEALTH MULTISPECIALTY {AIG} |
| BHMG – CORPORATE CARE |
| BHMG – UNITED MEDICAL |
| Blue Balloon, LLC |
| Bucks Physical & Sports Rehabilitation, LLC |
| CCG Medical Group LLC |
| Center for Ambulatory Surgery, LLC |
| Central Jersey Ambulatory Surgery Center, LLC |
| Central Jersey Specialty Surgical Associates, LLC |
| Central New Jersey Hand Surgery, LLC |
| Children's Specialized Hospital |
| Childrens Specialized Hospital ABA II, LLC |
| Childrens Specialized Hospital ABA, LLC |
| Clara Maass Medical Center |
| Clara Maass Medical Center House |
| CMMC PROVIDER SERVICES |
| CNJ Specialty Surgical Associates |
| Colonia Pediatrics, LLC |
| Community Medical Center |
| Cooperman Barnabas Medical Center |
| Digestive Healthcare Center, LLC |
| East Jersey Health Care Services LLC |
| Endo – Surgi of Union ASC, LLC |

---

[1] The list of entities and/or provider DBA names on Appendix G is based upon reasonable diligence and current knowledge. Each entity listed may have multiple NPIs. Plaintiffs reserve the right to amend or supplement this Appendix.

| RWJ Barnabas Health, Inc.[1] |
|---|
| Endoscopy Center of Ocean County, LLC |
| Endoscopy Center of Toms River, LLC |
| Essex Endoscopy Center, LLC |
| Eye Institute of Essex, PA |
| Family Care Primary and Urgent Care, LLC |
| Family First Primary Physicians II, LLC |
| Family First Primary Physicians LLC |
| Foot and Ankle Physicians of NJ, LLC |
| Freehold Ambulatory Anesthesia Associates, LLC |
| Garden State Endoscopy Anesthesia |
| Garden State Physician Associates, LLC |
| Gastroenterology Associates of New Jersey, LLC |
| Gastroenterology Diagnostics Holding Company, LLC |
| Gaurang Patel MD LLC |
| Hamilton Endoscopy and Surgery Center, LLC |
| Hudson Crossing Surgery Center, LLC |
| Huron Pathology Associates, PLLC |
| ID Care, LLC |
| JAG – ONE Physical Therapy LLC |
| Jersey City Medical Center |
| Kayal Medical Group, LLC |
| Kayal Orthopaedic, PLLC |
| Kintiroglou Pediatrics, LLC |
| Laparoscopic Specialty Surgical Associates LLC |
| Linden Surgical Center, L.L.C. |
| Livingston ASC, LLC |
| Livingston Infusion Care DBA Qualitas Pharmacy Services |
| Livingston Pathology Associates, LLC |
| Matthew J. Marano Jr. MD, LLC |
| May Street Surgi Center, L.L.C. |
| MD Care Urgent Center, LLC |
| Medemerge, LLC |
| Medical Oncology Associates at SBMC |
| Medicor Cardiology, LLC |
| Medicor Cardiology, PA |
| MMC PROVIDER SERVICES |
| Monmouth Medical Center |
| MONMOUTH MEDICAL CENTER FACULTY PRACTICE PLAN |
| Montgomery Medical Associates, LLC |
| Morris Avenue Endoscopy LLC, dba Garden State Endoscopy and Surgery Center |
| MVP Medical Associates II, LLC |
| MVP Medical Associates, PA |
| NBIMC Adult Gastroenterology |

| RWJ Barnabas Health, Inc.[1] |
|---|
| NBIMC CHONJ PHYSICIAN GROUP |
| NBIMC Department of Cardiothoracic Surgery |
| NBIMC Department of Geriatrics |
| NBIMC Department of Heart Transplant |
| NBIMC Department of Internal Medicine |
| NBIMC Department of Non – Invasive Cardiology |
| NBIMC DEPARTMENT OF OBSTETRICS AND GYN |
| NBIMC DEPARTMENT OF PATHOLOGY |
| NBIMC DEPT OF ONCOLOGY |
| NBIMC DEPT OF RADIOLOGY |
| NBIMC DEPT OF SURGERY |
| NBIMC INTERVENTIONAL CARDIOLOGY |
| NBIMC PROVIDER SERVICES |
| NBIMC TRINITAS PEDIATRIC MEDICAL GROUP |
| New Jersey Imaging Network |
| New Jersey Surgery Center, LLC |
| NEWARK BETH ISRAEL EMERGENCY ROOM DEPT |
| Newark Beth Israel Medical Center |
| NEWARK BETH ISRAEL MEDICAL CENTER INC |
| NJ Spine Center, LLC |
| North Jersey Gastro Holdco, LLC |
| Oak Tree Surgery Center, LLC |
| Ocean Endosurgery Center, LLC |
| Ocean Otolaryngology Associates, P.A. |
| Ocean Otolaryngology, LLC |
| ON TIME AMBULANCE, INC. |
| Oncology & Hematology Specialists, LLC |
| Ophthalmology NJ LLC |
| Orthopaedic, Sports Medicine & Rehabilitation Center, LLC |
| Parkway Anesthesia Associates, LLC |
| Pathlink of Georgia, LLC |
| PathLink of New Jersey, LLC |
| Pathlink of New Mexico, LLC |
| Pathlink of Ohio, LLC |
| Pathlink of Pennsylvania, PLLC |
| Pathlink of Texas, PLLC |
| Pediatricare Associates, LLC |
| PNP Pediatrics, LLC |
| Premier Endoscopy, LLC |
| Radiation Oncology Group at SBMC |
| RB Gastroenterology Holding Company, LLC |
| RB Physical and Occupational Therapy PLLC |
| Robert Wood Johnson Endosurgical Center, LLC |

| **RWJ Barnabas Health, Inc.**[1] |
|---|
| Robert Wood Johnson Medical Associates at Hamilton, P.A. d/b/a Care Station Medical Group |
| Robert Wood Johnson Physician Enterprise, PA |
| Robert Wood Johnson University Hospital |
| Robert Wood Johnson University Hospital at Hamilton |
| Robert Wood Johnson University Hospital Rahway |
| Roxbury Eye Center, P.C. |
| Rutgers Health – PCC Monument Square |
| Rutgers Health – RWJ Acute Pain |
| Rutgers Health – RWJ Allergy Faculty |
| Rutgers Health – RWJ Anesthesiology Group |
| Rutgers Health – RWJ Cancer Institute of New Jersey |
| Rutgers Health – RWJ Cardiology |
| Rutgers Health – RWJ Critical Intensive Care |
| Rutgers Health – RWJ Department of Medicine Gen Internal |
| Rutgers Health – RWJ Dermatology |
| Rutgers Health – RWJ Electrophysiology |
| Rutgers Health – RWJ Emergency Medicine |
| Rutgers Health – RWJ Endocrinology |
| Rutgers Health – RWJ Gastroenterology |
| Rutgers Health – RWJ Hem/Onc |
| Rutgers Health – RWJ Immunology |
| Rutgers Health – RWJ Maternal Fetal Medicine |
| Rutgers Health – RWJ Neonatology |
| Rutgers Health – RWJ Nephrology |
| Rutgers Health – RWJ Neurology Group |
| Rutgers Health – RWJ Neurosurgery Faculty |
| Rutgers Health – RWJ OB/GYN Group |
| Rutgers Health – RWJ Pain Management |
| Rutgers Health – RWJ Pathology |
| Rutgers Health – RWJ Pediatric Adolescent Medicine |
| Rutgers Health – RWJ Pediatric Allergy Immunology Inf Disease |
| Rutgers Health – RWJ Pediatric Cardiology |
| Rutgers Health – RWJ Pediatric Child Development |
| Rutgers Health – RWJ Pediatric Critical Care |
| Rutgers Health – RWJ Pediatric Development |
| Rutgers Health – RWJ Pediatric Emergency Faculty |
| Rutgers Health – RWJ Pediatric Endocrinology |
| Rutgers Health – RWJ Pediatric G.I. |
| Rutgers Health – RWJ Pediatric Genetics |
| Rutgers Health – RWJ Pediatric Group |
| Rutgers Health – RWJ Pediatric Hematology – Oncology |
| Rutgers Health – RWJ Pediatric Metabolism |
| Rutgers Health – RWJ Pediatric Nephrology |

| RWJ Barnabas Health, Inc.[1] |
|---|
| Rutgers Health – RWJ Pediatric Neurology |
| Rutgers Health – RWJ Pediatric Neurosurgery |
| Rutgers Health – RWJ Pediatric Pulmonary |
| Rutgers Health – RWJ Pediatric Rheumatology |
| Rutgers Health – RWJ Pediatric Surgery |
| Rutgers Health – RWJ Plastic Surgery |
| Rutgers Health – RWJ Primary Care Institute |
| Rutgers Health – RWJ Primary Medicine Group |
| Rutgers Health – RWJ Psychiatry Clinic |
| Rutgers Health – RWJ Radiation Oncology |
| Rutgers Health – RWJ Rheumatology |
| Rutgers Health – RWJ Scleroderma Program |
| Rutgers Health – RWJ Sports Medicine |
| Rutgers Health – RWJ Surgery Group |
| Rutgers Health – RWJ Surgical Associates |
| Rutgers Health – RWJ Surgical Critical Care |
| Rutgers Health – RWJ Surgical Oncology |
| Rutgers Health – RWJ Surgical Sciences |
| Rutgers Health – RWJ Thoracic Surgery |
| Rutgers Health – RWJ Transplant Program |
| Rutgers Health – RWJ Urogynecology |
| Rutgers Health – RWJ Vascular Surgery Group |
| RWJ Health Network |
| RWJ Hospital Practices Hamilton – OBGYN |
| RWJ Hospital Practices Hamilton – Oncology |
| RWJ Hospital Practices Hamilton – Pulmonary |
| RWJ Hospital Practices Hamilton – Thoracic Surgery |
| RWJ Medical Associates New Brunswick |
| RWJ Visiting Nurses |
| RWJBH Associates 2, LLC d/b/a RWJBarnabas Renaissance Primary Care |
| RWJBH Emergency Medicine Associates, LLC |
| RWJBH Health Partners, LLC |
| RWJBH Observation Associates, LLC |
| RWJBH Primary Care Services |
| RWJUH Imaging at Plum Street, LLC. |
| Saint Barnabas Behavioral Health Center |
| Saint Barnabas Outpt Ctrs/ACC |
| SBMC PROVIDER SERVICES |
| Seaview Orthopaedic and Medical Associates, LLC |
| Short Hills Surgery Center, LLC |
| Shrewsbury Ambulatory Anesthesia, LLC |
| Shrewsbury Diagnostic Imaging, L.L.C. |
| Somerset Pediatric Group, LLC |
| Somerset Surgical Services LLC |

| **RWJ Barnabas Health, Inc.**[1] |
| --- |
| Specialty Surgical Center Anesthesia |
| Specialty Surgical Center of North Brunswick, LLC |
| Specialty Surgical Center, LLC |
| The Cardiovascular Care Group PC |
| The Florham Park Endoscopy ASC, LLC |
| The Hanover NJ Endoscopy ASC, LLC |
| The Oakhurst Endoscopy ASC, LLC |
| The West Orange NJ Endoscopy ASC, LLC |
| Toms River Ambulatory Anesthesia, LLC |
| Toms River West Ambulatory Surgery Center, LLC |
| Trinitas Physician Practice, LLC |
| Trinitas Regional Medical Center |
| Union County Healthcare Associates, LLC |
| VNA Health Group of NJ – Barnabas Health Home Care & Hospice |
| VNA Health Group of NJ – Barnabas Health Home Care & Hospice |
| VNA Health Group of NJ – VNA of Central Jersey Home Care & Hospice |
| VNA Health Group of NJ – VNA of Central Jersey Home Care & Hospice |
| VNA Health Group of NJ – VNA of Central Jersey Home Care & Hospice |
| West Orange ASC, LLC |

**APPENDIX H**

| University of Florida Health Corporation[1] |
|---|
| College of Dentistry |
| College of Health and Health Professions |
| FCPA |
| Flagler Health + Imaging |
| Flagler Health + Orthopedic Specialists |
| Flagler Health + Pediatrics |
| Flagler Health + Primary Care |
| Flagler Health + Surgical Specialists |
| Flagler Hosp & MuraBella UCCs |
| Infusion Center for Women @ Shands Jacksonville |
| Leesburg Regional Medical Center Physician Services LLC |
| Pathology Services Alliance, LLC |
| Shands at Vista |
| Shands Jacksonville Medical Center D/B/A: UF Health North |
| Shands Jacksonville Medical Center-Clinical Center D/B/A: UF Health Jacksonville |
| Shands Jacksonville Transitional Care Unit |
| Shands JAX |
| Shands Nutrition |
| ShandsCair (Commercial/Medicare) |
| ShandsCair (Medicaid) |
| UF Health Alliance Laboratory |
| UF Health Breast Imaging Center - Emerson |
| UF Health Breast Imaging Center - Jacksonville |
| UF Health Center for Autism and Neurodevelopment |
| UF Health Dermatology Lab at Springhill (FCPA) |
| UF Health Diabetes Education and Nutrition |
| UF Health Dialysis - Shands Hospital (Peds) |
| UF Health Dialysis Center |
| UF Health Dorothy - Mangurian Neuroimaging Suite |
| UF Health Emergency & Urgent Care Center - Baymeadows |
| UF Health Emergency & Urgent Care Center - Lane Avenue |
| UF Health Emergency & Urgent Care Center - New Kings |
| UF Health Emergency / Urgent Care Clermont |
| UF Health Emergency / Urgent Care Eustis Mt. Dora |
| UF Health Endoscopy Center |
| UF Health Family Medicine - Magnolia Parke |
| UF Health Flagler Hospital |

[1] The list of entities and/or provider DBA names on Appendix H is based upon reasonable diligence and current knowledge. Each entity listed may have multiple NPIs. Plaintiffs reserve the right to amend or supplement this Appendix.

| University of Florida Health Corporation[1] |
|---|
| UF Health Florida Recovery Center |
| UF Health Florida Surgical Center/Children's Surgical Center |
| UF Health Hearing Center - The Oaks |
| UF Health Heart & Vascular Hospital |
| UF Health Imaging Center - Baymadows |
| UF Health Imaging Center - Emerson |
| UF Health Imaging Center - Wildlight |
| UF Health Imaging Center Annex - Jacksonville |
| UF Health Infusion Center - Jacksonville |
| UF Health Infusion Center - Medical Plaza |
| UF Health Infusion Center – North |
| UF Health Interventional Radiology - Jacksonville |
| UF Health Jacksonville Home Care |
| UF Health Jacksonville Outpatient Surgery Center |
| UF Health Leesburg Hospital |
| UF Health Leesburg Hospital Urgent Care Center |
| UF Health Lessburg Hospital Senior Behavioral Health Center |
| UF Health Medical Dermatology - Springhill |
| UF Health Medical Lab - Medical Plaza (infusion center) Shands |
| UF Health Medical Lab - Rocky Point Lab |
| UF Health Medical Lab - Springhill |
| UF Health Medical Lab-Tower Hill |
| UF Health Neuromedicine - Fixel Institute |
| UF Health Neuromedicine Hospital |
| UF Health Ocala Neighborhood Hospital |
| UF Health Oncology - Baymeadows |
| UF Health Oncology - Fernandina |
| UF Health Oncology - LaVilla |
| UF Health Oncology - Orange Park |
| UF Health Outpatient Surgery – North |
| UF Health Outreach Lab - Emerson |
| UF Health Pain Management |
| UF Health Pain Management Center - Jacksonville |
| UF Health Pathology & Laboratory Medicine - Jacksonville |
| UF Health Pathology & Laboratory Medicine – North |
| UF Health Pathology Lab (FCPA) |
| UF Health Pediatric Cardiac MRI/CT Center at the University of Florida |
| UF Health Pediatric Pulmonary Center-Medical Plaza |
| UF Health Psychiatric Hospital/Vista |
| UF Health Pulmonary Center - Medical Plaza |
| UF Health Radiation Oncology - Davis Cancer Pavilion |
| UF Health Radiation Oncology - Jacksonville |
| UF Health Radiology - Jacksonville |
| UF Health Radiology - JTB Kerman |

| University of Florida Health Corporation[1] |
| --- |
| UF Health Radiology - Medical Plaza |
| UF Health Radiology - North |
| UF Health Radiology - OSMI |
| UF Health Radiology - Shands Hospital |
| UF Health Radiology - The Oaks |
| UF Health Radiology - World Equestrian Center |
| UF Health Rehab - Student Care Center |
| UF Health Rehab Center - Davis Cancer Pavilion |
| UF Health Rehab Center - Haile Plantation |
| UF Health Rehab Center - Magnolia Parke |
| UF Health Rehab Center - OSMI & OSM/Ortho |
| UF Health Rehab Center for Kids - Magnolia Parke |
| UF Health Rehabilitation - Emerson |
| UF Health Rehabilitation - Jacksonville |
| UF Health Rehabilitation – North |
| UF Health Rehabilitation - Wildlight |
| UF Health Respiratory Therapy – North |
| UF Health Shands Cancer Hospital |
| UF Health Shands Children's Hospital |
| UF Health Shands Emergency Center - Kanapaha |
| UF Health Shands Emergency Center - Springhill |
| UF Health Shands HomeCare |
| UF Health Shands Hospital |
| UF Health Sleep Center |
| UF Health Sleep Center - Jacksonville |
| UF Health Spanish Plaines Hospital (fka UF Health The Villages Hospital) |
| UF Health Spanish Plaines Hospital Freestanding ER (fka UF Health The Villages Hospital Brownwood Freestanding ER) |
| UF Health Spanish Plaines Rehabilitation Hospital (fka UF Health The Villages Hospital Rehabilitation Hospital) |
| UF Health Speech & Hearing Center - Shands Hospital |
| UF Health St. Johns Home Care |
| UF Health Surgical Center - The Oaks |
| UF Health Urgent Care - Flagler Hospital |
| UF Health Urgent Care - MuraBella |
| UF Health Urgent Care - Wildlight |
| UF Health Urgent Care Center - Eastside |
| UF Health Women's and Diagnostic Imaging-Springhill |
| UF Health Wound Care and Hyperbaric Center at Magnolia Park |
| UFJPI |
| University of Florida College of Nursing |
| Villages Regional Hospital Physician Services LLC |

H3

## APPENDIX I

| **The University of Chicago Medical Center**[1] |
| --- |
| Ingalls – Calumet City Infusion Center |
| Ingalls – Flossmoor |
| Ingalls – Harvey |
| Ingalls – Tinley Park Cancer Center |
| Ingalls – Tinley Park Infusion |
| Ingalls Hospice |
| Ingalls Memorial Hospital |
| Ingalls Memorial Hospital  – Inpatient |
| Ingalls Memorial Hospital Medicaid |
| Ingalls Memorial Hospital Pediatrics |
| Ingalls Memorial Hospital Professional billing |
| Ingalls Memorial Hospital Psychiatric |
| Ingalls Memorial Hospital Rehabilitation |
| Ingalls Outpatient Pharmacy |
| Ingalls Private Duty Nursing |
| Ingalls Same Day Surgery |
| River East Ambulatory Infusion Center |
| The University of Chicago Medical Center |
| The University of Chicago Physicians Group |
| The University of Chicago Physicians Group (Urgent Care) |
| Tinley Park Ambulatory Infusion Center |
| UChicago Medicine Crown Point Ambulatory Surgery Center |
| UChicago Medicine Northwest Indiana INC |
| UCM DCAM |
| UCM ED Pharmacy |
| UCM Home Care (formerly Ingalls Home Care) |
| UCM Medical Group Sub, LLC (formerly Primary Healthcare Associates, S.C.) |
| UCM Medical Group Sub, LLC (formerly Primary Healthcare Associates, S.C.) |
| UCMC – Crown Point |
| UCMC – Inpatient |
| UCMC Cancer Care Chesterton |
| UCMC Cancer Care Valparaiso |
| UCMC Northbrook |
| UCMC Orland Park |
| UCMC Pharmacy Service Home Infusion |
| UCMC Pharmacy Services |

---

[1] The list of entities and/or provider DBA names on Appendix I is based upon reasonable diligence and current knowledge.  Each entity listed may have multiple NPIs.  Plaintiffs reserve the right to amend or supplement this Appendix.

| The University of Chicago Medical Center[1] |
| --- |
| UCMC River East |
| UCMC Silver Cross |
| University of Chicago Medical Center |
| University of Chicago Medical Center |
| University of Chicago Medical Center  – Comer Children's Hospital |
| University of Chicago Medical Center  – DCAM Professional billing |
| University of Chicago Medical Center Northwest Indiana Cancer Center |

## <u>APPENDIX J – LIST OF BLUES</u>

"Blues" means the following entities, which are also referenced internally by Defendants as "Primary Licensees."  Shorthands defined for Blues in Complaint § IV.B (which may include subsidiary/(ies) or affiliate(s) of the Blue in the defined shorthand) are included.

1. Aware Integrated, Inc. ("BCBS-MN")

2. Blue Cross and Blue Shield of Alabama ("BCBS-AL")

3. Blue Cross and Blue Shield of Kansas City ("BCBS-KC")

4. Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS")

5. Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA")

6. Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBS-MI")

7. Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company ("BCBS-MS")

8. Blue Cross and Blue Shield of North Carolina ("BCBS-NC")

9. Blue Cross & Blue Shield of Rhode Island ("BCBS-RI")

10. Blue Cross and Blue Shield of South Carolina ("BCBS-SC")

11. BlueCross BlueShield of Tennessee, Inc. ("BCBS-TN")

12. Blue Cross and Blue Shield of Wyoming ("BCBS-WY")

13. California Physicians' Service ("BS-CA")

14. Cambia Health Solutions, Inc. ("Cambia")

15. Capital Blue Cross ("Capital")

16. CareFirst, Inc. ("CareFirst")

17. Elevance Health Inc. ("Elevance")

18. Gemstone Holidngs, Inc. ("BC-ID")

19. GoodLife Partners, Inc. ("BCBS-NE")

20. GuideWell Mutual Holding Corporation ("Guidewell")

21. Hawaii Medical Service Association ("BCBS-HI")

22. Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC")

23. HealthyDakota Mutual Holdings ("BCBS-ND")

24. Highmark Inc. ("Highmark")

25. Horizon Healthcare Services, Inc. ("BCBS-NJ")

26. Independence Health Group, Inc. ("Independence")

27. Lifetime Healthcare, Inc. ("Excellus")

28. Louisiana Health Service & Indemnity Company ("BCBS-LA")

29. PREMERA ("Premera")

30. Prosano, Inc. ("BCBS-AZ")

31. USAble Mutual Insurance Company ("BCBS-AR")

32. Wellmark, Inc. ("Wellmark")